# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re:                                          :
                                                :
Philadelphia Newspapers, LLC, *et al.*,[1]      :    CIVIL ACTION NO.  09-mc-00178
                            Debtors.            :
                                                :
                                                :
                                                :

### BRIEF OF APPELLANTS
### PHILADELPHIA NEWSPAPERS, LLC, *ET AL.*

DILWORTH PAXSON LLP
Lawrence G. McMichael
Christie Callahan Comerford
Catherine G. Pappas
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
Telephone:  (215) 575-7000
Facsimile:  (215) 575-7200
*Co-Counsel for the Debtors*

-and-

PROSKAUER ROSE LLP
Mark K. Thomas
Paul V. Possinger
Peter J. Young
Three First National Plaza
70 West Madison, Suite 3800
Chicago, Illinois  60602-4342
Telephone:  (312) 962-3550
Facsimile:  (312) 962-3551
*Co-Counsel for the Debtors*

---

[1]    The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  PMH Acquisition, LLC (1299), Broad Street Video, LLC (4665), Philadelphia Newspapers, LLC (3870), Philadelphia Direct, LLC (4439), Philly Online, LLC (5185), PMH Holdings, LLC (1768), Broad Street Publishing, LLC (4574), Philadelphia Media, LLC (0657), and Philadelphia Media Holdings, LLC (4680).

## <u>TABLE OF CONTENTS</u>

I.    STATEMENT OF APPELLATE JURISDICTION ............................................................1

II.   STATEMENT OF ISSUE PRESENTED AND STANDARD OF REVIEW ....................3

III.  STATEMENT OF THE CASE.........................................................................................3

IV.   ARGUMENT ...................................................................................................................8

     A.    Summary of Argument ........................................................................................8

     B.    The Bankruptcy Court Erred in Denying that Provision of the Debtors'
           Bid Procedures Motion Which Requires the Lenders to Bid Cash, Not
           Debt, at the Auction Sale Contemplated by the Debtors' Plan............................10

          1.    The Rules of Statutory Construction.........................................................10

          2.    The Bankruptcy Code is Clear and Unambiguous in that it
               Provides Alternate Avenues to Plan Confirmation, in the Context
               of a Plan Sale, that Do Not Always Grant Secured Lenders Credit
               Bid Rights ...............................................................................................11

          3.    Relevant Case Law Supports the Debtors' Argument that Plan Sales
               Are Not Exclusively Governed by Subsection (ii)....................................16

          4.    The Bankruptcy Court Improperly Resorted to the Legislative
               History of a Section of the Bankruptcy Code that is Not
               Applicable to this Case.............................................................................23

          5.    The Consequences of the Bankruptcy Court's Decision Are to Undermine
               the Debtors' Ability to Reorganize..........................................................26

V.    CONCLUSION...............................................................................................................31

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

American Tobacco Co. v. Patterson, 456 U.S. 63 (1982)................................................ 10

Bobb v. Attorney General of U.S., 458 F.3d 213 (3d Cir. 2006).................................... 15

Commissioner v. Brown, 380 U.S. 563, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965)............................ 25

Connecticut Nat'l Bank v. Germain, 503 U.S. 249 (1992) ...................................... 11, 13

CoreStates Bank, N.A. v. United Chemical Tech., Inc., 202 B.R. 33 (E.D. Pa. 1996) ......... 22, 23

Garcia v. United States, 469 U.S. 70 (1984), reh'g denied 469 U.S. 1230 (1985) ...................... 11

Griffin v. Oceanic Contractors, Inc., 458 U.S. 564 (1982)........................................ 25

H&M Parmely Farms v. Farmers Home Admin., 127 B.R. 644 (D.S.D. 1990)........................... 17

Haggar Co. v. Helvering, 308 U.S. 389, 60 S.Ct. 337, 84 L.Ed. 340 (1940) ............................... 25

In re 222 Liberty Assocs., 105 B.R. 798 (Bankr. E.D. Pa. 1989)..................................... 17

In re Amatex Corp., 755 F.2d 1034, 1039 (3d Cir. 1985), cert. denied 109 S. Ct. 137 (1988) .. 1, 2

In re Arnold & Baker Farms, 85 F.3d 1415 (9th Cir. 1996) ........................................ 16

In re Briscoe Enterprises, Ltd., II, 994 F.2d 1160 (5th Cir. 1993)................................. 15

In re Camden Ordnance Mfg. Co. of Arkansas, Inc., 245 B.R. 794 (E.D.Pa. 2000) ................... 10

In re Combustion Eng'g, Inc., 391 F.3d 190 (3d Cir. 2004) .................................... 13, 14

In re Criimi Mae, 251 B.R. 796 (Bankr. D. Md. 2000) ............................................. 18

In re Gillcrese, 346 B.R. 373 (Bankr. W.D. Pa. 2006) ............................................ 11

In re Kent Terminal Corp., 166 B.R. 555 (Bankr. S.D.N.Y. 1994)............................... 17

In re Klayman, 333 B.R. 695 (Bankr. E.D. Pa. 2005) ............................................. 10

In re Marilyn Steinberg Enterprises Inc., 141 B.R. 587 (Bankr. E.D. Pa. 1992)....................... 10

In re Market Square Inn, Inc., 978 F.2d 116 (3d Cir. 1992)......................................... 2

In re Matrix Dev. Corp., 2009 WL 2169717 (Bankr. D. Or. July 16, 2009) ............................ 17

In re Mehta, 310 F.3d 308 (3d Cir. 2002)......................................................... 24

ii

In re Orfa Corp., Nos. 90-11253S, 90-11254S, 90-11255S,
    1991 WL 225985 (Bankr. E.D. Pa. Oct. 30, 1991) .................................................. 17

In re Pacific Lumber Co., __ F.3d __, 2009 WL 3082066 (5th Cir. Sept. 29, 2009) ............ passim

In re Realty Investments, Ltd. V, 72 B.R. 143 (Bankr. C.D. Cal. 1987) ..................................... 17

In re River Village, 181 B.R. 795 (E.D. Pa. 1995) ....................................................................... 17

In re SunCruz Casinos, LLC, 298 B.R. 833 (Bankr. S.D. Fla. 2003).......................................... 17

In re Telegroup, Inc., 281 F.3d 133 (3d Cir. 2002)........................................................................ 3

In re Trans World Airlines, Inc., 145 F.3d 124 (3d Cir. 1998)....................................................... 3

In re United Healthcare System, Inc., 396 F.3d 247 (3d Cir. 2005) .............................................. 3

Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997) ................................................................. 10

Ross v. Hotel Employees and Restaurant Employees International Union,
    266 F.3d 236, 245 (3d Cir. 2001) .......................................................................... 10

TRW v. Andrews, 534 U.S. 19 (2001) ......................................................................................... 14

Union Bank v. Wolas, 502 U.S. 151 (1991) ................................................................................ 11

United States v. Katz, 271 U.S. 354, 46 S.Ct. 513 , 70 L.Ed. 986 (1926).................................. 25

United States v. Ron Pair Enterprises, Inc., 489 U.S. 235 (1989) ......................................... 10, 24

Wade v. Bradford, 39 F.3d 1126 (10th Cir. 1994)................................................................. 15, 16

## Other Authorities

124 Cong. Rec. 32350 (Sept. 28, 1978)....................................................................................... 25

Daniel P. Winekka and Debra K. Simpson, Will Bankruptcy Courts Limit The Right To Credit
    Bid?, 17 J.Bankr.L. & Prac. 6 (September 2008) ................................................... 30

Resolved: Loan to Own Lenders Should Not Be Allowed To Credit Bid, 0412078 American
    Bankruptcy Institute 85 (25th Annual Spring Meeting, Educational Materials, April 12 – 15,
    2007) ....................................................................................................................... 30

## Rules

Fed. R. Bankr. P. 8003 .................................................................................................................. 1

**Statutes**

11 U.S.C. § 1111 ................................................................................................................ 18

11 U.S.C. § 1123 ................................................................................................................ 11

11 U.S.C. § 1129 ................................................................................................................ 11

28 U.S.C. § 158 .................................................................................................................. 1

28 U.S.C. §1334 ................................................................................................................. 1

28 U.S.C. §157 ................................................................................................................... 1

829884_1

## I.    STATEMENT OF APPELLATE JURISDICTION

The Bankruptcy Court has jurisdiction over the underlying bankruptcy case and this core proceeding under 28 U.S.C. §157(b)(2) and 28 U.S.C. §1334.  Pursuant to 28 U.S.C. § 158(a)(1), the District Court has jurisdiction to adjudicate appeals "from final judgments, orders, and decrees" of the Bankruptcy Court.  Pursuant to 28 U.S.C § 158(a)(3), the District Court may, in its discretion, exercise jurisdiction to adjudicate appeals from interlocutory orders of the Bankruptcy Court.  See Fed. R. Bankr. P. 8003(c).  The Order Denying the Debtors' Motion for an Order: (A) Approving Procedures for the Sale of Certain of the Debtors' Assets; (B) Scheduling an Auction; (C) Approving Assumption and Assignment Procedures; (D) Approving Form of Notice; and (E) Granting Related Relief (the "Bid Procedures Motion"), entered by the Bankruptcy Court on October 8, 2009, is a final order, from which a timely notice of appeal was filed, giving this Court appellate jurisdiction.

