## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
-------------------------------------------------------------x
                                         :
In re:                                   :        Chapter 11 (Jointly Administered)
                                         :
Philadelphia Newspaper LLC et al.,       :        No. 0911204 (JFK)
                                         :
                        Debtors.         :        Civil Action No. 09-mc-00178
-------------------------------------------------------------x
```

**BRIEF OF APPELLEES THE STEERING GROUP OF PREPETITION SECURED
LENDERS AND CITIZENS BANK OF PENNSYLVANIA ,
AS AGENT FOR THE PREPETITION SECURED LENDERS**

**AKIN GUMP STRAUSS HAUER
   & FELD LLP**
Fred S. Hodara
Abid Qureshi
Alexis Freeman
One Bryant Park
New York, NY  10036
Telephone:     (212) 872-1000
Facsimile:      (212) 872-1002
Attorneys for Steering Group of Prepetition
Secured Lenders

**DRINKER BIDDLE & REATH LLP**
Andrew C. Kassner
Andrew J. Flame
David F. Abernethy
One Logan Square
18th & Cherry Streets
Philadelphia, PA  19103-6996
Telephone:     (215) 988-2700
Facsimile:      (215)988-2757
Attorneys for Citizens Bank of Pennsylvania, as
Agent, on behalf of the Prepetition Lenders

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ........................................................................... 1

I.     The Bankruptcy Court Properly Rejected the Debtors' Efforts to Prevent the
       Prepetition Lenders from Exercising Their Right to Credit Bid at the Auction of
       the Debtors' Assets ................................................................................... 7

       A.     As a Preliminary Matter, the Debtors' Arguments Concerning the
              Committee's Investigation Into the "Recording Incident" Are Waived,
              Meritless, and Irrelevant. ............................................................... 7

       B.     The Bankruptcy Court Properly Analyzed the Bankruptcy Code Provisions
              Preserving the Basic Right of Secured Creditors to Bid the Amount of
              Their Debt at Any Sale of Their Collateral. .................................... 9

       C.     Judicial Authority Overwhelmingly Establishes that a Secured Creditor
              Cannot Be Deprived of Its Right to Credit Bid Under the Undisputed Facts
              Presented Here.  *Pacific Lumber* Is Not to the Contrary ................. 17

       D.     The Prepetition Lenders Have a Contractual Right to Credit Bid, Which
              the Bankruptcy Code Requires the Court to Protect. ....................... 26

II.    Denying the Prepetition Lenders the Right to Credit Bid Will Serve the Debtors'
       Insiders at the Expense of the Secured Creditors and May Critically Impair the
       Lending Market ..................................................................................... 26

III.   This Court Should Disregard the Debtors' Newly Minted Parade of Horribles. ........ 28

CONCLUSION ................................................................................................. 30

## TABLE OF AUTHORITIES

**Cases**

*Butner v. U.S.*, 440 U.S. 48 (1979) ................................................................26

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims (In re Papercraft Corp.)*, 211 B.R. 813 (W.D. Pa. 1997)................................7

*City of New York v. Quanta Res. Corp. (In re Quanta Res. Corp.)*, 739 F.2d 912 (3d Cir. 1984) ...................................................................................10 n.11

*Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448 (3d. Cir. 2006) ..............................................................................11, 11 n.12

*Commonwealth of Pa. State Employees' Ret. Fund v. Roane*, 14 B.R 542 (E.D. Pa. 1981) ..............................................................................................10

*Connecticut National Bank v. Germain*, 503 U.S. 249 (1992)..........................14

*Duncan v. Walker,* 533 U.S. 167 (2001) ..........................................................16

*H&M Parmely Farms v. Farmers Home Admin.*, 127 B.R. 644 (D.S.D. 1990).......... 20-21

*Harris v. City of Philadelphia,* 35 F.3d 840 (3d Cir. 1994) ................................8

*In re 222 Liberty Assocs.*, 108 B.R. 971 (Bankr. E.D. Pa. 1990)...................14, 17, 18, 19

*In re American Biomaterials Corp.,* 954 F.2d 919 (3d Cir. 1992) ......................8

*In re Briggs Transportation Co.,* 35 B.R. 210 (Bankr. D. Minn. 1983)............10

*In re Combustion Eng'g Inc.,* 391 F.3d 190 (3d Cir. 2004) ..............................17

*In re Criimi Mae, Inc.*, 251 B.R. 796 (Bankr. D. Md. 2000) ............................21

*In re Edwards*, 228 B.R. 552 (Bankr. E.D. Pa. 1998) ................................. 24-25

*In re Finova Capital Corp.,* 356 B.R. 609 (Bankr. D. Del. 2006) .....................11

*In re Kent Terminal Corp.*, 166 B.R. 555 (Bankr. S.D.N.Y. 1994) ..............14, 20

*In re Matrix Dev. Corp*, No. 08-32798, 2009 WL. 2169717 (Bankr. D. Or. July 16, 2009) ..............................................................................................14, 21

*In re Morgan House General P'ship,* Nos. 96-MC-184 & 96-MC-185, 1997 WL 50419 (E.D. Pa. Feb. 7, 1997)..........................................................11 n.12

*In re Orfa Corp. of Philadelphia*, Nos. 90-11253S, 90-11254S & 90-11255S,
1991 WL. 225985 (Bankr. E.D. Pa. Oct. 30, 1991) ................................................ 19-20

*In re Pacific Lumber,* No. 08-40746, __ F.3d __ , 2009 WL 3082066 (5th Cir.
Sept. 29, 2009) .......................................................................................22, 23, 24, 25

*In re Realty Investments, Ltd. V*, 72 B.R. 143 (Bankr. C.D. Cal. 1987)......................14, 20

*In re River Village Assocs.*, 181 B.R. 795 (E.D. Pa. 1995) ................................................19

*In re Scotia Dev. LLC, et al.,* Case No. 07-20027-C-11 (Bankr. S.D. Tex. June 6,
2008) ..................................................................................................................25 n.19

*In re Seminole Oil & Gas Corp.*, 963 F.2d 368 (4th Cir. 1992)..........................................7

*In re Top Grade Sausage, Inc.*, 227 F.3d 123 (3d Cir. 2000) ..............................................7

*In re Suncruz Casinos, LLC*, 298 B.R. 833 (Bankr. S.D. Fla. 2003) ...........................14, 20

*Louisville Joint Stock  Land Bank v. Radford*, 295 U.S. 555 (1935)..........................10 n.11

*Matter of Kennedy*, 158 B.R. 589 (Bankr. D.N.J. 1993)....................................................26

*Medical Protective Co. v. Watkins,* 198 F.3d 100 (3d Cir. 1999*)* ..................................8, 28

*Pepper v. Litton,* 308 U.S. 295 (1939) ...............................................................................7

*Phila. Newspapers, LLC v. Official Comm. of Unsecured Creditors,* 408 B.R. 585
(E.D. Pa. 2009).............................................................................................. 7, 7-8 n.10

*Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 7 F.3d 1110 (3d Cir.