The ruling issued by the Bankruptcy Court on October 8, 2009 (the "October 8 Order") is a final order and properly appealable. (P000001-P000006; October 8 Order).  The Bankruptcy Court's decision with respect to the pivotal issue of credit bidding was a purely legal and final determination, premised upon the Bankruptcy Court's interpretation of an unambiguous provision of the Bankruptcy Code.  The credit bid issue is central to the Debtors' proposed Plan and, as acknowledged by the Bankruptcy Court, this central issue could "easily dictate the outcome of the case."  (P000007-P000032; October 8 Op. at 19).  The Third Circuit has long embraced a "pragmatic and less technical" approach to finality of orders in the bankruptcy context.  F/S Airlease II, Inc. v. Simon (In re F/S Airlease II), 844 F.2d 99, 103 (3d Cir. 1988) (quoting In re Amatex Corp., 755 F.2d 1034, 1039 (3d Cir. 1985)), cert. denied 488 U.S. 852 (1988.  This "functional" approach has developed in an effort "to avoid the waste of time and resources that might result from reviewing discrete portions of the [bankruptcy case] only after a

plan of reorganization is approved." In re Amatex, 755 F.2d at 1039. More importantly, review of this issue after the conclusion of the case will be meaningless, as the sale of the Debtors' assets will have been concluded and the plan confirmation hearing scheduled for December 4, 2009, will be completed. Consequently, as this legal issue is of critical importance to all parties in these cases, meaningful appellate review now is imperative.

In the context of the pragmatic approach to finality, courts in this Circuit consider a variety of factors including "the impact of the matter on the assets of the bankruptcy estate, the preclusive effect of a decision on the merits, and whether the interests of judicial economy will be furthered," In re F/S Airlease II, 844 F.2d at 104, as well as whether the order implicates purely legal issues or leaves additional work to be done by the Bankruptcy Court. See Hylland v. Northwestern Corp. (In re Northwestern Corp.), 319 B.R. 68, 73 (D. Del. 2005). Paramount among such considerations is the impact upon the assets of the bankruptcy estate. See In re Market Square Inn, Inc., 978 F.2d 116, 120 (3d Cir. 1992).

Application of the factors that guide the "pragmatic" inquiry into finality unquestionably points to the finality of the October 8 Order in the instant case. The question of whether the senior secured lenders (the "Lenders") will have the opportunity to credit bid at the auction sale contemplated by the Debtors' Plan will substantially impact upon the assets of the bankruptcy estate, as the answer to that question may well dictate the bidder to whom those assets are sold, whether the auction is a reliable determination of the fair market value of the assets, and correspondingly what distributions contemplated by the Debtors' Plan can be made. Further, with respect to the issue at bar, there is no further work to be done by the Bankruptcy Court. The Bankruptcy Court issued its determination on this question in such a way that it is clear that the court below has finally determined this discrete and critical issue, largely due to the fact that its

2

decision involved exclusively a question of law. For these reasons, and because the determination of this issue will, as the Court below itself acknowledged, likely dictate the outcome of these cases, the October 8 Order is final and immediately appealable, the appeal of which confers appellate jurisdiction on this Court.

## II.    STATEMENT OF ISSUE PRESENTED AND STANDARD OF REVIEW

The Debtors present the following issue on appeal:

*Whether the Bankruptcy Court erred in denying that provision of the Debtors' Bid Procedures Motion which requires a bid by the Lenders to be made in cash in the same manner as all prospective bidders, and precludes a credit bid at the auction sale contemplated by the Debtors' proposed plan of reorganization.[2]*

The Bankruptcy Court committed a legal error in denying the credit bid prohibition in the Debtors' Bid Procedures Motion. The District Court reviews the Bankruptcy Court's legal determinations de novo. See In re United Healthcare System, Inc., 396 F.3d 247, 249 (3d Cir. 2005) (quoting In re Trans World Airlines, Inc., 145 F.3d 124, 130-31 (3d Cir. 1998)). See also In re Telegroup, Inc., 281 F.3d 133, 136 (3d Cir. 2002) ("[T]his appeal presents a pure question of law, which [is] review[ed] de novo.").

## III.    STATEMENT OF THE CASE

The Debtors, other than Philadelphia Media Holdings, LLC ("PMH"), commenced voluntary cases under Chapter 11 of the Bankruptcy Code on February 22, 2009 (the "Petition Date"). PMH filed its petition for relief under Chapter 11 of the Bankruptcy Code on June 10, 2009 and its Chapter 11 case has been procedurally consolidated with the Debtors' other Chapter 11 cases.

---

[2]    As discussed with this Court at the conference on October 15, 2009, the issues arising from the Bankruptcy Court's denial of the break-up fee and expense reimbursement in the same October 8, 2009 Order will be briefed separately on a schedule to be set by the Court.

Prior to the commencement of these cases, one or more of the Lenders unlawfully recorded a confidential settlement meeting with the Debtors. The Debtors contend that these Lenders retaliated against the Debtors after the Debtors insisted that this unlawful recording be properly reported. After these cases were commenced, the Debtors applied for the retention of special counsel to advise them of their rights, and as to the impact of these illegal activities on the senior secured claims of these Lenders. That application was denied by the Bankruptcy Court, which directed that the investigation be conducted instead by the Official Committee of Unsecured Creditors (the "Committee").

That ruling by the Bankruptcy Court resulted in an appeal to this Court which partially reversed the determination of the Bankruptcy Court. This Court directed that the Debtors be allowed to retain special counsel, and that the Debtors' special counsel should be kept updated on the progress of the investigation so that the Debtors could be properly advised about these matters, which this Court characterized as an important "arrow" in the Debtors' "quiver."

The Committee conducting the investigation, however, continued to freeze the Debtors and their special counsel out of the investigation that was supposedly being undertaken. Later, the Debtors brought to the attention of the Bankruptcy Court the fact that the investigation appeared to be a sham, and that the Committee would not even advise the Debtors or their special counsel as to the progress of that investigation. The Bankruptcy Court reviewed the investigation work product of the Committee, saw that no depositions were taken, no internal emails or other key records were requested or produced from the Lenders in relation to the illegal recording or its retaliatory aftermath, and that the Debtors and their special counsel were improperly frozen out of the investigation altogether, contrary to this Court's ruling. The Bankruptcy Court proclaimed that the Committee made "a fine mess" of the investigation.

4

(P000033-P000241; Aug. 18, 2009 Hrg. Tr. at 59:17-18). No further progress has been made on this matter to date. The Debtors still do not know what impact the Lenders' illegal conduct will have on the validity or extent of the claims of the Lenders involved, nor has the Bankruptcy Court decided how the defective investigation will be remedied.

On August 20, 2009, the Debtors filed their Joint Chapter 11 Plan of Reorganization (the "Plan") and corresponding Disclosure Statement. The Debtors' Plan calls for an auction sale (the "Plan Sale") of substantially all of the Debtors' assets, excluding certain real property that will be transferred to the Lenders. In contemplation of that Plan Sale, the Debtors executed an Asset Purchase Agreement (the "Stalking Horse Agreement") with Philly Papers, LLC, as purchaser. The Stalking Horse Agreement was filed with the Debtors' Disclosure Statement on August 20, 2009.