1993) ...................................................................................................................8

*Schlumberger Res. Mgmt. Servs. v. CellNet Data Sys. (In re CellNet Data Sys.),*
327 F.3d 242 (3d Cir. 2003) ........................................................................................6

*Southerton Corp. v. United Penn Bank (In re Southerton Corp.),* 46 B.R. 391
(M.D. Pa. 1982) ...........................................................................................10

*TRW, Inc. v. Andrews,* 534 U.S. 19 (2001).......................................................................16

*United Savings Ass'n of Tex. v. Timbers of Inwood Forest Assocs. (In re Timbers of
Inwood Forest Assocs.)*, 793 F.2d 1380 (5th Cir. 1981) ......................................10 n.11

*United States v. Ron Pair Enters.*, 489 U.S. 235 (1989)...................................................17

*United States v. Sec. Indus. Bank*, 459 U.S. 70 (1982) ..............................................10 n.11

*United States v. United States Gypsum Co.*, 333 U.S. 364 (1948)...................................6-7

**Statutes**

11 U.S.C. § 363(k) ....................................................................................11

11 U.S.C. § 506(a)(1)...........................................................................12 n.14

11 U.S.C. § 1111(b)(1)(A) ........................................................................12

11 U.S.C. § 1111(b)(1)(B)(ii)....................................................................13

11 U.S.C. § 1111(b)(2) ..............................................................................12

11 U.S.C. § 1129(b)(2)(A) ...................................................................15 n.16

124 Cong. Rec. 32,407 (1978) ..................................................................13

**Other Authorities**

7 Collier on Bankruptcy, ¶1108.07[2] (15th ed. 2008) ......................................7

7 Collier on Bankruptcy, ¶1111.03[3][b] (15th ed. 2008)................................13

7 Collier on Bankruptcy, ¶1111.03[4] (15th ed. 2008) ...................................12

**Miscellaneous**

Haydon et al., *The 1111(b)(2) Election: A Primer*, 13 Bank. Dev. J. 99 (1996) ..............16

Ronald J. Mann*, Explaining the Pattern of Secured Credit*, 110 Harv. L. Rev. 625
    (1997).............................................................................................. 27-28

Rubinger & Marsh, *"Sale of Collateral" Plans Which Deny A Nonrecourse
    Undersecured Creditor the Right to Credit Bid: Pine Gate Revisited*, 10
    Bank. Dev. J. 265 (1994) ...........................................................................16

## PRELIMINARY STATEMENT

In August 2009, the above-captioned debtors (the "Debtors")[1] filed a Joint Chapter 11 Plan seeking to sell substantially all of the Debtors' assets at auction.  To ensure that the assets would go to an inside stalking horse bidder, the Debtors proposed bid procedures precluding secured creditors – including appellees the Prepetition Lenders,[2] secured creditors with a $295 million credit lien against the Debtors – from exercising their right to bid the amount of their secured claim ("credit bid") at the auction.  The Bankruptcy Court properly rejected the Debtors' proposal, and ruled that the Prepetition Lenders must be allowed to credit bid under the circumstances presented by this case.[3]

As the Bankruptcy Court recognized, the Bankruptcy Code protects secured creditors throughout the bankruptcy process.  Specifically, the Code protects secured creditors from the undervaluation of their collateral by granting them the right to credit bid at a sale of the collateral:  a secured creditor who is dissatisfied with the sale price can, by credit bidding, increase the bid to what it considers fair or outbid other potential buyers and acquire title to the collateral.  Outside the sale context, the Code protects secured creditors from undervaluation by granting them the right, under section 1111(b), to give up their right to deficiency claims in exchange for having all of their claims treated as fully secured.[4]

---

[1] The Debtors in these Chapter 11 cases are PMH Acquisition, LLC; Broad Street Video, LLC; Philadelphia Newspapers, LLC;, Philadelphia Direct, LLC; Philly Online, LLC; PMH Holdings, LLC; Broad Street Publishing, LLC; Philadelphia Media, LLC; and Philadelphia Media Holdings, LLC.

[2] Appellees are the Steering Group of Prepetition Secured Lenders and Citizens Bank of Pennsylvania as Agent for the Prepetition Secured Lenders (collectively, the "Prepetition Lenders").

[3] The Bankruptcy Court also rejected the Debtors' proposal to grant the stalking horse bidder a break-up fee and expense reimbursement.  Although the Debtors recognize that this Court now has jurisdiction over all issues related to the order from which it appealed on October 13, 2009, they have sought reconsideration of this aspect of the Bankruptcy Court's ruling in a motion filed on October 19, 2009.

[4] All statutory references indicate Title 11 of the Bankruptcy Code unless otherwise specified.

The right of secured creditors to credit bid at a sale pursuant to section 363(k) is well-established.  The Debtors nevertheless argue that secured creditors can be deprived of their right to credit bid at a sale that occurs before plan confirmation, based on a skewed reading of section 1129, which sets forth the standards for plan confirmation.  The right to credit bid, however, exists independently of these standards, and applies whenever a debtor sells a secured creditor's collateral.  In any event, nothing in section 1129 abrogates the right of secured creditors to credit bid.  To the contrary, as the Bankruptcy Court observed, section 1129 expressly preserves the right of secured creditors to credit bid at a sale like the one devised by the Debtors here.

Any question about the scope of the secured creditor's right to credit bid is put to rest by an examination of section 1111(b), which, as noted above, permits undersecured creditors to elect to have their claims treated as fully secured even when the amount of their claims exceeds the value of the collateral.  The statute withdraws this protection from recourse creditors (like the Prepetition Lenders) when the collateral is sold, whether pursuant to section 363 or as part of a plan of reorganization.  Such creditors may be deprived of their election right when assets are sold, Congress has explained, because it is understood that they can protect the value of their investment by credit bidding at the sale.  The exception thus proves the rule:  secured creditors are entitled to credit bid at a sale pursuant to a plan of reorganization just as they are at a sale pursuant to section 363(k).  Every court that has considered the interplay of sections 363, 1129 and 1111 has, like the Bankruptcy Court here, reached this conclusion.

Based on its analysis of the facts and the law, the Bankruptcy Court concluded that the Debtors should not be allowed to end run the carefully crafted system designed to protect secured creditors throughout the bankruptcy process by writing bid procedures that cut off the

right to credit bid, especially where, as here, the bid procedures represent a calculated effort by the Debtors to maintain control of their assets by ensuring the success of their insider bidder.

This Court should affirm the Bankruptcy Court's order rejecting the Debtors' unlawful and inequitable scheme.

## COUNTER STATEMENT OF ISSUES PRESENTED ON APPEAL

Whether the Bankruptcy Court clearly erred in rejecting bid procedures precluding the Prepetition Lenders from credit bidding at the auction of the collateral securing their claim, where the Prepetition Lenders have no other means of protecting the value of their collateral, and the bid procedures were designed by the Debtors to ensure the success of their insider stalking horse bidder?

## COUNTER STATEMENT OF THE CASE

On February 22, 2009, each of the Debtors filed a voluntary petition for relief with the Court under chapter 11 of title 11 of the United States Code, 11 U.S.C. §101, *et seq.* (as amended, the "Bankruptcy Code"), commencing these jointly administered chapter 11 cases. The Debtors, who own and operate numerous print and online publications in Philadelphia, including its leading newspapers, the *Philadelphia Inquirer* and the *Philadelphia Daily News*, are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108.[5]

The Debtors are parties to a Credit and Guaranty Agreement dated June 29, 2006 (as amended) with appellees Citizens Bank of Pennsylvania, as administrative and collateral agent, and certain other lender parties, pursuant to which the Prepetition Lenders extended a term loan in the original principal amount of $295,000,000. The Credit and Guaranty Agreement, along

---

[5] An Official Committee of Unsecured Creditors (the "Committee") was appointed on March 2, 2009; no trustee or examiner has been appointed or sought.

with the parties' Security Agreement, include provisions for the Prepetition Lenders to credit bid

at a public sale of their collateral.  (L0000386, Credit and Guaranty Agreement, sec. 9.09(b);

L0000389, Security Agreement, sec. 7.01(b).)

On August 20, 2009, the Debtors filed a Joint Chapter 11 Plan (the "Plan") and

accompanying disclosure statement, providing for a sale, by public auction, of substantially all of

the Debtors' Assets.  (L0000192-L0000233; Docket No. 947.)  By means of this auction (the

"Auction"), the Debtors seek to sell substantially all of the Debtors' assets to a stalking horse

bidder (the "Stalking Horse Bidder") that the Bankruptcy Court found (P000025-P000026;

October 8 Opinion ("Op.") at 19-20) – and the Debtors concede (P000451; Docket No. 1195 at

76:4-13) – to be an insider.[6]  Should the Stalking Horse Bidder prevail, the Debtors' Plan

contemplates a distribution to the Prepetition Lenders of approximately $36 million in cash and

the surrender of the Debtors' headquarters building in Philadelphia, which the Debtors claim is

worth $30 million.  (P000010; Op. at 4.)