Under the Stalking Horse Agreement and the Plan, the Stalking Horse will pay to the Debtors' estates a cash purchase price of $30,000,000, in addition to an estimate of assumed obligations that would bring the total purchase price to approximately $43,000,000 (including payment of $4,000,000 in administrative expenses and priority claims). After payment of certain other obligations, the sale proceeds plus cash on hand will be used to make a cash distribution to the Lenders of approximately $35,000,000.

In connection with the Stalking Horse Agreement and the Plan Sale, the Debtors filed their Bid Procedures Motion on August 28, 2009. (P000242-P000339). The Bid Procedures Motion sets out the proposed Bid Procedures to govern the Plan Sale, which, inter alia, provide that all bidders, including the Lenders, must bid in cash and that the Lenders cannot submit credit bids at the Plan Sale. This provision is essential, because the cash proceeds from the winning bidder following the auction will be used to fund the Debtors' Plan under Section 1129 of the

5

Bankruptcy Code, because not all participants in the senior secured debt may want to credit bid, and because the recording investigation has not been completed and the validity of certain of the Lenders' claims has not been determined. This provision is also permitted by law, as detailed below, because the Debtors' Plan Sale is to be conducted pursuant to Sections 1123 and 1129 of the Bankruptcy Code, not Section 363, and the Debtors have the option of requiring all bids to be in cash by proceeding under Section 1129(b)(2)(A)(iii) of the Bankruptcy Code. Accordingly, because the estates require cash to fund the Plan, and because the investigation into the impact of the recording incident on the Lenders' claims is not complete, the Debtors are not proceeding under Section 1129(b)(2)(A)(ii), which incorporates Section 363(k) and provides the Lenders with the right to credit bid their claims. Rather, the Debtors intend to confirm their Plan under Section 1129(b)(2)(A)(iii), which provides no right to credit bid.

The Debtors have secured the Stalking Horse bidder to set the floor for and encourage bidding at the Plan Sale. The Debtors believe that the cash payment to the Lenders resulting from the Stalking Horse Agreement constitutes fair market value for their assets and, together with an aggressive marketing effort to encourage competitive bidding at the Plan Sale, will bring a successful conclusion to the Debtors' Chapter 11 cases. The Debtors have retained an independent investment banker and former Third Circuit judge to act as Sale Monitors to ensure the transparency and competitiveness of the auction. As such, this auction is assuredly going to be open and fair and will establish the value of the senior secured claims as a matter of law.

On October 1, 2009, following the submission of briefs, the Bankruptcy Court heard argument on the credit bidding and break-up fee provisions of the Bid Procedures Motion. At the hearing, the Lenders and the Committee argued that the Lenders have a right to credit bid at any sale of their collateral, and, as in their papers, relied upon the legislative history of sections

6

of the Bankruptcy Code inapplicable to this case to support that assertion. The Debtors maintain that the statute is unambiguous, and provides options for confirmation of a plan of reorganization that contemplates a sale of secured lenders' collateral even in the absence of the opportunity for those lenders to credit bid.

Just days before the October 1, 2009 hearing on this hotly contested element of the Debtors' Plan Sale, the Fifth Circuit Court of Appeals, on September 29, 2009, rendered an opinion on the very credit bid issue that the parties in the instant case were arguing to the Bankruptcy Court. See In re Pacific Lumber Co., __ F.3d __, 2009 WL 3082066 (5th Cir. Sept. 29, 2009). The Bankruptcy Court permitted the parties to supplement their briefing to address any developments highlighted by Pacific Lumber. Pacific Lumber, while not controlling in this Circuit, is the first Circuit Court opinion to address the issue of credit bidding and its interplay with the Bankruptcy Code provisions of Section 1129(b)(2)(A) and a plan sale.

On October 8, 2009, the Bankruptcy Court issued an Opinion and Order regarding the Bid Procedures Motion, denying the provision of the Bid Procedures Motion that prohibits the Lenders from credit bidding their debt, and also denying the proposed break-up fee and expense reimbursement provisions.

On October 9, 2009, in a conference with the principal parties, the Bankruptcy Court set November 16, 2009 as the bid deadline and November 18, 2009 as the date for the auction sale. On October 13, 2009, the Debtors filed a Notice of Appeal from the Bankruptcy Court's October 8, 2009 Order on the Bid Procedures Motion. Given that the dates for the bid deadline and auction are rapidly approaching, and considering that the currency in which bids come will substantially impact the Debtors' Plan and the course of these cases, on October 13, 2009, the

Debtors sought and obtained this Court's expedited consideration of the credit bid issue on appeal.

## IV.    ARGUMENT

### A.    Summary of Argument

The Debtors have gone to great lengths to construct a truly fair and equitable Plan for all relevant constituencies, including the Lenders.  The Plan calls for transferring the real estate collateral in kind to the Lenders and providing them with cash equal to the value of their secured claim on the Debtors' other assets.  The value is set by a public auction conducted after a thorough marketing process, which will be monitored by one of the most well-respected jurists in the region, Arlin Adams, and a financial advisor with much experience in bankruptcy restructurings, J. Scott Victor.  The Debtors have entered into an asset purchase agreement with a Stalking Horse comprised of both new and old equity holders to set the floor for the competitive bidding, which the Debtors believe is already in excess of fair market value for the assets being sold.  The Debtors' Plan provides that the Lenders will receive the indubitable equivalent of the value of the secured claim by paying it to the Lenders in cash.  The Debtors have the right to put that Plan before the Lenders and other creditors for a vote.

The Debtors' Plan, however, suffered a major set-back when the Bankruptcy Court issued the October 8 Order.  The Bankruptcy Court declined to approve a provision in the Debtors' Bid Procedures for the auction that required all bidders, including the Lenders, to bid in cash, not in debt.  In doing so, the Bankruptcy Court ignored the unambiguous, plain language of Section 1129(b)(2)(A), misapplied canons of statutory construction and improperly considered legislative history regarding a section of the Code that all parties concede does not apply to the Lenders.

The effect of the Bankruptcy Court's decision is to gut the Debtors' Plan.  The entire premise of the Debtors' Plan involves a cash payment to the Lenders and the unsecured creditors.

8

A credit bid by the Lenders, which they have indicated they intend to make, does not provide any cash to fund the Debtors' Plan, potentially rendering it unconfirmable.  A credit bid raises numerous other issues involving fairness to those Lenders who may not want to be in the newspaper business but who will be forced to have their portion of the debt credit bid if 51% of the Lenders choose to do so.  Finally, two of the largest Lenders were involved in the illegal recording incident that has been the subject of significant litigation in the Bankruptcy Court and in this Court.  As a condition of receiving much-needed debtor-in-possession financing, the Lenders demanded that the parties defer the investigation into that illegal conduct and potential litigation until January 2010, which the parties did.  Now that the Bankruptcy Court has ruled that the Lenders have the right to credit bid, there are serious issues regarding what rights the Lenders involved in the illegal conduct should be permitted to have with respect to the credit bid. For example, is it appropriate for these Lenders to be counted toward the 51% requirement necessary to direct the Agent to credit bid their claim even though these Lenders' claim may well be subject to equitable subordination?  Similarly, should the Agent be permitted to credit bid the amount of these Lenders' portion of the debt?  Simply put, the Bankruptcy Court's decision raises numerous issues that would not arise absent a right to credit bid.

Since the Debtors have the right to propose a Plan with an all cash auction under Section 1129(b)(2)(A)(iii), the Bankruptcy Court erred in not approving the Debtors' Bid Procedures, effectively forcing the Debtors to change their Plan.