To ensure the success of their Stalking Horse Bidder, the Debtors proposed Bid

Procedures designed to preclude the Prepetition Lenders from credit bidding at the proposed

Auction.  (P000242-P000339; Docket No. 1007 [Motion for an Order:  (A) Approving

Procedures for the Sale of Certain of the Debtors' Assets; (B) Scheduling an Auction; (C)

Approving Assumption and Assignment Procedures; (D) Approving Form of Notice; and (E)

---

[6] The Stalking Horse bidder identified in the Bid Procedures Motion is comprised of, among others, the Carpenters Pension and Annuity Fund of Philadelphia and Vicinity ("Carpenters Pension Fund").  Carpenters Pension Fund owns approximately 30% of the equity in PMH.  (L0000265-L0000266; Docket No. 1033, ¶7.)  The Chairman of the Stalking Horse bidder is Bruce Toll, who also serves as Chairman of the Board of Advisors of Debtor PMH, the entity that appointed Brian Tierney as the Debtors' CEO and sole manager.  Until recently, Mr. Toll owned 20% of the equity in PMH.  Penn Matrix Investors, whose controlling partner is David Haas, is the third entity comprising the Stalking Horse bidder.  (L0000339; Docket No. 1140, at 9.)  The Stalking Horse bid also contemplates other participating investors, which the Prepetition Lenders are advised may include Brian Tierney, either as a direct investor or as a recipient of equity in the Stalking Horse in his capacity as Chief Executive Officer. (L0000339; Docket No. 1140, at 9.)

Granting Related Relief (the "Bid Procedures Motion")].)  Specifically, the Bid Procedures included a provision stating that, "[t]he Plan Sale is being conduction under sections 1123(a) and (b) and 1129 of the Bankruptcy Code.  As such, no holder of a lien on any of the assets of the Debtors shall be permitted to credit bid pursuant to section 363(k) of the Bankruptcy Code." (P000250;Docket No. 1007, p. 9.)

The Debtors also sought to ensure the success of their Bidder by unleashing an aggressive "Keep It Local" publicity campaign that was, in the words of the Bankruptcy Court, clearly "slanted" toward the Stalking Horse bidder.  (L0000374-L0000375; Docket No. 1303 at 17:22-18:6.)[7]

On September 18, 2009, the Prepetition Lenders filed their Objections to the Bid Procedures Motion, objecting to the provision precluding them from credit bidding at the Auction and to provisions granting the Stalking Horse Bidder a break-up fee and expense reimbursement in the event another bidder prevails at the Auction.[8]  (L0000297-L0000330; Docket No. 1108.)

---

[7] As set forth in the Committee's motion objecting to the campaign, the Debtors mounted their campaign to champion the sale to the Stalking Horse and to deter any sale to or plan proposed by creditors or potential "out of town owners."  (L0000266; Docket No. 1033, at ¶9 [Motion for an Order (A) Directing Debtors to Cease Their Publicity Campaign Advocating a Sale of Substantially all Their Assets to "Local Owners" and (B) Granting Other Remedial Relief (the "Publicity Campaign Motion")].)  Among other things, the Debtors printed full-page advertisements in the Philadelphia Inquirer and Philadelphia Daily New advocating the consummation of a sale to "local ownership" and warning that sale to any other bidder could undercut the quality of journalism and even close one of the newspapers; posted "Keep it Local" messages and videos supporting the investment by the Stalking Horse on the Debtors' commercial news website, philly.com; sent a mass mailing to all advertisers advocating a sale to the Stalking Horse; and distributed "Keep it Local" buttons to all of their employees.  (L0000267-L0000269; *Id.*, ¶¶ 10-14.)  The Publicity Campaign Motion has not yet been resolved.

[8] The Prepetition Lenders, the Debtors, and the Committee engaged in mediation with Judge Fehling, which resolved numerous objections that the Prepetition Lenders had to the proposed bid procedures.  (L0000305; Docket No. 1108, at ¶9.)

On October 1, 2009, the Bankruptcy Court held a hearing on the Bid Procedures Motion, focusing on the Prepetition Lenders' objections.  (P000376-P000515; Docket No. 1195.)[9]

On October 8, the Bankruptcy Court entered a written opinion rejecting the provisions to which the Prepetition Lenders objected.  With respect to the credit bid issue before this Court, the Bankruptcy Court carefully assessed the relevant statutes and the case law cited by the parties and concluded that, on the law and the facts before it, there was no reason to deny the Lenders a credit bid right.  (P000028; Op. at 22.)  Indeed, the court stated, "it appears to this Court that the facts before it represent the case where the right to tender a credit bid should be an imperative." (P000025; Op. at 19.)

The Bankruptcy Court also based its decision on an alternative ground:  namely, that "it would not be appropriate … to approve the Debtors' tactics as a legitimate exercise of their business judgment."  (*Id.*)  Applying close scrutiny to the Debtors' proposed insider transaction, as it was required to do, the court concurred with the Lenders that the "Debtors' tactics are in furtherance of a strategy which is designed not to produce the highest and best offer for the Debtors' assets, but which is instead designed to promote the success of the Stalking Horse Bidder and the continuation of current ownership and management."  (P000027; Op. at 21.)

## STANDARD OF REVIEW

Pursuant to Rule 8013 of the Federal Rules of Bankruptcy Procedure, findings of fact by the bankruptcy court are set aside only if clearly erroneous.  *Schlumberger Res. Mgmt. Servs. v. CellNet Data Sys. (In re CellNet Data Sys.),* 327 F.3d 242, 244 (3d Cir. 2003); *see United States v. United States Gypsum Co.,* 333 U.S. 364, 395 (1948) (a factual finding is clearly erroneous

---

[9] The court allowed the parties until October 5, 2009, to submit supplemental briefs commenting on the Fifth Circuit's September 29, 2009, decision in *In re Pacific Lumber*, No. 08-40746, __ F.3d __, 2009 WL 3082066 (5th Cir. Sept. 29, 2009).

when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.").  Legal conclusions are reviewed de novo and mixed questions of law and fact are reviewed "under a mixed standard, affording a clearly erroneous standard to integral facts, but exercising plenary review of the lower court's interpretation and application of those facts to legal precepts."  *In re CellNet Data Sys.*, 327 F.3d at 244 (citing *In re Top Grade Sausage, Inc.*, 227 F.3d 123, 125 (3d Cir. 2000)).

Insider transactions are subject to a heightened level of scrutiny.  *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims (In re Papercraft Corp.)*, 211 B.R. 813, 823 (W.D. Pa. 1997) ("[I]nsider transactions are subjected to rigorous scrutiny and when challenged, the burden is on the insider not only to prove the good faith of a transaction but also to show the inherent fairness from the viewpoints of the corporation and those with interests therein.") (citing *Pepper v. Litton*, 308 U.S. 295, 306 (1939)); *see also In re Seminole Oil & Gas Corp.*, 963 F.2d 368, *6 (4th Cir. 1992); 7 Collier on Bankruptcy ¶ 1108.07[2] (15th ed. 2008).

I.    **The Bankruptcy Court Properly Rejected the Debtors' Efforts to Prevent the Prepetition Lenders from Exercising Their Right to Credit Bid at the Auction of the Debtors' Assets.**

   A.    **As a Preliminary Matter, the Debtors' Arguments Concerning the Committee's Investigation Into the "Recording Incident" Are Waived, Meritless, and Irrelevant.**

This Court is already familiar with many of the facts relating to the so-called "recording incident."  *See Phila. Newspapers, LLC v. Official Comm. of Unsecured Creditors*, 408 B.R. 585, 589 (E.D. Pa. 2009).[10]  On August 28, 2009, the parties entered a stipulation in which they

---

[10] During pre-petition negotiations, the Debtors, the Steering Group, and the Agent Bank met in person in Philadelphia on November 17, 2008 to discuss restructuring alternatives.  During the meeting, the Debtors' CEO, Brian Tierney, became aware that Steering Group member and CIT Group, Inc. representative, Vincent DeVito, was openly tape recording the meeting.  Tierney demanded that the recording device be turned off, and DeVito complied.  The Debtors sought to retain special counsel to investigate or bring claims concerning the incident, but the Bankruptcy Court denied their request, finding that pursuit of the matter would not benefit the estate.  This Court

agreed to suspend any investigation or pursuit of claims "until the earlier of (i) January 2, 2010 and (ii) such time as all indebtedness under the Creditors DIP is paid in full." (L0000247; Docket No. 1006 at 14, sec. 4(a).) The Debtors, however, are not content to let the matter rest, and brazenly attempt to inject it into this appeal (*see* appellants' brief at 4-6, 9, 28-29), even though they made *no mention* of the recording incident in any of their extensive briefs or oral argument in the Bankruptcy Court in connection with the credit bid issue that is the only issue before this Court. Consequently, neither the Prepetition Lenders nor the Bankruptcy Court have ever addressed the recording incident in this context, and this Court should not do so now.