**B.**    **The Bankruptcy Court Erred in Denying that Provision of the Debtors' Bid Procedures Motion Which Requires the Lenders to Bid Cash, Not Debt, at the Auction Sale Contemplated by the Debtors' Plan.**

**1.**    **The Rules of Statutory Construction**

The first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning.  "The inquiry must stop if the statutory language is unambiguous and the statutory scheme is coherent and consistent." In re Camden Ordnance Mfg. Co. of Arkansas, Inc., 245 B.R. 794, 803 (E.D.Pa. 2000) (citing Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997)).  "[The] starting point must be the language employed by Congress, ... and [courts] assume that the legislative purpose is expressed by the ordinary meaning of the words used." American Tobacco Co. v. Patterson, 456 U.S. 63, 68 (1982) (citations omitted). The precise language at issue is to be given its plain meaning unless the statute specifically provides for a different meaning.  In re Klayman, 333 B.R. 695, 700 (Bankr. E.D. Pa. 2005).

Binding precedent routinely holds that "[o]nly if the statute is ambiguous or unclear should a court consider legislative history for interpretive guidance." Ross v. Hotel Employees and Restaurant Employees International Union, 266 F.3d 236, 245 (3d Cir. 2001).  See, e.g., United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 241 (1989) ("The task of resolving the dispute over the meaning of [11 U.S.C.] § 506(b) begins where all such inquiries must begin: with the language of the statute itself") ("the language before us expresses Congress' intent ... with sufficient precision so that reference to legislative history and to pre-Code practice is hardly necessary");  In re Marilyn Steinberg Enterprises Inc., 141 B.R. 587, 593 (Bankr. E.D. Pa. 1992) ("courts must presume that a legislature says in a statute what it means and means in a statute what it says there.... When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete") (citations omitted) (quoting Connecticut Nat'l Bank v.

10

*Germain*, 503 U.S. 249, 253-54 (1992)); <u>Union Bank v. Wolas</u>, 502 U.S. 151, 159 (1991) (no

inquiry into Congressional intent when the statute is clear on its face).

The rule barring resort to the legislative history of an unambiguous statute holds true

regardless of whether the Lenders find support in the legislative history, because "general

legislative intent cannot overcome specific, unambiguous statutory language." <u>In re Gillcrese</u>,

346 B.R. 373, 376 (Bankr. W.D. Pa. 2006) (finding that "[a]lthough the movant's interpretation

finds some support in the relevant legislative history and the overall construction of Section

362(c)," this did not justify a departure from the "'plain meaning' of the statutory language")

(<u>citing</u> <u>Garcia v. United States</u>, 469 U.S. 70, 73 (1984), reh'g denied 469 U.S. 1230 (1985)).

Based upon the rules of statutory construction discussed above, and as will be shown by

the detailed discussion below of the relevant statutory provisions at issue, the plain language of

the Bankruptcy Code provides that the Lenders should not have the ability to credit bid at the

Plan Sale.

> **2.      The Bankruptcy Code is Clear and Unambiguous in that it
> Provides Alternate Avenues to Plan Confirmation, in the
> Context of a Plan Sale, that Do Not Always Grant Secured
> Lenders Credit Bid Rights.**

The Debtors have determined to conduct the sale of their business and substantially all

their assets pursuant to a Plan under Sections 1123(a) and (b), which govern the required

contents of a plan, and 1129 of the Bankruptcy Code, which provides the benchmarks necessary

for its confirmation.   <u>See</u> 11 U.S.C. §§1123, 1129.   Specific to the case at bar, Section

1129(b)(2)(A) sets out the criteria for confirmation of a "cramdown" plan, that is a plan that may

be confirmed as fair and equitable notwithstanding secured creditors' objections.   As is apparent

from the language of the statute itself, the right to credit bid – which is codified in Section 363(k)

of the Bankruptcy Code – only arises under a plan sale when Section 1129(b)(2)(A)(ii) is

11

invoked.  The Debtors' Plan, however, proposes to proceed under 1129(b)(2)(A)(iii), an obvious and meaningful alternative and one that does not implicate Section 363.  Section 1129(b)(2)(A) provides that

> For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
>
> (A) With respect to a class of secured claims, **the plan provides**—
>
> (i)      (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;
>
> (ii)      for the sale, subject to section 363 (k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; *or*
>
> (iii)      **for the realization by such holders of the indubitable equivalent of such claims**.

11 U.S.C. §1129(b)(2)(A)(emphasis added).

Consistent with this Section, the Debtors' Plan provides for the realization of the indubitable equivalent of the Lenders' claims under Section 1129(b)(2)(A)(iii).   Since only subsection (ii), not the applicable subsection (iii), provides for a right to credit bid under Section 363(k), the provision of the Debtors' Bid Procedures that does not allow a credit bid option to the Lenders should have been approved by the Bankruptcy Court.

While acknowledging that "where the language of the statute at issue is plain, the sole function of the Court is to enforce it according to its terms" and that Section 1129(b)(2)(A) is "framed in the disjunctive by virtue of the use of the word 'or,'" the Bankruptcy Court nonetheless held that the Debtors could not rely upon the alternative set forth in subsection (iii).

(P000007-P000032; October 8 Op. at 10-11).  According to the Bankruptcy Court, the provisions of 1129(b)(2)(A)(i), (ii), and (iii) do not provide alternatives when the "second of the three described alternatives" speaks directly to the type of auction sale that the Debtors propose.  Id. Of course, that is not what the statute says.

The Bankruptcy Court creates this new requirement that subsection (iii) is not available in a plan sale context by relying upon "a settled canon of statutory construction which dictates that a generic provision of a statute should not be used to achieve a result not contemplated by a more specific provision."  Id.  As an initial matter, "canons of construction are no more than rules of thumb that help courts determine the meaning of legislation, and in interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'"  Connecticut Nat'l Bank v. Germain, 503 U.S. at 253-54 (internal citations omitted).  Here, Section 1129(b)(2)(A) provides three alternative methods for meeting the fair and equitable requirement by using the word "or."  The plain language is clear and that should have ended the Bankruptcy Court's inquiry.

Even if it were appropriate to look beyond the unambiguous language of Section 1129(b)(2)(A), the canon that specific statutory provisions prevail over more general provisions does not apply here because subsection (iii) is no less specific than subsection (ii).  It is not phrased in terms of a general catch-all provision.  Rather, it is one of three specific ways that a debtor can satisfy the fair and equitable requirement.  The case cited by the Bankruptcy Court itself in support of application of this canon of statutory interpretation demonstrates why it does not apply here.  In In re Combustion Eng'g, Inc., 391 F.3d 190, 237 n.50 (3d Cir. 2004), the

13

issue was whether the Bankruptcy Court's general equitable power under Section 105(a) trumped an express limitation regarding the scope of a channeling injunction under Section 524(g). The Third Circuit held that it could not, citing the "well-settled maxim that specific statutory provisions prevail over more general provisions." Id. In contrast, subsection (iii) is not a general provision that the Debtors are attempting to use to evade an express limitation found in another section of the Code. Subsection (ii) is one option available to a debtor; it does not state that any plan contemplating a sale must provide the right to credit bid in order to satisfy the fair and equitable requirement. Congress could have easily imposed such a requirement either in Section 1129 or in Section 1123 but it did not. The Bankruptcy Court erred in imposing such a requirement based upon this inapplicable canon of statutory interpretation.

The other case relied upon by the Bankruptcy Court, TRW v. Andrews, 534 U.S. 19, 31 (2001), for the proposition that a statute should be construed to prevent any portion being superfluous, is likewise inapplicable. As written, in order to satisfy the fair and equitable requirement of Section 1129, a debtor proposing a plan sale has the choice of either proceeding under subsection (ii) and including a right to credit bid at the sale or establishing that the secured creditors will receive the indubitable equivalent of their claim under subsection (iii). Some debtors will undoubtedly choose to proceed under subsection (ii) rather than having to prove that the secured creditors will receive the indubitable equivalent under subsection (iii). This may be especially true in circumstances where the debtor's plan contemplates a private sale that could be subject to criticism for not resulting in fair market value rather than the public auction included within the Debtors' Plan. Other debtors might make the same determination that the instant Debtors did that a public auction is more likely to attract bidders if those bidders cannot be outbid with "house" money.