It is well-established that "failure to raise an issue in the [trial] court constitutes a waiver of the argument." *Medical Protective Co. v. Watkins*, 198 F.3d 100, 105 n.3 (3d Cir. 1999) (citation omitted); *see also Harris v. City of Philadelphia*, 35 F.3d 840, 845 (3d Cir. 1994). This rule "applies with added force where the timely raising of the issue would have permitted the parties to develop a factual record." *In re American Biomaterials Corp.*, 954 F.2d 919, 927-28 (3d Cir. 1992). The courts depart from this rule only in exceptional circumstances, e.g., where "manifest injustice would result" from a failure to consider a novel issue. *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110, 1115 (3d Cir. 1993). The reason is simple: litigants may not hold issues in abeyance for the court of appeal, wresting from the lower court the opportunity to consider questions – especially fact-specific questions – in the first instance.

No exceptional circumstances exist to displace the waiver rule here. The Debtors could have raised this highly fact-specific issue below, and simply elected not to do so. They are thus barred from raising it now. In any event, the issue is meritless and irrelevant to the credit

---

affirmed this aspect of the Bankruptcy Court's opinion, but reversed to allow special counsel to give the Debtors legal advice. *See Phila. Newspapers, LLC*, 408 B.R. at 600-01. This Court also affirmed the Bankruptcy Court's decision to have the Committee investigate the incident. *Id.*

bidding question.  First, the Debtors offer no evidence or legal support for their conjecture that the recording incident could compromise the liens of any of the Prepetition Lenders.  To the contrary, as the Debtors have repeatedly stipulated, including in connection with the recording incident, all of the Prepetition Lenders' liens are valid and properly perfected.  (L0000235, Docket 1006 at 2, ¶C; L0000003, Docket No. 829 at 3, ¶J.)  Further, as noted above, the Debtors stipulated to suspend any investigation or litigation relating to taping until January 2010.  Having agreed to defer any action concerning the recording incident until after the date they proposed for the auction, the Debtors should not be heard to suggest that claims they may raise months after the auction has taken place will affect the auction process.  This Court should strike or disregard the Debtors' highly improper and inflammatory statements and arguments regarding this issue.

      **B.**     **The Bankruptcy Court Properly Analyzed the Bankruptcy Code Provisions Preserving the Basic Right of Secured Creditors to Bid the Amount of Their Debt at Any Sale of Their Collateral.**

Like most courts that have considered the right of secured creditors to credit bid at a sale pursuant to a plan (see section C, *infra*), the Bankruptcy Court analyzed multiple sections of the Bankruptcy Code, including provisions of sections 363, 1111, and 1129.  The Debtors would have this Court focus on section 1129(b)(2)(A)(iii) in isolation, but the Debtors' interpretation of that section merely begs the question whether courts may ignore the right to credit bid.  Only by reviewing the relevant statutes in relation to one another, with resort, as necessary, to the congressional record, can the overarching scheme of the Code with respect to credit bidding be fully understood.

In keeping with the Fifth Amendment of the Constitution,[11] the Bankruptcy Code and the courts recognize the importance of preserving the benefit of the bargain struck by a secured creditor even in the greater context of a debtor's rehabilitation efforts. *See, e.g., Southerton Corp. v. United Penn Bank (In re Southerton Corp.)*, 46 B.R. 391, 397-98 (M.D. Pa. 1982) (the Bankruptcy Code strives to ensure that secured creditors receive in value essentially what they bargained for); *Commonwealth of Pa. State Employees' Ret. Fund v. Roane*, 14 B.R 542, 544-45 (E.D. Pa. 1981) (same). A crucial aspect of the bargain struck by a secured creditor is the ability to resort to the collateral securing its claim. *In re Briggs Transportation Co.*, 35 B.R. 210, 214 (Bankr. D. Minn. 1983). Indeed, the ability to access collateral (and thus lend on a secured basis) is a crucial component of a creditor's decision to lend to a given borrower.

The Bankruptcy Code provides two specific means by which a secured creditor can protect the value of its collateral – by credit bidding as allowed by section 363(k) and by making an election pursuant to section 1111(b). As discussed below, the Debtors rendered the section 1111(b) election unavailable to the Prepetition Lenders by electing to sell their assets at an auction. Accordingly, the only protection available to the Prepetition Lenders is the right to credit bid. This right cannot be cut off without depriving the Prepetition Lenders of their constitutionally protected rights under the Bankruptcy Code, as Congress recognized when it passed section 1111.

---

[11] It is well-established that Congress's "bankruptcy power is subject to the Fifth Amendment's prohibition against taking private property without compensation." *United States v. Sec. Indus. Bank*, 459 U.S. 70, 75 (1982); *see also Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589-90 (1935). In keeping with the Fifth Amendment, this Circuit, along with numerous others, has recognized that "[t]he rights of a secured creditor in the debtor's assets are 'property' subject to a 'taking.'" *City of New York v. Quanta Res. Corp. (In re Quanta Res. Corp.)*, 739 F.2d 912, 922 (3d Cir. 1984). Further, the Bankruptcy Code protects the "right of a secured creditor to have the value of its secured position maintained *throughout* the proceeding." *United Savings Ass'n of Tex. v. Timbers of Inwood Forest Assocs. (In re Timbers of Inwood Forest Assocs.)*, 793 F.2d 1380, 1390 n.14 (5th Cir. 1981) (internal quotations omitted) (emphasis added).

**(1)    Section 363(k) Preserves A Secured Lender's Right to Credit Bid.**

Bankruptcy Code section 363(k) empowers a secured lender to credit bid the full face amount of its claim when the collateral securing its claim is sold outside the ordinary course of business.  Section 363(k) provides:

> At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. § 363(k).[12]

By granting a secured creditor the right to credit bid its claim, the Bankruptcy Code preserves the secured creditor's status by ensuring that its debt is either paid in full or that the collateral remains in place to secure the debt.  *See Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 461 (3d. Cir. 2006) ("Because the Lenders had a valid security interest in essentially all the assets sold … [t]heir credit bid did nothing more than preserve their right to the proceeds, as credit bids do under § 363(k)"); *see also In re Finova Capital Corp.*, 356 B.R. 609, 626 (Bankr. D. Del. 2006) (same).[13]

**(2)    Section 1111 confirms the Prepetition Lenders' right to credit bid.**

Although section 363(k) does not, by its express terms, apply to the sale of collateral in the context of a plan, congressional intent makes clear that a secured creditor has the right to

---

[12] Section 363(k) does not limit a secured creditor's bid to the economic value of its secured claim; a secured creditor may bid the full amount of its claim regardless of the underlying value of its collateral.  *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 459 (3d. Cir. 2006); *In re Morgan House General P'ship*, Nos. 96-MC-184 & 96-MC-185, 1997 WL 50419, at *1 (E.D. Pa. Feb. 7, 1997) (holding that secured creditor under section 363(k) was authorized to bid on its collateral to the extent of its claim).

[13] Bankruptcy Code section 363(k) authorizes a court, for cause, to restrict a secured creditor from credit bidding at a sale of its collateral, but courts have narrowly construed this provision to apply in situations where the validity of a lien or the good faith of the secured creditor is put in question.  Because no such circumstances exist here, the Bankruptcy Court properly found that no cause to prevent the Prepetition Lenders from credit bidding in this case.  (P000028; Op. at 22.)

credit bid whenever its collateral is being sold.  This right is critical where, as here, a secured lender has been stripped of the second form of protection available to it under the Bankruptcy Code:  the section 1111(b) election.