In any event, a "statute is rendered superfluous only if a general statute can cover every possible circumstance covered by the specific." Bobb v. Attorney General of U.S., 458 F.3d 213, 224 (3d Cir. 2006).  Not every sale under subsection (ii) will necessarily provide the secured creditors with the indubitable equivalent under subsection (iii).  For instance, a private plan sale to a third party with no judicial determination of value, but with a credit bid right, would comply with subsection (ii) but not with subsection (iii).  In fact, if a debtor determines to proceed under either subsection (i) or (ii),  the court need not even consider whether the secured lenders have realized the indubitable equivalent of their claims.  See, e.g., Wade v. Bradford, 39 F.3d 1126, 1130 (10th Cir. 1994) ("[B]ecause the debtors' plan satisfied the requirements of § 1129(b)(2)(A)(i), creditor was not entitled to the 'indubitable equivalent' of his claims as described in § 1129(b)(2)(A)(iii).  These requirements are written in the disjunctive, requiring the plan to satisfy only one before it could be confirmed over creditor's objection."); In re Briscoe Enterprises, Ltd., II, 994 F.2d 1160, 1168 (5th Cir. 1993) ("While this Court has held that simple technical compliance with one of the three options in 1129(b)(2)(A) may not necessarily satisfy the fair and equitable requirement, it has not transformed the 'or' in 1129(b)(2)(A) into an 'and.' As we hold that the plan satisfies 1129(b)(2)(A)(i), we need not attempt to decipher the meaning of 'indubitable equivalent'".).  Accordingly, since subsection (ii) is not coextensive with subsection (iii), subsection (ii) is not rendered superfluous by permitting the Debtors to proceed under subsection (iii) instead of subsection (ii).

In any situation where Congress provides alternative means whereby one can achieve a particular result, the means not utilized in that particular circumstance would be deemed to be superfluous under the Bankruptcy Court's reasoning.  Clearly where, as here, Congress has expressly provided three alternative means for a debtor to establish that its plan is fair and

equitable, it cannot reasonably be said that a debtor is not entitled to proceed under its choice of provisions.  Numerous courts support the Debtors' argument that it can satisfy the fair and equitable requirement by complying with any one of the three subsections of Section 1129(b)(2)(A).  Although the Third Circuit Court of Appeals has not yet addressed the issue, other Courts of Appeal have done so.  While not binding on this Court, these decisions should be regarded as highly persuasive.[3]  See, e.g., See In re Pacific Lumber Co., __ F.3d __, 2009 WL 3082066 (5th Cir. Sept. 29, 2009) ("Three minimum alternatives are provided for secured creditors" in the context of the fair and equitable requirements of 1129(b)(2)(A));  In re Arnold & Baker Farms, 85 F.3d 1415, 1420 (9th Cir. 1996) ("To be 'fair and equitable,' the plan must satisfy, with respect to secured claims, one of the [Section 1129(b)(2)(A)] tests.");  Wade v. Bradford, 39 F.3d at 1130 ("The[] requirements [of 1129(b)(2)(A)] are written in the disjunctive, requiring the plan to satisfy only one before it could be confirmed over creditor's objection.");  In re Briscoe Enterprises, Ltd., II, 994 F.2d at 1168 ("While this Court has held that simple technical compliance with one of the three options in 1129(b)(2)(A) may not necessarily satisfy the fair and equitable requirement, it has not transformed the 'or' in 1129(b)(2)(A) into an 'and.'").

### 3. Relevant Case Law Supports the Debtors' Argument that Plan Sales Are Not Exclusively Governed by Subsection (ii).

In support of its decision to look to legislative history, the Bankruptcy Court cited several cases, none of which actually considered the issue of whether subsection (iii) was clear and unambiguous or support the Bankruptcy Court's position that the "or" in Section 1129(b)(2)(A)

---

[3]    The Bankruptcy Court acknowledged that decisions of other Circuit Courts of Appeal should be highly persuasive.  See (P000007-P000032; October 8 Opinion at 16 n.2) (citing Onyeanusi v. Pan American World Airways, Inc., 767 F.Supp 654, 655 n.1 (E.D. Pa. 1990) ("Absent a decision by its Court of Appeals and a conflict between circuits, a district court should regard the authority of another circuit as "highly persuasive.") (citations omitted).

does not always mean "or."   (P000007-P000032; October 8 Op. at 13).  Nor do the cases cited

by the Bankruptcy Court evidence a cohesive rationale for resorting to legislative history.   In

fact, to the extent there is any common denominator underpinning these cases it is based upon a

purported ambiguity in Section 1111(b), which the Lenders and other objecting parties have

admitted does not apply here. (P000340-P000375; Lender Objection at 10, 11).  Thus, cases

involving disputes regarding whether the Section 1111(b) election should apply to nonrecourse

creditors have no application to these facts.   Indeed, each of the cases relied upon by the

Bankruptcy Court either dealt with the interpretation of Section 1111(b), nonrecourse creditors

and/or relied upon such cases.  See In re 222 Liberty Assocs., 105 B.R. 798 (Bankr. E.D. Pa.

1989) (nonrecourse creditor and Section 1111(b)); In re Orfa Corp., Nos. 90-11253S, 90-11254S,

90-11255S, 1991 WL 225985 (Bankr. E.D. Pa. Oct. 30, 1991) (nonrecourse creditor and Section

1111(b), but still finding that denial of nonrecourse creditor's right to credit bid did not render

plan unconfirmable);  In re River Village, 181 B.R. 795 (E.D. Pa. 1995) (discussing creditor-

proposed plan and relying upon nonrecourse creditor cases);   In re Realty Investments, Ltd. V,

72 B.R. 143 (Bankr. C.D. Cal. 1987) (nonrecourse creditor and Section 1111(b)); In re SunCruz

Casinos, LLC, 298 B.R. 833 (Bankr. S.D. Fla. 2003) (nonrecourse creditor relying upon

nonrecourse creditor cases); In re Kent Terminal Corp., 166 B.R. 555 (Bankr. S.D.N.Y. 1994)

(nonrecourse creditor, Section 1111(b), and relying on nonrecourse creditor cases); H&M

Parmely Farms v. Farmers Home Admin., 127 B.R. 644 (D.S.D. 1990) (misplaced reliance on

nonrecourse and recourse creditor cases and provisions and Section 1111(b)); In re Matrix Dev.

Corp., No. 08-32798-tmb11, 2009 WL 2169717 (Bankr. D. Or. July 16, 2009) (Section 1111(b)

and relying upon nonrecourse creditor cases).  The instant case involves Lenders who have full

17

recourse and whose collateral is proposed to be sold under a plan.  Thus, section 1111(b) does not apply to this case at all.  <u>See</u> 11 U.S.C. §1111(b)(1)(B)(ii).

In contrast to the inapposite cases cited by the Bankruptcy Court, the decisions by the Fifth Circuit in <u>Pacific Lumber</u> and by the bankruptcy court in <u>In re Criimi Mae</u>, 251 B.R. 796, 807-08 (Bankr. D. Md. 2000), should guide this Court, especially since the Fifth Circuit is the only Court of Appeals to have squarely addressed this issue.  As acknowledged by the Bankruptcy Court, since the Third Circuit has not yet addressed this issue, the Court should regard the authority of another Circuit Court of Appeals as "highly persuasive."  (P000007-P000032; October 8 Op. at 16, n. 2 (citations omitted)).

In <u>In re Pacific Lumber Company</u>, the Fifth Circuit Court of Appeals explained that the denial of the ability of secured creditors to credit bid at a sale of their collateral is within the clear contemplation of the alternatives provided in the Bankruptcy Code, and does not affect the confirmability of a plan.  <u>Pacific Lumber</u>, 2009 WL 3082066 at *12.   In so holding, the Fifth Circuit evaluated, <u>inter alia</u>, whether a plan that provided for a private sale of certain secured lenders' collateral without granting those lenders any bid rights at all, let alone credit bid rights, satisfied the fair and equitable requirements of Section 1129.   The Fifth Circuit found that it did, for the very reason the Debtors believe that their Plan can:  because of "the obvious proposition that because the three subsections of § 1129(b)(2)(A) are joined by the disjunctive 'or', they are alternatives . . . . [and] Clause (iii) thus affords a distinct basis for confirming a plan if it offered the [secured creditors] the 'realization of the indubitable equivalent of [their] claims.'"  <u>Id.</u> at *9. The Fifth Circuit expressly rejected the creditors' arguments (and the Bankruptcy Court's rationale in this case) that permitting the plan sale to be confirmed under subsection (iii) would violate the statutory canons that (1) a generic provision of a statute should not be used to achieve

18

a result not contemplated by a more specific provision and (2) a statute should be construed to prevent any portion being superfluous.  Id.  The Fifth Circuit emphasized that, although "Clause (ii) could have applied," the possible application of Clause (ii) to a plan sale does not, due to the disjunctive nature of the statute, mandate the exclusive application of Clause (ii) to a plan sale. Id. at *8-9 (emphasis added).  Similarly, here, although the Debtors could have determined to proceed under subsection (ii) and include the right to credit bid in their Bid Procedures, they were not required to do so.