Bankruptcy Code section 1111(b) was enacted, among other things, to provide non-recourse creditors with a mechanism to enforce any deficiency claims held by such creditors against the debtor or its estate.  11 U.S.C. § 1111(b)(1)(A).  It is undisputed that the Prepetition Lenders have recourse against the Debtors pursuant to the Prepetition Credit Agreement, and are thus ineligible for the benefits afforded to non-recourse creditors.  However, section 1111 also provides both recourse and non-recourse secured creditors with the option to elect to have their claims treated as secured claims, even when they are bifurcated into secured and unsecured deficiency claims pursuant to section 506(a).  11 U.S.C. § 1111(b)(2).[14]

A section 1111(b) election allows an undersecured creditor to convert its right to a deficiency claim into a claim fully secured by the subject collateral.  If a secured creditor makes a section 1111(b) election, the debtor's plan must provide that the secured creditor will receive payments equal to the total amount of the creditor's claims with such payment obligation having a present value equal to the current value of the creditor's collateral (or, stated differently, the value of the creditor's secured claim).  *See, e.g.,* 7 Collier on Bankruptcy, ¶1111.03[4] (15th ed. 2008).  As a practical matter, section 1111(b) prevents an insider from appropriating the future

---

[14] Pursuant to Bankruptcy Code section 506(a)(1), a secured creditor's claim "is a secured claim to the extent of the value of such creditor's interest in the estate's interest in [the property securing such claim]…and is an unsecured claim to the extent that the value of such creditor's interest…is less than the amount of such allowed claim."  11 U.S.C. § 506(a)(1).   An undersecured creditor thus has, pursuant to sections 506(a) and 1111(b)(1), both a secured claim (fixed at the value of the collateral underlying the claim) and an unsecured deficiency claim assertable against the debtor's estate for that portion of the creditor's claim not covered by the value of the collateral.

value of collateral by buying up a debtor's assets when (as here) the market value of those assets is deeply depressed.

A secured creditor with recourse is, however, statutorily prohibited from making an 1111(b) election when such creditor's collateral is sold, either under section 363 or pursuant to a plan. 11 U.S.C. § 1111(b)(1)(B)(ii) (a secured creditor cannot make an 1111(b) election if "the holder of a [secured claim] has recourse against the debtor on account of such claim and such property is sold under section 363 of this title or is to be sold under the plan.").[15] The reason for this exclusion is not spelled out in the statute, but is clarified by the Congressional Record, which states that a "sale of property under section 363 or under a plan is excluded from treatment under section 1111(b) *because of the secured party's right to bid in the full amount of its allowed claim at any sale of collateral under section 363(k)* of the House Amendment." 124 Cong. Rec. 32,407 (1978) (statement of Rep. Edwards), reprinted in 1978 U.S.C.C.A.N. 6474 (emphasis added). In other words, a secured creditor may be deprived of its ability to make an 1111(b) election when its collateral is sold either under section 363 or pursuant to a plan because the secured creditor's right to credit bid is sufficient to protect its interests in the property. As explained by the leading bankruptcy treatise on which courts routinely rely, "the reason for the inclusion of the exception contained in section 1111(b)(1)(B)(ii) is that a secured creditor has the opportunity to protect its position. It may bid its debt at the sale of the collateral and recover the collateral. This ability gives it the benefit of its bargain and requires no special protection." 7 Collier on Bankruptcy ¶ 1111.03[3][b].

---

[15] The Debtors insist that section 1111(b) is irrelevant to this case because it is inapplicable. But it is "inapplicable" only because the Debtors chose to sell their assets by means of a public auction, thereby depriving the Prepetition Lenders of the right to make an election under section 1111(b)(2). The loss of this protection is of course highly relevant to the issue whether the Lenders should be allowed to credit bid.

The Debtors' refrain that the legislative history need not and should not be consulted is belied by the fact that virtually every court to consider the impact of section 1111(b) on the right to credit bid has – like the Bankruptcy Court here – cited to the Congressional Record as an aid to interpreting its language.  *E.g., In re 222 Liberty Associates*, 108 B.R. 971, 978 (Bankr. E.D. Pa. 1990); *In re Matrix Dev. Corp,* No. 08-32798, 2009 WL 2169717, *8 (Bankr. D. Or.  July 16, 2009); *In re Suncruz Casinos, LLC*, 298 B.R. 833, 838 (Bankr. S.D. Fla. 2003); *In re Kent Terminal Corp.*, 166 B.R. 555, 565 (Bankr. S.D.N.Y. 1994); *In re Realty Investments, Ltd*. 72 B.R. 143, 146 (Bankr. C.D. Cal. 1987).  As the *222 Liberty* court put it, "The fact that commentators such as Collier and other courts interpreting § 1111(b) all refer to the legislative history when construing the section, supports our belief that the language, or the 'natural reading,' of the section is not so clear that reference to the legislative history is not necessary." 108 B.R. at 978.  *See also Connecticut National Bank v. Germain*, 503 U.S. 249, 255 (1992) (Stevens, J., concurring) ("Whenever there is some uncertainty about the meaning of a statute, it is prudent to examine the legislative history.").

> **(3)** **Section 1129 does not permit the Debtors to deny the Prepetition Lenders the right to credit bid.**

Bankruptcy Code section 1129(b)(2)(A) allows a debtor to cram down a plan on a non-consenting secured creditor if the debtor can satisfy one of three disjunctive cram down methods: (i) allowing the secured creditor to retain its lien on its collateral and receive deferred cash payments equaling the present value of the creditor's allowed secured claim; (ii) allowing the secured creditor to obtain a lien on the proceeds from "the sale (subject to 363(k))" of its collateral and receive deferred cash payments equaling the present value of the creditor's

allowed secured claim; or (iii) providing the secured creditor with the "indubitable equivalent" of its allowed secured claim.[16]

The Debtors maintain they can avoid a secured creditor's right to credit bid under section 1129(b)(2)(A)(ii) by asserting that the underlying plan of reorganization complies with 1129(b)(2)(A)(iii). The Debtors are mistaken. As the Bankruptcy Court observed, the Debtors' arguments represent "a not so thinly veiled attempt to manipulate the sale process in order to frustrate a credit bed which the Debtors anticipate will exceed the bid of the Stalking Horse." (P000017; Op. at 11).

First, section 1129 (entitled "Confirmation of Plan") applies only to plan confirmation. The Debtors have elected to sell the Prepetition Lenders' collateral at an auction. The Auction will occur prior to plan confirmation, and must be conducted in accordance with the requirements of the Bankruptcy Code, the Constitution, and applicable case law. At the plan confirmation hearing that will follow the Auction, section 1129 will apply and must be satisfied. Section 1129 cannot, however, be read to take away the fundamental right to credit bid at an auction any more than it could be interpreted to modify a secured creditor's right to adequate protection, or the requirements for the use of its cash collateral, or any other right that a secured creditor has during the course of a bankruptcy case.

Further, even assuming *arguendo* that section 1129 is applicable, it does not eviscerate a secured creditor's right to credit bid. To the contrary, as the Bankruptcy Court observed, section

---

[16] Section 1129(b)(2)(A) provides: "(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in the property; (ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or (iii) for the realization by such holders of the indubitable equivalent of such claims." 11 U.S.C. § 1129(b)(2)(A).

1129(b)(2)(A)(ii) explicitly preserves that right in the context of a sale by including the words "subject to section 363(k)."  (P000017; Op. at 11.)  Commentators have construed this to mean that any sale conducted in the context of a plan of reorganization invariably includes the right to credit bid.  *See* Haydon et al., *The 1111(b)(2) Election:  A Primer*, 13 Bank. Dev. J. 99, 112 (1996); Rubinger & Marsh, *"Sale of Collateral" Plans Which Deny A Nonrecourse Undersecured Creditor the Right to Credit Bid:  Pine Gate Revisited*, 10 Bank. Dev. J. 265, 268 (1994).

The Bankruptcy Court followed this common sense approach, reasoning that section 1129(b)(2)(A)(iii) cannot be used to displace section 1129(b)(2)(A)(ii) "when the <u>exact</u> means by which the plan intends the indubitable equivalent cramdown of a dissenting creditor is a cash out of the creditor via an auction sale such as is provided for in detail under the second of the three described alternatives."  (P000017**;** Op. at 11 (original emphasis).)  In other words, when a debtor elects to cram down a plan using the sale method described in section 1129(b)(2)(A)(ii), that sale is necessarily subject to section 363(k), in keeping with the express directive of that provision.