Despite recognizing that "[c]ertain of the legal issues on appeal in Pacific Lumber are strikingly similar to ones herein," the Bankruptcy Court refused to follow the holding in Pacific Lumber.  (P000007-9000032; October 8 Op. at 17).  The Bankruptcy Court distinguished Pacific Lumber on three grounds.  First, the Bankruptcy Court noted that the Fifth Circuit's decision mentioned that "in some cases provision of a credit bid option to a dissenting secured creditor might be 'imperative.'"  Id.  The Bankruptcy Court's opinion omits the full context of the Fifth Circuit's statement.  Specifically, the Pacific Lumber court noted that "[a]lthough a credit bid option might render Clause (ii) imperative in some cases, **it is unnecessary here because the plan offered a cash payment to the [secured lenders]**" which, despite **"[w]hatever uncertainties exist about indubitable equivalent, paying off secured creditors in cash can hardly be improper if the plan accurately reflected the value of the [secured creditors'] collateral**."  Pacific Lumber,  2009 WL 3082066 at *9, 10 (emphasis added).  Thus, the Fifth Circuit found that a credit bid was not imperative because the plan, like the Plan here, offered the creditors a cash payment, which could afford the debtors a distinct basis for confirming a plan under subsection (iii) if the payment resulted in the creditors realizing the indubitable equivalent of their claims.  Id.  Stated differently, the credit bid would only be imperative if the debtor was

19

not able to confirm a plan under subsection (iii) and, therefore, had to resort to attempting to confirm a plan under subsection (ii). Consistently, here, as long as the Lenders will be provided with the indubitable equivalent of their claim (i.e., cash equal to the value of the secured claim), the Debtors' Plan need not also provide for a right to credit bid.

Second, the Bankruptcy Court distinguished Pacific Lumber because it involved a private sale whereas the Debtors' Plan provides for a public auction. This factor, however, should weigh in favor of the Debtors' position, not against it. In Pacific Lumber, the secured creditors' collateral value was determined by the bankruptcy court and the plan provided for payment to the secured creditors of the judicially determined amount, in cash, in satisfaction of the indubitable equivalent requirement of 1129(b)(2)(A)(iii). Both the bankruptcy court and the Fifth Circuit found that such a cash payment satisfied the standard.

The Debtors in this case propose under their Plan to transfer to the Lenders certain real property collateral in kind and make a cash distribution to the Lenders equal to the highest or otherwise best bid received at the open auction of substantially all of the Debtors' remaining assets. In this regard, the Debtors' Plan Sale and Plan go further in satisfaction of Section 1129(b)(2)(A)(iii) than did the Pacific Lumber plan sale, which did not involve a public auction. In fact, the objecting secured creditors in Pacific Lumber "disagree[d] with the bankruptcy court's decision to value the [collateral] judicially rather than through a public auction." Id. at *11. Nevertheless, the Fifth Circuit determined that the cash payment to the secured lenders in the amount of the judicially determined value constituted the indubitable equivalent and satisfied the fair and equitable confirmation requirements.

Because Pacific Lumber involved a private sale with a judicially determined value of the secured lenders' collateral, the Bid Procedures and Plan in this case actually treat the Lenders

20

better than the treatment approved by the Fifth Circuit.  Here, the Debtors will transfer the real property collateral to the Lenders in kind and pay the Lenders, in cash, the full amount of the value of their remaining collateral, as determined at a public auction monitored by an independent investment banker and former Third Circuit judge to assure fairness.  The Lenders have the right in this case (a right not afforded by the procedure affirmed in <u>Pacific Lumber</u>) to participate and bid at the auction, although not to credit bid.  This recent precedent in the Fifth Circuit would have permitted a more aggressive treatment of the Lenders than the Debtors chose in this case.

Third, the Bankruptcy Court distinguished Pacific Lumber on the basis that it appears that the Fifth Circuit "viewed objections predicated on the credit bid issue as belated."  (P000007-P0000032; October 8 Op. at 18).  If that were the determining factor, the Fifth Circuit could have declined to hear the appeal on equitable grounds but it expressly chose not to do so.  Indeed, delay is not even mentioned in the comprehensive section of the opinion addressing the issues under Section 1129.  Moreover, the Fifth Circuit did not place any weight on the creditors' alleged failure to protect themselves by making an election under Section 1111(b).  To the contrary, the Fifth Circuit found the election issue irrelevant since, even if the creditors had made an election, the present value of the future payment stream would still be capped at the value of the collateral as assessed by the Court in determining the indubitable equivalent.  <u>Pacific Lumber</u>, 2009 WL 3082066 at n.22.  Accordingly, this Court should not find the Bankruptcy Court's distinctions persuasive.

The only other case presenting facts similar to the instant case also supports the Debtors' position.  In <u>In re Criimi Mae</u>, the Court approved the debtor's disclosure statement over the objection of secured creditors who were denied the right to credit bid at a sale of their collateral

21

under the proposed plan.  251 B.R. at 807-08.  The secured creditors argued that because the

proposed plan contemplated a sale, it must comport with 1129(b)(2)(A)(ii) and provide for a

credit bid.  Id. at 806-807.  The secured creditors further argued that "because subsection (ii) of

1129(b)(2)(A) is more specific than subsection (iii)," subsection (ii) should govern.  Id.  The

Criimi Mae court held, however, that the provisions of 1129(b)(2)(A)(i), (ii) and (iii) are not in

conflict, and are clearly "to be treated as distinct alternatives."  Id. at 807.  The Bankruptcy Court

in the instant case distinguished Criimi Mae in part on the grounds that the Criimi Mae court,

unlike the Bankruptcy Court below, "accepted the statutory language of § 1129 as being clear

and unambiguous."  (P000007-P000032; October 8 Op. at 13).  The fact of the matter is that

Section 1129 of the Bankruptcy Code, particularly Section 1129(b)(2)(A), is clear and

unambiguous.  The Debtors, in crafting their Plan read the alternatives of 1129(b)(2)(A)(i), (ii),

and (iii) to be just what they are – alternatives.  The Criimi Mae court read the statute in the same

plain fashion.

    In this Circuit, Judge Padova was faced with a situation analogous to this case involving

the interplay between subsections (i) and (iii) rather than (ii) and (iii).  CoreStates Bank, N.A. v.

United Chemical Tech., Inc., 202 B.R. 33 (E.D. Pa. 1996).  There, the debtor attempted to

confirm its plan under Section 1129(b)(2)(A)(i).  That subsection states that a debtor can meet

the fair and equitable requirement if the plan provides that the creditor is to retain the lien

securing its claim and is to receive deferred cash payments with a present value at least equal to

the claim.  The debtor's plan proposed to provide the secured creditors with continuing liens on

most, but not all, of the collateral and with deferred cash payments.  Id. at 49.  The debtor argued

that since the creditor's claim was adequately protected through an equity cushion in the retained

collateral worth twice the value of the creditor's claim, subsection (i) should not be construed as

requiring continuing liens on all collateral.  Judge Padova rejected the debtor's argument that it could satisfy subsection (i) without providing that the creditor retain its lien on <u>all</u> collateral securing the claim.  The Court made clear, however, that subsection (i) was only one alternative under Section 1129(b)(2)(A) and "[b]ecause the three requirements articulated in § 1129(b)(2)(A) are disjunctive, failure to satisfy subsection (i)(I) (requiring retention of liens) will not defeat a plan so long as it satisfies subsection (iii) (requiring indubitable equivalent)."  <u>Id.</u> at 51.  Because the Bankruptcy Court below had made no findings with respect to subsection (iii) and satisfaction of the indubitable equivalent requirement, Judge Padova declined to do so on appeal.  Unlike the instant case, however, Judge Padova did not find that subsection (iii) was unavailable as a means for meeting the fair and equitable requirement merely because subsection (i) more closely resembled the provisions of the debtor's plan.  Similarly, here, subsection (iii) should not be unavailable to the Debtors just because their Plan is similar in some respects to subsection (ii).