The Bankruptcy Court's approach comports with the canons of statutory construction.  If a sale could be consummated without allowing for credit bidding, there would be no need to include the term "subject to 363(k)" in section 1129(b)(2)(A)(ii).  *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (citation and quotations omitted); *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (courts are "reluctant to treat statutory terms as surplusage in any setting.") (citation and quotations omitted).  By the same token, if a section 1129(b)(2)(A)(ii) sale could be deemed fair and equitable so long as it

included credit bidding *or* provided the creditor with the indubitable equivalent of its claim,

Congress would have said so.  Because section 1129(b)(2)(A)(ii) specifically provides for credit

bidding, and only for credit bidding, it cannot be diluted by means of the more general

alternative provided by section 1129(b)(2)(A)(iii), especially where, as here, dilution would run

counter to congressional intent.  *See, e.g., In re Combustion Eng'g Inc.*, 391 F.3d 190, 237 n.50

(3d Cir. 2004) (section 105(a) of the Bankruptcy Code cannot be used to achieve a result not

contemplated by more specific provisions of the Code); *cf. United States v. Ron Pair Enters.,

Inc.*, 489 U.S. 235, 243 (1989) (in rare cases where strict language is at odds with congressional

intent, the latter controls).

 In sum, review of sections 363, 1111, 1129, and the relevant legislative history makes

plain Congress's intent:  a debtor cannot transfer the inherent value of a secured creditor's

collateral to another party (least of all an insider) without affording the secured creditor the

right to (1) take the property through a credit bid, (2) be repaid its entire claim by being outbid

on its credit bid, or (3) preserve its entire claim secured by the collateral through an 1111(b)

election.  The Debtors' reading of the Code would abrogate the right to credit bid even in

situations where a creditor cannot make a section 1111(b) election, leaving the creditor shorn of

any protection, contrary to the intent of Congress, the purpose of the Code, and the

Constitution.

 **C.** **Judicial Authority Overwhelmingly Establishes that a Secured Creditor Cannot Be Deprived of Its Right to Credit Bid Under the Undisputed Facts Presented Here.  *Pacific Lumber* Is Not to the Contrary.**

 **1.** **Case law in this district.**

Courts in this district have unequivocally confirmed that an undersecured creditor is

entitled to credit bid at the sale of its collateral under the circumstances presented here.  In *222

Liberty Associates*, for example, the bankruptcy court squarely rejected a plan that failed to

afford a secured creditor, under circumstances similar to those presented here, "its right to credit bid, as required by 11 U.S.C. §§ 363(k), 1111(b) and 1129(b)."  108 B.R. 971, 973-4 (Bankr. E.D. Pa. 1990).  The *222 Liberty* debtor was a limited partnership holding a single asset, an office building located in Philadelphia (the "Property").  The Property was subject to a mortgage held by creditor Goldome Realty Credit Corporation ("Goldome"), which had granted the debtor a $6.5 million construction loan prior to the petition date.  One of the debtor's proposed bankruptcy plans contemplated that the debtor's general partner and plan proponent, David Wolk, would commit to fund plan distributions.  In exchange for Wolk's commitment to fund the plan, the debtor was required to sell Wolk or his designee, among other things, all of the debtor's rights, title, and interest in the Property.  The plan also required that a final order be entered decreeing that the sale of the Property was not subject to section 363(k), and that Goldome was therefore not entitled to credit bid at the proposed sale.

Goldome objected to the plan on the grounds that, among other things, it stripped Goldome of its right to credit bid for the Property.  The court sustained Goldome's objection based on its review of sections 363, 1111, and 1129.  In performing its statutory analysis, the court relied on the Congressional Record accompanying section 1111 to conclude that Congress intended a secured creditor to be able to bid the full amount of its claim at any sale of collateral. *222 Liberty*, 108 B.R. at 978-79; *see id.* at 980 (observing that, "where, as here, the words of the statute are not sufficiently clear so that the statute can be readily interpreted, reference to legislative history is critical").

Given this legislative backdrop, the court concluded that the proposed plan contravened Congress's intent to protect secured creditors by depriving Goldome both of its rights under section 1111(b) and of its right to credit bid for the Property. *222 Liberty*, 108 B.R. at 979-80

18

("if we adopt Wolk's position and hold that Goldome is not permitted to credit-bid nor permitted to be treated as a recourse creditor, then the [reorganization plan] will cash out Goldome's claim at the court-determined fair market value of the Property rather than the amount to which the Debtor agreed to pay in the original contract and mortgage and Goldome will be unable to protect itself by bidding what it believes is the value of the Property at the planned sale.  This is precisely what … Congress sought to avoid by the enactment of §§ 1111(b) and 1129(b).") (citation and footnote omitted).[17]  *See also In re River Village Assocs.,* 181 B.R. 795, 805-06 (E.D. Pa. 1995) (affirming secured creditor's right to credit bid over debtor's objection, and observing that "Congress did not intend to deprive creditors of the right to bid their full claim under a plan of reorganization").

The bankruptcy court in *In re Orfa Corp. of Philadelphia,* Nos. 90-11253S, 90-11254S & 90-11255S, 1991 WL 225985, *5 (Bankr. E.D. Pa. Oct. 30, 1991) confirmed that, under the circumstances presented here and in *Liberty 222*, a creditor cannot be deprived of its right to credit bid.  Citing *222 Liberty*, the *Orfa* court observed that, while section 363(k) does not by its express terms apply to a sale conducted pursuant to a plan, "there are certain circumstances in which the requirements of §§ 363(b),(k) cannot be avoided, even though a sale takes place within the plan process, because the particular sale provided for in the plan would frustrate other Code provisions."  *Orfa*, 1991 WL 225985 at *6.  The court explained that such circumstances exist where a debtor seeks to "cash out the creditor's secured claim, already significantly 'stripped

---

[17] Courts are inconsistent in their analysis as to whether *nonrecourse* secured creditors are also prohibited from making an 1111(b) election if the collateral securing their claim is sold.  This distinction is largely irrelevant here because: (i) the Prepetition Lenders are recourse lenders and are therefore clearly prohibited from making an 1111(b) election in connection with the proposed plan; and (ii) while the Prepetition Lenders arguably derive a benefit by virtue of their recourse status, the distribution estimated to be received by the Prepetition Lenders on account of their deficiency claim is valued at less than 1%.  (L0000204-L0000205; Debtors' Disclosure Statement With Respect to the Joint Chapter 11 Plan, Docket No. 946, at 8-9.)  Accordingly, the Prepetition Lenders are in virtually the same position they would be in if they were nonrecourse creditors and, as a result, may very well have made an 1111(b) election had the option been available to them.

down' by 11 U.S.C. § 506(a) … to the value of the secured asset, without providing it with an

§ 1111(b) election or a right to credit bid, the very 'evils' which §§ 1111(b) and 1129(b) were

enacted to prevent."  *Id.*  (internal citation omitted)

The *Orfa* court ultimately determined that the fully secured creditor asserting its right to

credit bid in that case was not entitled to do so because:  (i) the proposed purchaser of the

collateral was neither an insider nor a plan proponent, and (ii) the secured creditor contesting

confirmation of the plan was either oversecured or, at worst, slightly undersecured.  *Orfa*, 1991

WL 225985 at *7.  In other words, the secured creditor would receive virtually full payment of

its claim under the debtor's plan.  In those circumstances – which are the reverse of those

presented here – the *Orfa* court found that the secured creditor's interests were already protected

by virtue of the value of its collateral.

### 2.    Case law outside this district.

Courts outside this jurisdiction have overwhelmingly agreed that a secured creditor

should not be deprived of its right to credit bid in connection with the sale of assets pursuant to a

plan.  *See e.g.*, *In re Realty Investments, Ltd. V*, 72 B.R. 143, 146 (Bankr. C.D. Cal. 1987)

("legislative history makes it clear that the rights of section 363(k) attach to sale of property

under the plan"); *In re Suncruz Casinos, LLC*, 298 B.R. 833, 839 (Bankr. S.D. Fla. 2003)

(holding that debtor's attempt to limit secured creditor's right to credit bid "contravenes the plain

language of section 363(k) and its legislative history, and therefore is improper"); *In re Kent

Terminal Corp.*, 166 B.R. 555, 566-67 (Bankr. S.D.N.Y. 1994) (holding that "if a plan proposes

the sale of a creditor's collateral free and clear of liens, the lienholder has the unconditional right

to bid in its lien"); *H&M Parmely Farms v. Farmers Home Admin.*, 127 B.R. 644, 648 (D.S.D.