> **4.    The Bankruptcy Court Improperly Resorted to the Legislative History of a Section of the Bankruptcy Code that is Not Applicable to this Case.**

Even if there were some ambiguity regarding whether the subsections of Section 1129(b)(2)(A) should be read as alternatives, the Bankruptcy Court should have relied upon the legislative history of that Section to resolve that issue, not the legislative history of Section 1111(b), which the Lenders concede is not applicable here.  The legislative history regarding Section 1129(b)(2)(A) is crystal clear on this issue.  It provides that, with respect to secured creditors to which Section 1111(b)(2) does not apply, the "court must confirm the plan notwithstanding the dissent of such a class of secured creditors **if any of the three alternative requirements are met**."  124 Cong. Rec. 32350, 32407 (Sept. 28, 1978) (statement of Rep.

23

Edwards) (emphasis added).    It does not say that the alternative that the Court determines is most similar to the provisions of the Plan must be met.  To the extent any legislative history is necessary, the statements that specifically address the statute claimed to be ambiguous should control.

The Bankruptcy Court, however, turned to the legislative history that addresses the circumstances under which an 1111(b) election can be made.  At the very most, that legislative history might be relevant to whether a creditor should be denied the right to make an 1111(b) election to the extent Section 1111(b) might be unclear.  Here, however, the Lenders have not argued that they have the right to make a Section 1111(b) election.  To the contrary, the Lenders concede that under the plain language of Section 1111(b), they are entitled to no such election. (P000340-P000375; Lender Objection at 10, 11).

The Bankruptcy Court also supports its decision to review the legislative history because, even if the statute were plain and unambiguous, the plain meaning should not be deemed conclusive where literal application of the language in question would produce a result demonstrably at odds with the intention of the drafters, citing United States v. Ron Pair Enterprises, 489 U.S. 235, 242 (1989) and In re Mehta, 310 F.3d 308, 311 (3d Cir. 2002). (P000007-P000032; October 8 Op. at 12).    Although cases often parrot Ron Pair's "demonstrably at odds" language in discussing general rules of statutory construction, courts also acknowledge the rarity of a situation where the literal application of the language of the statute produces a result demonstrably at odds with the intention of the drafters and, accordingly, it is seldom determinative.  Moreover, the "demonstrably at odds" is a narrow exception that has no application on these facts where the issue is not whether the Court should adopt a restricted interpretation of the language of the statute but whether the Court should nullify the existing,

24

plain language of the Bankruptcy Code by essentially re-writing Section 1129(b)(2)(A) to conform to one statement in the legislative history of Section 1111(b) even though doing so would contradict the legislative history of Section 1129(b)(2)(A) itself.

A review of United States Supreme Court jurisprudence from which the "demonstrably at odds" language in Ron Pair emanates confirms the view that the "demonstrably at odds" concept is limited to determining whether the court should take a literal, more restrictive or more general interpretation of particular words in a statute. For example, Ron Pair quoted the "demonstrably at odds" language from Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571 (1982). The Griffin Court explained:

> Nevertheless, in rare cases the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters, and those intentions must be controlling. We have reserved "some 'scope for adopting a restricted rather than a **literal or usual meaning of its words** where acceptance of that meaning ... would thwart the obvious purpose of the statute.' " Commissioner v. Brown, 380 U.S. 563, 571, 85 S.Ct. 1162, 1166, 14 L.Ed.2d 75 (1965) (quoting Helvering v. Hammel, 311 U.S. 504, 510-511, 61 S.Ct. 368, 371, 85 L.Ed. 303 (1941)). This, however, is not the exceptional case.

Id. (emphasis added). Tracing the roots back even further, Helvering provides:

> True, courts in the interpretation of a statute have some scope **for adopting a restricted rather than a literal or usual meaning of its words** where acceptance of that meaning would lead to absurd results, United States v. Katz, 271 U.S. 354, 362, 46 S.Ct. 513, 516, 70 L.Ed. 986, or would thwart the obvious purpose of the statute, Haggar Co. v. Helvering, 308 U.S. 389, 60 S.Ct. 337, 84 L.Ed. 340 (1940).

Helvering, 311 U.S. at 510-511 (emphasis added). Similarly, Haggar explains that a literal reading of statutes "would lead to absurd results is to be avoided when they can be given a reasonable application **consistent with their words** and with the legislative purpose." Haggar Co. v. Helvering, 308 U.S. at 394. Here, the issue is not whether particular language should be interpreted narrowly or broadly. None of these cases suggest that it is appropriate for a court to

25

ignore the plain language of a Bankruptcy Code section when nothing in the legislative history of that section suggests that the plain meaning of the words is at odds with Congress' intent. If Congress had intended to prohibit the Debtors from utilizing subsection (iii) to confirm their Plan without providing the Lenders with a right to credit bid, or had intended that lenders always have the right to credit bid, it could easily and clearly have said that in the Bankruptcy Code.

     5.    **The Consequences of the Bankruptcy Court's Decision Are to Undermine the Debtors' Ability to Reorganize.**

At the argument to set the expedited briefing schedule in this matter, the Court inquired as to the practical consequences of the Bankruptcy Court's ruling on the Debtors' Plan. Simply put, as discussed in detail below, the decision to permit a credit bid completely undermines the structure and substance of the Debtors' Plan.

While recognizing that the parties agree that the credit bid issue involved a purely legal issue, the Bankruptcy Court veers off the course of determining the appropriate statutory interpretation by questioning the Debtors' motives in seeking to deny the Lenders the opportunity to credit bid. In discussing the interplay between subsections (ii) and (iii), the Bankruptcy Court found the Debtors' position "illogical" and "a not so thinly veiled attempt to manipulate the sale process in order to frustrate a credit bid which the Debtors anticipate will exceed the bid of the Stalking Horse."[4] (P000007-P000032; October 8 Op. at 11). Far from

---

[4] The Bankruptcy Court also noted the insider status of two investors in the Stalking Horse. (P000007-P000032, October 8 Op. at 19.) These two (of three) investors in the Stalking Horse are insiders only because they are current or former equity investors in the Debtor PMH. Neither of them was an officer or director of the Debtors nor had any involvement in management. The largest single investor in the Stalking Horse, however, is not an insider and has no prior relationship with the Debtors.

    As an initial matter, the insider status of some of the Stalking Horse investors has absolutely no bearing on the issue before the Court, the proper interpretation of Section 1129(b)(2)(A). In addition, nothing about the Debtors' Plan favors the insiders, i.e., "old" equity investors in PMH. In fact, they receive nothing under the Debtors' Plan and their interests are cancelled. The asset purchase agreement between the Debtors and the Stalking Horse was negotiated at arm's length, with the Debtors represented by counsel and each of the Stalking Horse investors represented by separate counsel. (P000376-P000515; Oct. 1, 2009 Hrg. Tr. at 89:12-90:9). The Stalking Horse cash bid is subject to higher and better offers at the auction, including any cash bid by the Lenders, and the Debtors have

trying to "manipulate" the sale process, the Debtors are attempting to ensure that the process yields the highest bid, in real cash, by putting all bidders on the same footing.  The Plan provides (1) an open, public auction that will be monitored by two sale monitors, former Third Circuit Court of Appeals Judge Arlin Adams and restructuring advisor, J. Scott Victor, to ensure the fairness of the sale process; (2) that all of the Lenders have the right to bid in the same manner as all bidders at the auction; (3) a Stalking Horse bidder that sets the minimum floor for bidding at a substantial price for the collateral being sold, (4) that the Lenders receive, in cash, the value of their secured claim as determined by the auction process and (5) that the Lenders can vote their deficiency claim.  Given these protections in the Plan,  it is difficult to understand why it would be at all *logical* to provide the Lenders with the right to credit bid at the auction when the Bankruptcy Code does not require it.