1990) (holding that "where a Chapter 11 plan contemplates liquidation of certain assets, the

intent of § 363(k) is to notify the creditor of the upcoming sale of the secured property and allow it to reap the 'benefit of the bargain' by 'bidding in debt' to the full amount of its allowed claim"); *In re Matrix Dev. Corp.,* No. 08-32798, 2009 WL 2169717 at *8 (Bankr. D. Or. July 16, 2009) (holding that "Section 1111(b) was enacted to protect the rights of secured creditors by ensuring that they either received full payment of their allowed claims or retained the right to retake their collateral via a credit bid at a sale, either under § 363 or under [a plan]"). In each of these cases, as in *222 Liberty* and *Orfa*, the courts considered the interplay of section 1111 with sections 363 and 1129 in upholding the rights of secured creditors to credit bid at sales pursuant to a plan of reorganization.

Only two cases have permitted debtors to curtail the credit bid rights of secured creditors in the context of sales pursuant to a plan of reorganization. In *In re Criimi Mae, Inc.*, 251 B.R. 796 (Bankr. D. Md. 2000), the bankruptcy court ruled that a proposed chapter 11 plan that provided for the sale of a secured creditor's collateral without affording it the right to credit bid was capable of being confirmed so long as the plan provided the creditor with substitute collateral amounting to the indubitable equivalent of its claim (an issue the court did not reach). 251 B.R. at 806-08. Unlike nearly every other court to have considered the issue, the court in *Criimi Mae* failed to consider the interplay among sections 363, 1111, and 1129, or take into account the relevant legislative history. (*See* P000014; Op. at 14 (criticizing *Criimi Mae* on these grounds and observing that, as a result of its cabined approach, the opinion "seems to allow one to accomplish indirectly a result unavailable by direct application of the statutory scheme")).[18]

---

[18] The *Criimi Mae* court did not indicate whether the debtors were undersecured like the Lenders here, or oversecured and thus arguably not in need of the protections afforded by section 1111 and 363. Review of the

In its recent ruling in *In re Pacific Lumber Co.*, No. 08-40746, __ F.3d __, 2009 WL 3082066, (5th Cir. Sept. 29, 2009), the Fifth Circuit affirmed (on direct appeal) a bankruptcy court's decision confirming a plan of reorganization over the secured creditors' objection, *inter alia*, that they did not have a chance to credit bid when collateral valued by the bankruptcy court was transferred from the debtors to two newly formed entities. *Pacific Lumber*, which is not controlling in this Circuit, is, as the Bankruptcy Court found, distinguishable on its facts.

In *Pacific Lumber*, secured creditors (the "Noteholders") challenged confirmation of a chapter 11 plan to reorganize Pacific Lumber Company ("Palco") and its wholly owned special purpose entity, Scotia Pacific LLC ("Scopac"). 2009 WL 3082066 at *2. The Noteholders' claim (worth approximately $740 million) was secured by Scopac's assets, which included 200,000 acres of redwood timberland (the "Timberlands"). Under the plan proposed by a Palco competitor and secured creditor, and approved by the bankruptcy court, the debtors' assets, including the Timberlands, would be transferred to two new entities formed by the plan proponent *Id.* Following the transfer, the Noteholders would receive $513.6 million in cash – including the amount ($510 million) at which the bankruptcy court valued the Timberlands – along with any payments that might flow to their unsecured deficiency claim and a lien on the proceeds of certain outside litigation. *Id.* at *2-3.

The Noteholders objected to confirmation of the plan, asserting, *inter alia*, that the plan was not fair and equitable because the Timberlands collateral was to be transferred without providing the Noteholders a chance to credit bid. 2009 WL 3082066 at *4. Contrary to the bankruptcy court's holding, the Noteholders argued the transfer of assets pursuant to the plan

underlying briefing reveals that under the proposed plan, the secured creditor would be paid the full amount of its claim, including accrued interest and fees. (*See* P000406-P000407; Docket No. 1195 at 31:21 - 32:3.)

was in effect a sale, and should have been controlled by Bankruptcy Code section 1129(b)(2)(A)(ii).

The Fifth Circuit affirmed the bankruptcy court's ruling in part. Specifically, it ruled that, while section 1129(b)(2)(A)(ii) "theoretically applied to this transaction," which was in fact a sale, the Noteholders had not demonstrated that it applied "exclusively." 2009 WL 3082066 at *9. The Court of Appeals recognized that "a credit bid option might render [1129(b)(2)(A)(ii)] imperative in some cases," *id.* at *9, but did not elaborate as to those circumstances. According to the Court, 1129(b)(2)(A)(iii) could apply if the amount paid to the Noteholders represented the indubitable equivalent of the value of their collateral. *Id.* The Court next considered the bankruptcy court's valuation of the collateral and its determination that the Noteholders received the indubitable equivalent of their claims under the plan. Because the bankruptcy court's rulings were not clearly erroneous, the Court concluded that the plan was fair and equitable under 1129(b)(2)(A)(iii). *Id.* at *8-12.

As a procedural matter, the dispute before this Court is distinct from *Pacific Lumber* because it arises in the context of a motion to approve bid procedures, not plan confirmation. Unlike the Prepetition Lenders here, the Noteholders in *Pacific Lumber* waited until the plan had been confirmed by the bankruptcy court to assert their right to credit bid. Indeed, the Noteholders did not object to the procedure by which title to the collateral would be transferred until after the bankruptcy court had conducted a lengthy valuation trial – at which point they belatedly argued that the assets should have been sold at auction. *See Pacific Lumber*, 2009 WL 3082066 at *11 (holding the creditors waived their auction argument). In other words, the Noteholders' objection was evidently based on their dissatisfaction with the result they obtained rather than with the process in the first instance. As a result of the secured creditors' strategy,

*Pacific Lumber* did not go up on appeal until the bankruptcy court had ruled on valuation, determined that the Noteholders had received the indubitable equivalent of their claim, and confirmed the plan.  The Court of Appeals reviewed these rulings for clear error, and determined that the bankruptcy court had not clearly erred.  Not surprisingly, perhaps, the Court of Appeals gave short shrift to the Noteholders' eleventh hour argument that they were deprived of the right to credit bid.  In this case, by contrast, the Prepetition Lenders timely objected to the Debtors' Bid Procedures, by which the Debtors seek to sell substantially all of their assets to a Stalking Horse Bidder whom they have freely acknowledged is an insider.  (P000451; Docket No. 1195 at 76.)

As a substantive matter, *Pacific Lumber* is distinct from this case because it involved the transfer of assets pursuant to judicial valuation rather than an auction designed to ensure the success of an insider Stalking Horse bidder.  In *Pacific Lumber*, the bankruptcy court valued the collateral in a neutral and impartial manner after considering the testimony of no fewer than eight valuation experts (including two tendered by the Noteholders).  2009 WL 3082066 at *11-12.  There were no findings that the sale process was being manipulated to maximize insider interests or prejudice the secured creditors.  Here, by contrast, the Bankruptcy Court made just such findings.  Indeed, the very reason the Debtors proposed to curtail credit bidding was to cut out the secured creditors and artificially constrain competitive bidding, for the sole purpose of ensuring that the Debtors' insiders could retain the assets and entrench current management.  (P000024-P000025, P000027; Op. at 18-19, 21.)  As the Bankruptcy Court found, the Debtors' scheme was thus incompatible with the purpose of an auction, namely, to encourage the fair, open and competitive sale of the debtor's assets while maximizing the value of the estate for the debtor's creditors.  (P000024-P000025; Op. at 18-19.)  *See also In re Edwards*, 228 B.R. 552,

561 (Bankr. E.D. Pa. 1998). Unlike *Pacific Lumber*, the Bankruptcy Court concluded, the facts

of this case make it one "where the right to credit bid should be an imperative." (P000024; Op. at

19.)