The Bankruptcy Court acknowledged that other potential bidders will be dissuaded from participating in the auction process if the Lenders are permitted to credit bid.  (P000007-P000032; October 8 Op. at 20).  Commentators cited by the Bankruptcy Court support the view that credit bidding can discourage other bidders and make it difficult to get the best price for an asset of the Debtors at an auction. See Resolved: Loan to Own Lenders Should Not Be Allowed To Credit Bid, 0412078 American Bankruptcy Institute 85 (25th Annual Spring Meeting, Educational Materials, April 12 – 15, 2007); see also Daniel P. Winekka and Debra K. Simpson, Will Bankruptcy Courts Limit The Right To Credit Bid?, 17 J.Bankr.L. & Prac. 6, Art. 6 (September 2008).  The Bankruptcy Court disregards this self evident effect on the bidding process.

---

agreed to independent Sale Monitors to alleviate any potential concerns that the Debtors will favor the Stalking Horse in the sale process.  The sale process is designed to further competitive bidding, which will not occur if the Lenders are permitted to credit bid.

829884_1

Mandating that the Debtors' sale process permit the Lenders to credit bid at the auction discourages bidding by putting the Lenders in a preferred position over other potential bidders. The Code provides many different alternatives to a debtor with respect to the treatment of creditors under a plan of reorganization.  Providing the Lenders with the indubitable equivalent of their claim by transferring the real estate collateral in kind and paying cash representing the fair market value of the remaining collateral (i.e., the full amount of the "secured claim" as defined by Section 506(a)(1) of the Bankruptcy Code) is not manipulating the system.   It promotes a fair and open auction and it is permitted by the alternative structure of Section 1129(b)(2)(A).

On the other hand, if the Lenders are permitted to credit bid, it would turn the Debtors' entire Plan on its head.  As this Court is aware, within days of filing these cases, the Debtors sought permission to retain special counsel to conduct an investigation into an illegal recording of a confidential meeting involving the Debtors by one of the Lenders, CIT Group.  That request was denied by the Bankruptcy Court, which instead appointed the Creditors' Committee to investigate the Debtors' claims, and the Debtors appealed to this Court.  This Court reversed, in part, the Bankruptcy Court decision but did not reverse that portion which authorized the Committee to conduct the investigation on the Debtors' behalf.  At that time, this Court declined to reach the merits regarding how the investigation was being conducted, finding that such issues were properly raised in the first instance in the Bankruptcy Court.  Thereafter, the Debtors raised the deficiencies of the investigation with the Bankruptcy Court, including the failure to take any depositions and the failure to require production of any emails.  The Bankruptcy Court indicated in very clear language that it was unhappy with how the Committee was conducting the investigation and ordered the Committee to immediately meet with Debtors' counsel to update

28

them on the status of the investigation. After this meeting, the Debtors filed a motion with the Bankruptcy Court to reconsider the denial of the Debtors' request to employ special counsel to conduct the investigation because of the dismal investigation of the Committee.

That motion was ultimately reassigned to Judge Raslavich. The day before argument on the motion, the Committee produced a draft report of its investigation. At argument on the motion, Judge Raslavich told counsel for the Committee that they had "made a fine mess" of the investigation. (P000033-P000241; Aug. 18, 2009 Hrg. Tr. at 59:17-18). Judge Raslavich took the motion under advisement.

Around this same period, the Debtors and the Lenders mediated the dispute regarding the Debtors' proposed debtor-in-possession financing. The mediation resulted in the Lenders providing the financing rather than the third party lender arranged by the Debtors. As a condition to providing such financing, the Lenders demanded that the Debtors stipulate that the recording investigation would be suspended until January 2010. Given the stipulation, the Bankruptcy Court has not ruled on the Debtors' motion regarding the investigation.

Because the investigation may result in a subordination claim being made against CIT Group, and possibly against Angelo Gordon and others (as there is evidence to suggest that Angelo Gordon or others may have had a role in the illegal recording and/or its retaliatory aftermath), it is difficult to even understand how a credit bid would work when two of the largest claims of the Lenders could be subject to equitable subordination or other attack. The Debtors intend to file a motion with the Bankruptcy Court to disqualify these Lenders from participating in any credit bid but, even if they were disqualified, it is still not clear how such claims would be treated under the Plan. In contrast, if the Lenders are required to bid in cash like everyone else

29

and are the winning bidder, the distribution to CIT and Angelo Gordon could be held until resolution of any subordination claim.

Additionally, the ruling requiring that the Debtors permit the Lenders to credit bid prejudices those in the Lender group that would prefer to receive cash rather than an equity stake in a newspaper business. According to the Lenders, 51% of the Lenders by value can instruct the Agent to credit bid even if the other 49% would prefer to receive cash. If the Lenders who want to own the Debtors' businesses were required to use cash to bid like all other bidders, those Lenders who want cash, would receive it. In the absence of cash, the Debtors' Plan would not be funded and, therefore, it could not be confirmed as proposed. Thus, in essence, permitting the Lenders to credit bid torpedoes the cash distribution under the Debtors' Plan.

In part, the Bankruptcy Court minimized the impact on bidding of a credit bid right since any cash overbid increases the payment to the Lenders under the Debtors' Plan on account of their secured claim. But the Bankruptcy Court ignores the fact that as much as 49% of the Lenders may not agree with a credit bid. Still others may prefer to credit bid only to a certain level. Getting to such a level is less likely if the Lenders are granted the opportunity to credit bid since that fact will chill competitive bidding. Accordingly, the only fair and equitable result is to ensure that all bidders must bid in cash. Then, those Lenders who wish to be in the newspaper business can participate in the cash bidding and those that do not can await the outcome of the auction and then determine whether to vote in favor of the Plan. Simply put, if there is no cash to distribute in accordance with the provisions of the Debtors' Plan, the Plan will be materially different from the one proposed by the Debtors. The Debtors should be permitted to proceed with their Plan, not a Plan preferred by the Lenders or the Bankruptcy Court. There is nothing at

all manipulative about the Debtors availing themselves of an option that the Bankruptcy Code gives them.

A plan sale without a right to credit bid, as allowed by the plain language of the applicable Bankruptcy Code section, does not deprive the Lenders of the ample protections afforded them in the plan confirmation process. If the Lenders are not permitted to credit bid, they still have all of the other rights under Section 1129 of the Bankruptcy Code including the right to vote against the Plan. The Debtors must still meet all of the requirements for plan confirmation including the existence of an impaired and consenting class. The Debtors believe that an actively-marketed sale process subject to independent and well-respected monitors, culminating in a fair and open public auction, provides them with the best opportunity to obtain a favorable vote from the Lenders and other creditors and confirm their Plan. A credit bid deprives the Debtors of that opportunity. There is no reason why the Bankruptcy Court should be able to impose that requirement, and limit the Debtors' options to confirm a plan, when Congress chose not to.

## V.    CONCLUSION

For the reasons stated above, the Debtors respectfully request that this Court reverse the October 8, 2009 Order of the Bankruptcy Court insofar as it requires the Debtors to allow the Lenders to credit bid at the Plan Sale, and remand the case to the Bankruptcy Court with instructions to approve the Debtors' proposed Bid Procedures requiring all bidders to bid cash.

Dated:  October 19, 2009
          Philadelphia, Pennsylvania

/s/ Lawrence G. McMichael

**DILWORTH PAXSON LLP**
Lawrence G. McMichael
Christie Callahan Comerford
Catherine G. Pappas
1500 Market St., Suite 3500E
Philadelphia, PA 19102
Telephone:  (215) 575-7000
Facsimile:  (215) 575-7200

- and -

**PROSKAUER ROSE LLP**
Mark K. Thomas
Paul V. Possinger
Peter J. Young
Three First National Plaza
70 West Madison, Suite 3800
Chicago, Illinois  60602-4342
Telephone:  (312) 962-3550
Facsimile:  (312) 962-3551

*Co-Counsel for the Debtors and Debtors in Possession*

829884_1