The *Pacific Lumber* case is distinguishable for another reason. As in *Criimi Mae*, the

court made no effort to square legislative intent with its interpretation of 1129(b)(2)(A). The

court remarked in passing that the Noteholders had "declined" to make an election under section

1111(b)(2), apparently failing to avail themselves of a means of protecting their investment. *See*

2009 WL 3082066 at nn.8, 21. But if the Noteholders' collateral were being sold, as the Court of

Appeals determined, they could not have made a section 1111(b) election. The reason for the

Fifth Circuit's misapprehension is clarified by a review of the underlying bankruptcy court

decision. Because the bankruptcy court determined that the transfer of assets under the plan was

*not* a sale, and did not preclude the Noteholders from making a section 1111(b)(2) election, it

found that the Noteholders were sufficiently protected by section 1111(b) and did not need the

additional protection of credit bidding.[19] When the Fifth Circuit determined that the asset

transfer was, in fact, a sale, it should have understood that the Noteholders were therefore

ineligible for section 1111(b) protection. Consequently, it should have recognized that the

Noteholders were entitled to credit bid, as set forth in the Congressional Record and case law

interpreting section 1111(b). Because the Fifth Circuit apparently misconstrued the Noteholders'

rights under section 1111, it did not proceed to analyze the statute in relation to sections 1129

and 363, as it should have done, and as the Bankruptcy Court did here.

---

[19] *See In re Scotia Dev. LLC, et al.*, Case No. 07-20027-C-11 (Bankr. S.D. Tex. June 6, 2008), Findings of Facts and Conclusions of Law Regarding (A) Confirmation of MRC/Marathon Plan; (B) Denial of Confirmation of the Indenture Trustee Plan and (C) Denial of the Motion to Appoint A Chapter 11 Trustee (Dkt. No. 3088), at pp. 114-15.

Based on the factual distinctions set forth above, the Bankruptcy Court concluded that the Fifth Circuit would have ruled differently had this case been before it. (P000024-P000025; Op. at 18-19.) Accordingly, *Pacific Lumber* does not compel the outcome favored by the Debtors.

> **D.    The Prepetition Lenders Have a Contractual Right to Credit Bid, Which the Bankruptcy Code Requires the Court to Protect.**

Finally, the Prepetition Lenders' right to credit bid is preserved by the Credit and Guaranty Agreement (L0000386; section 9.09(b), Right to Realize on Collateral and Enforce Guaranty) and Security Agreement (L0000389; section 7.01(b)) with the Debtors, which specifically provides for the Prepetition Lenders to credit bid at sales of their collateral. This contractual right exists separate and apart from the Bankruptcy Code and should not be lightly dismissed. When construing the Code, every effort should be made to preserve a creditor's state law rights vis-à-vis the debtor. "[R]ights of the secured creditor … at the time of the filing of the bankruptcy petition are created and defined by state law, except to the extent that the Bankruptcy Code specifically authorizes a departure from state law." *Matter of Kennedy*, 158 B.R. 589, 601 (Bankr. D.N.J. 1993) (citation and quotations omitted). The Code authorizes no such departure here. *See Butner v. U.S.*, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."). This is particularly true where, as here, congressional intent clearly indicates that a given right was meant to be preserved and protected.

**II.    Denying the Prepetition Lenders the Right to Credit Bid Will Serve the Debtors' Insiders at the Expense of the Secured Creditors and May Critically Impair the Lending Market.**

After rejecting the Debtors' legal arguments, the Bankruptcy Court found that, as an equitable matter, "it would not be appropriate … to approve the Debtors' tactics as a legitimate

exercise of their business judgment." (P000025; Op. at 19.) Applying close scrutiny to the

Debtors' proposed insider transaction, as it was required to do, the court found that the Debtors

were unable to show that their tactics were anything but "a strategy which is designed not to

produce the highest and best offer for the Debtors' assets, but which is instead designed to

promote the success of the Stalking Horse Bidder and the continuation of current ownership and

management." (P000027; Op. at 21.)

Should the Debtors succeed in manipulating the auction process to deny the Prepetition

Lenders the right to credit bid, they will be able to retain control of the company at the expense

of its creditors. Debtors will thus effectively eviscerate the bargain struck between the Lenders

and the company when they negotiated and signed the credit documents, in contravention of the

Constitution, the Code, and the Debtors' contractual rights.

The Debtors argue that the Lenders are free to make a cash bid, but this reasoning ignores

the principles and structure of the Bankruptcy Code. Creditors who are already undersecured to

the tune of several hundred million dollars cannot be required to risk new money to protect the

value of their collateral (P000015-P000016; Op. at 9-10). Further, as explained at oral argument,

some of the Lenders are, as a practical matter, structurally unable to submit a cash bid. (*See*

P000453-P000454; Docket No. 1195 at 78:12 - 79:18.)

Denying the Prepetition Lenders the right to credit bid could also have far reaching

ramifications in the lending market. A secured creditor, especially one who has recourse to a

debtor's collateral, is exposed to a lower degree of risk than a creditor who lends on an

unsecured basis, and incurs lower overall costs when it comes to enforcing payment of a

delinquent debt. Accordingly, creditors who lend on a secured basis generally charge less for a

loan than creditors who lend on an unsecured basis. *See* Ronald J. Mann, *Explaining the Pattern*

*of Secured Credit*, 110 Harv. L. Rev. 625, 638-9 (1997) (discussing the cost savings obtained by secured creditors, and how those savings translate into reduced costs for borrowers).

The risk calculus is also affected by the panoply of rights associated with a typical secured loan including, among others, the right to foreclose on collateral after a default outside of bankruptcy and the right to participate by credit bidding at an auction conducted after a bankruptcy. If creditors' established rights are curtailed, they will sustain greater risks, and consequently fold into the price of their loans the costs associated with such risks, including the cost of enforcing repayment. A ruling for the Debtors could therefore result in more expensive financing for borrowers going forward, exacerbating an already troubled and uncertain lending market.

### III. This Court Should Disregard the Debtors' Newly Minted Parade of Horribles.

The Debtors argue for the first time on appeal that affirmance of the Bankruptcy Court's opinion will prejudice members of the Lender group who would prefer not to credit bid and "torpedo[]" the cash distribution under the Debtors' Plan. As noted above, arguments made for the first time on appeal are waived. *E.g.*, *Medical Protective Co. v. Watkins*, 198 F.3d at 105-06 n.3. In any event, the Debtors' speculations are groundless. There is nothing to suggest that any of the Prepetition Lenders object to credit bidding. Even if there were dissenters among the Lenders, they are contractually bound to an arrangement by which the majority has authority to instruct the Agent to credit bid. (L0000386; Credit and Guaranty Agreement, sec. 9.09(b)**.**) The merits of that arrangement are irrelevant to the issue whether the Prepetition Lenders should be permitted to credit bid. As for the issue of cash resources, there is no reason to believe "there will be no cash to distribute" should the credit bidders prevail at the Auction. The Lenders have recourse to cash on hand and exit facility mechanisms to ensure that a plan can be confirmed in keeping with the requirements of the Code. That the plan will be different from the one

conceived by the Debtors – which presumes that the Stalking Horse will be the prevailing bidder – is no reason to assume it will not be successful.  In any event, as the Bankruptcy Court observed at oral argument, the issue of cash resources is a confirmation issue that will apply to any bidder, including the Stalking Horse, and thus not a ground to exclude credit bidding. (P000448-P000449; Docket No. 1195 at 73:23 - 74:7.)

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should affirm the Bankruptcy Court's Order

denying the Bid Procedures Motion insofar as it precludes the Prepetition Lenders from credit

bidding.

Dated: October 23, 2009

                    Respectfully Submitted,

                    _/s/ Andrew J. Flame_____
                    Andrew C. Kassner
                    David F. Abernethy
                    Andrew J. Flame
                    DRINKER BIDDLE & REATH LLP
                    One Logan Square
                    18th & Cherry Streets
                    Philadelphia, PA 19103-6996
                    Telephone: (215) 988-2700
                    Fax: (215) 988-2757
                    Email: andrew.kassner @dbr.com
                    Email: andrew.flame@dbr.com

                    Attorneys for Citizens Bank of Pennsylvania, as
                    Agent, on behalf of the Prepetition Lenders

                    - and -

                    Fred S. Hodara
                    Abid Qureshi
                    Alexis Freeman
                    AKIN GUMP STRAUSS HAUER & FELD LLP
                    One Bryant Park
                    New York, NY   10036
                    Telephone:  (212) 872-1000
                    Facsimile:   (212) 872-1002

                    Attorneys for the Steering Group of Prepetition
                    Lenders