# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re:                                    :
                                          :
Philadelphia Newspapers, LLC, *et al.*,[1]    :    CIVIL ACTION NO.  09-mc-00178
Debtors.                        :
                                          :
                                          :

## REPLY BRIEF OF APPELLANTS
## PHILADELPHIA NEWSPAPERS, LLC, *ET AL.*

DILWORTH PAXSON LLP
Lawrence G. McMichael
Christie Callahan Comerford
Catherine G. Pappas
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
Telephone:  (215) 575-7000
Facsimile:  (215) 575-7200
*Co-Counsel for the Debtors*

-and-

PROSKAUER ROSE LLP
Mark K. Thomas
Paul V. Possinger
Peter J. Young
Three First National Plaza
70 West Madison, Suite 3800
Chicago, Illinois  60602-4342
Telephone:  (312) 962-3550
Facsimile:  (312) 962-3551
*Co-Counsel for the Debtors*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  PMH Acquisition, LLC (1299), Broad Street Video, LLC (4665), Philadelphia Newspapers, LLC (3870), Philadelphia Direct, LLC (4439), Philly Online, LLC (5185), PMH Holdings, LLC (1768), Broad Street Publishing, LLC (4574), Philadelphia Media, LLC (0657), and Philadelphia Media Holdings, LLC (4680).

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................... ii

A.  The Court Should Not Be Distracted by Provisions of the Code Which Plainly Do Not Apply to these Facts. ...................................................1

B.  The Recent Fifth Circuit Decision in In re Pacific Lumber Co. Should Inform this Court's Inquiry ...........................................................7

C.  Section 1129(b)(2)(A) Does Not Establish a Right to Credit Bid......................8

D.  The Contractual Agreements Do Not Provide for a Right to Credit Bid................................................................................................9

E.  The Debtors Need Not Prove Each Element of Plan Confirmation Now................................................................................................10

F.  The Court Need Not Entertain Certain of the Lender and Committee Arguments that Exceed the Scope of the Issue on Appeal ...........................11

    1.  The "Keep It Local" Campaign ...............................................12

    2.  Insider Status of Stalking Horse ............................................13

    3.  The Debtors Have Not Waived Their Right to Pursue a Subordination Claim or Any Other Claim Arising Out of the Illegal Recording and Retaliatory Conduct..........................................15

i

# TABLE OF AUTHORITIES

## Cases

*ABS P'ship v. AirTran Airways, Inc.*, 1 A.D.3d 24 (N.Y. App. Div. 2003).................................. 10

*Exxon Mobil Corp. v. Allapattah Svcs., Inc.*, 545 U.S. 546 (2005) ..................................... 6

*First Options of Chicago, Inc. v. Kaplan* (*In re Kaplan*), 198 B.R. 91 (E.D. Pa. 1996) ............... 6

*In re AM Int'l Inc.*, 203 B.R. 898 (D. Del. 1996).......................................................... 6

*In re Continental Airlines, Inc.*, 780 F.2d 1223 (5th Cir. 1986) .......................................... 1

*In re Pacific Lumber Co.*, __ F.3d __, 2009 WL 3082066 (5th Cir. Sept. 29, 2009)................. 6, 7

*In re Plabell Rubber Prods., Inc.*, 149 B.R. 475 (Bankr. N.D. Ohio 1992) .................................. 2

*In re PWS Holding Corp.*, 228 F.3d 224 (3d Cir. 2000)................................................... 3

*In re Reagan*, 403 B.R. 614 (8th Cir. BAP 2009)........................................................ 13

*Onyeanusi v. Pan American World Airways, Inc.*, 767 F.Supp 654 (E.D. Pa. 1990)..................... 6

*Reiss v. Financial Performance Corp.*, 764 N.E.2d 958 (N.Y. 2001) .......................................... 10

*Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 807 N.E.2d 876 (N.Y. 2004) ................... 10

*W.W.W. Assoc. v. Giancontieri*, 566 N.E.2d 639 (N.Y. 1990) ..................................... 10

## Statutes

11 U.S.C. § 1111 ....................................................................................... 4

11 U.S.C. § 1123(b)(4) ................................................................................ 3

11 U.S.C. § 363(b) .................................................................................... 1

11 U.S.C. § 363(k) .................................................................................... 2

11 U.S.C. §506(a) ................................................................................... 8, 9

## Other Authorities

124 Cong. Rec. 32, 407................................................................................ 5

830947_4

The sole appellate issue before this Court is whether the Bankruptcy Code requires that a debtor permit a secured creditor the right to credit bid at a plan sale. This is a purely legal issue which turns on the proper interpretation of the Bankruptcy Code and is subject to <u>de novo</u> review by this Court. No provision in the Bankruptcy Code grants such a right to credit bid at a plan sale. Rather, creditors are protected by the many provisions under Section 1129 with respect to a debtor's ability to confirm a plan. The confirmation requirements of Section 1129 are not yet before the Bankruptcy Court or this Court. The only issue is whether the procedures established prior to the plan sale must include a right to credit bid.

A. **The Court Should Not Be Distracted by Provisions of the Code Which Plainly Do Not Apply to these Facts.**

The Lenders urge the Court to consider the provisions of Sections 363 and 1111(b), arguing that these two provisions provide the exclusive protection for the Lenders in conjunction with the Debtors' Plan Sale. [Lender Brief at 10.] This argument ignores the many and varied protections offered to creditors under Section 1129, which governs confirmation of the Debtors' Plan. The plan confirmation protections do not apply to sales outside of the plan context. Accordingly, sales outside the ordinary course of a debtor's business and outside the context of a plan can only be conducted and completed upon notice and a hearing pursuant to Section 363(b). <u>Compare</u> 11 U.S.C. § 363(b) <u>with</u> §§ 1123, 1129. Certain other protections for the benefit of creditors are included in Section 363, such as Section 363(k) which grants secured creditors rights – though not unlimited – to credit bid at sales of their collateral under Section 363(b). When a debtor attempts to sell a substantial portion of its assets under Section 363, rather than under a plan sale, creditors complain and courts are concerned that the debtor is attempting to deprive creditors of the protections afforded by Section 1129. <u>See</u>, <u>e.g.</u>, <u>In re Continental Airlines, Inc.</u>, 780 F.2d 1223, 1227-28 (5th Cir. 1986) ("[A] debtor in Chapter 11 cannot use §

363(b) to sidestep the protection creditors have when it comes time to confirm a plan of reorganization ... [but] [a]t the same time, we fully appreciate that post-petition pre-confirmation transactions outside the ordinary course of business may be required and that each hearing on a § 363(b) transaction cannot become a mini-hearing on plan confirmation.    Balancing these considerations, we hold that when an objector to a proposed transaction under § 363(b) claims that it is being denied certain protection because approval is sought pursuant to § 363(b) instead of as part of a reorganization plan, the objector must specify exactly what protection is being denied."); see also In re Plabell Rubber Prods., Inc., 149 B.R. 475, 480 (Bankr. N.D. Ohio 1992) ("A sale of substantially all of Debtor's property outside the ordinary course of business, and without a chapter 11 disclosure statement and plan, must be closely scrutinized.    That is, such a sale may not be employed to circumvent the creditor protections of chapter 11.") (internal citations omitted).[2]

Even a cursory review of the plain language of Sections 363 and 1111(b) demonstrates their inapplicability to the present facts.  First, Section 363(k) provides:

> **At a sale under subsection (b) of this section** of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. § 363(k) (emphasis added).  Thus, by its plain language, the "credit bid" right afforded by Section 363(k) only applies to "a sale under subsection (b)" of Section 363.    In this case, however, the sale is not being conducted pursuant to subsection (b) of Section 363, which "governs the sale of assets outside of the reorganization plan." In re PWS Holding Corp., 228

---

[2] Although much of the Committee's Brief is irrelevant to the legal issue before this Court, it is nonetheless interesting because it sets forth the Committee's position regarding the high hurdles that the Debtors still have to clear during plan confirmation.   In this regard, it undercuts any argument that sales under Section 363, which have no such additional protections, should be treated the same as sales under a plan.

830947_4

F.3d 224, 247 (3d Cir. 2000).    Rather, the sale is being conducted pursuant to Section

1123(b)(4),[3] which provides that "a plan may ... provide for the sale of all or substantially all of

the property of the estate, and the distribution of the proceeds of such sale among holders of

claims or interests."  11 U.S.C. § 1123(b)(4).  Accordingly, the credit bid provision of Section

363(k), by its own express limitation, does not apply here.  If Congress had intended otherwise, it

could have simply omitted the language "under subsection (b)" or referenced Section 1123(b)(4)

along with "under subsection (b)" so that it read "[a]t a sale under subsection (b) or Section

1123(b)(4)."    Congress did not choose either of these alternatives and this Court should not re-

write the plain language of this statute.

Second, the Lenders rely heavily upon Section 1111 while admitting that it does not

apply when the collateral securing the claim is sold under Section 363 or pursuant to a plan.

[Lender Brief at 13.]    The relevant provisions of Section 1111 provide:

> (b)(1)(A) A claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse, unless--
>
> (i) the class of which such claim is a part elects, by at least two-thirds in amount and more than half in number of allowed claims of such class, application of paragraph (2) of this subsection; or
>
> (ii) such holder does not have such recourse and such property is sold under section 363 of this title or is to be sold under the plan.
>
> **(B) A class of claims may not elect application of paragraph (2) of this subsection if--**
>
> (i) the interest on account of such claims of the holders of such claims in such property is of inconsequential value; or

---

[3] See P242, P256.

3

**(ii) the holder of a claim of such class has recourse against the debtor on account of such claim and such property is sold under section 363 of this title or is to be sold under the plan.**

(2) If such an election is made, then notwithstanding section 506(a) of this title, such claim is a secured claim to the extent that such claim is allowed.

11 U.S.C. § 1111 (emphasis added).   This Section makes clear that a recourse creditor, like the Lenders here, cannot make an election to have its entire claim treated as secured if the property securing the claim is sold under Section 363 or "is to be sold under the plan."  It says nothing about the Lenders' claimed right to credit bid, nor is it ambiguous in that regard.  Significantly, even the Lenders do not contend that this provision is ambiguous, though they nevertheless endeavor to resort to unnecessary legislative history to "clarif[y]" what "is not spelled out" in the very explicit exclusions of Section 1111(b).  [Lender Brief at 13.]

The Lenders ominously claim that Section 1111(b) strips them of a form of protection, implying some sort of entitlement under the Code.  Yet, the Lenders cannot be "stripped" of something that was never theirs.  The Lenders' argument puts the rabbit in the hat: they assume, incorrectly, that the Bankruptcy Code gives them the absolute right either to credit bid at any sale or to make an election under Section 1111(b).  The Lenders acknowledge that Section 1111(b) was enacted to provide *non-recourse* creditors with a mechanism to enforce a deficiency claim.  Of course, as *recourse* creditors, the Lenders already have a mechanism for enforcing a deficiency claim, Section 506(a).  Under the plain language of Section 1111(b), they never had the right to make an election in the context of a sale under Section 363 or under a plan.  Section 363 does not give secured lenders the right to credit bid in all circumstances and it does not apply to plan sales.  Not happy with the plain language of the Code, which makes clear that an election is not available to recourse creditors in a sale under Section 363 or under a plan, the Lenders ponder Congress's reasons for not providing them with the right to a make an election in the sale

4

context.   This sort of inquiry may be academically interesting, but it is entirely inappropriate under traditional rules of statutory construction, which require courts to enforce statutory language as written.

The Lenders then review the legislative history of Section 1111(b) to try and determine why Congress did not provide them with the election right in the sale context.  The Lenders point to the Congressional Record, which states that a "sale of property under section 363 or under a plan is excluded from treatment under section 1111(b) because of the secured party's right to bid in the full amount of its allowed claim at any sale of its collateral under section 363(k) of the House Amendment." 124 Cong. Rec. 32,407 (Sept. 28, 1978) (statement of Rep. Edwards). Rather than elucidating the issue, however, the legislative history further confuses it. Specifically, although purporting to explain why the election does not apply in the context of a 363 sale and a sale under the plan, the explanation refers only to the rights afforded by Section 363(k), which by its own terms does not apply to sales under a plan.  One is left to guess whether the reference to "sale under a plan" was an error by the Congressman making the statements, whether he intended to refer to "sale under a plan" but omitted another phrase that would have explained why an election was not available in a sale under a plan, whether he mistakenly believed that Section 363(k) was not limited to only Section 363(b) sales or something else. What is clear from this one, isolated statement is that the Congressman was wrong.  Even if the legislative history were not ambiguous, at most, it suggests that the Lenders should not be denied the right to a Section 1111(b) election – not that they should be permitted a right to credit bid. The legislative history on which the Lenders so heavily rely simply does not dictate the outcome they claim – a "fundamental right" to credit bid – and moreover should not dictate such an outcome where the statute itself is abundantly clear.  See e.g., Exxon Mobil Corp. v. Allapattah

5

Svcs., Inc., 545 U.S. 546, 568 (2005) (because the "authoritative statement is the statutory text," noting the pitfalls of reliance on legislative history by emphasizing, among other criticisms, that "legislative history is itself often murky, ambiguous, and contradictory [such that] [j]udicial investigation of legislative history has a tendency to become . . . an exercise in 'looking over a crowd and picking out your friends'") (citation omitted).

Finally, rather than claiming the language is ambiguous, the Lenders resort to the murky legislative history of Section 1111(b) on the basis that other courts have done so. The Lenders have cited no opinion that is binding upon this Court. Indeed, each of the cases cited by the Lenders, at page 14 of their Brief, are opinions of bankruptcy courts. This Court is required to review the Bankruptcy Court's opinion in this Court de novo, and need not attach any weight to the opinions of lower courts. See In re AM Int'l Inc., 203 B.R. 898, 905 (D. Del. 1996) (prior bankruptcy court decisions within or without the same district, even on virtually identical facts, do not bind later bankruptcy courts or district courts); see also First Options of Chicago, Inc. v. Kaplan (In re Kaplan), 198 B.R. 91, 94 (E.D. Pa. 1996) (District Court, acting in appellate capacity, noting that a bankruptcy court decision "has no precedential value for this Court"). In contrast, the Fifth Circuit Court of Appeals decision in In re Pacific Lumber Co., ___ F.3d ___, 2009 WL 3082066 (5th Cir. Sept. 29, 2009), should be regarded by this Court as "highly persuasive." See P22; October 8 Op. at 16 n.2 (citing Onyeanusi v. Pan American World Airways, Inc., 767 F.Supp 654, 655 n.1 (E.D. Pa. 1990) ("Absent a decision by its Court of Appeals and a conflict between circuits, a district court should regard the authority of another circuit as 'highly persuasive.'")) (citations omitted).

**B.**    **The Recent Fifth Circuit Decision in <u>In re Pacific Lumber Co.</u> Should Inform this Court's Inquiry.**

Neither the Bankruptcy Court nor the Appellees effectively distinguished the recent Fifth Circuit decision in <u>Pacific Lumber</u>, 2009 WL 3082066. That decision is the only precedent from a circuit court of appeals and should be followed by this Court, not marginalized as it is by the Lenders and the Committee. That case, like the one before the Court, involved a plan that incorporated a sale of the secured creditors' collateral. In <u>Pacific Lumber</u> the sale was a private sale to the plan proponent. The purchase price was based on a judicial valuation of the collateral. <u>Id.</u> at *11. Here, the Debtors propose to sell the Lenders' collateral at a public auction, so that the price at which the collateral is sold will be determined by the market. In <u>Pacific Lumber</u> the secured creditors were paid the value of their secured claim, as determined by the court, in cash. <u>Id.</u> at *10. Under the Debtors' plan, when the collateral is sold, the value as determined by the market will be paid to the Lenders in cash. Under these circumstances, the Fifth Circuit **held** that

- "because the three subsections of §1129(b)(2)(A) are joined by the disjunctive 'or,' they are alternatives." <u>Id.</u> at *9.

- "Clause (iii) thus affords a distinct basis for confirming a plan if it offered the [secured creditors] the 'realization...of the indubitable equivalent of such claims.'" <u>Id.</u> at *9.

- "Whatever uncertainties exist about indubitable equivalent, paying off secured creditors in cash can hardly be improper if the plan accurately reflected the value of the [secured creditors'] collateral." <u>Id.</u> at *10.

These holdings are clear. They are directly on point. They should be followed by this Court.

When addressing protections of the position of secured creditors, the Fifth Circuit cautioned that the Bankruptcy Code does not protect secured creditors' right to credit bid <u>per se</u> or the possible future appreciation in collateral value. It only protects the "secured claim." <u>Id.</u> at

7

*10. The secured claim is equal to the value of the collateral. See 11 U.S.C. §506(a). In Pacific Lumber there was no auction and therefore the secured creditors had no right to bid on their collateral at all, let alone credit bid. Yet the court found that they were treated fairly and equitably. Id. at *12. Here, the sale procedures proposed by the Debtors give the Lenders the same right to bid as any other bidder. They can participate in the auction and bid if they believe that other bidders are too low. The Lenders can participate fully and fairly in the market determination of the value of their collateral. The Lenders are therefore better protected here than the secured creditors were in Pacific Lumber. The correct application of the holdings in Pacific Lumber requires that the ruling of the Bankruptcy Court be reversed and that the Debtors' Bid Procedures be approved in as much as they do not allow credit bidding and treat all bidders the same.

### C.    Section 1129(b)(2)(A) Does Not Establish a Right to Credit Bid.

The Lenders argue that Section 1129 cannot deprive them of their "fundamental right to credit bid." [Lender Brief at 15.] The Lenders, however, cannot point to a single provision of the Bankruptcy Code that even arguably bestows upon them the "fundamental right" to credit bid. Rather, the most they can point to is a single imprecise comment of one Congressman thirty years ago. Clearly, had Congress intended to grant a "fundamental right" to credit bid under these circumstances, it would have so provided.

As discussed at length in the Debtors' opening Brief, the Bankruptcy Court's and the Lenders' statutory construction arguments are incorrect. Section 1129(b)(2)(A) expressly provides three alternative means by which a debtor can establish that its plan is fair and equitable. One alternative is to provide creditors the right to credit bid under Section 363(k). Another is to provide the creditors with the indubitable equivalent of their claim. The Debtors in

this case have determined to comply with the latter instead of the former, as permitted by the clear and unambiguous language of the Code.

**D.    The Contractual Agreements Do Not Provide for a Right to Credit Bid.**

The Lenders argue that they have a "contractual right to credit bid," when, in fact, neither of the documents that the Lenders point to as providing such a right says anything about the Lenders' ability to credit bid at a sale of the Debtors' assets under Chapter 11 of the Bankruptcy Code.    Rather, Section 9.09(b)(ii) of the Credit and Guaranty Agreement only grants the Collateral Agent the ability to credit bid "in the event of a foreclosure by Collateral Agent on any of the Collateral pursuant to public or private sale."    [L-0000386; Credit and Guaranty Agreement at § 9.09(b)(ii).] The sale contemplated in connection with the Debtors' Plan is a sale pursuant to Chapter 11 of the Bankruptcy Code, and subject to the regulations thereto.    As such, it is not a foreclosure sale by the Collateral Agent, and therefore the plain and unambiguous language of Section 9.09(b)(ii) of the Credit and Guaranty Agreement does not grant the Lenders the ability to credit bid at the Plan Sale.

Similarly, Section 7.01(b) of the Security Agreement, like the Credit Agreement, grants the Collateral Agent the ability to "use and apply any of the Secured Obligations as a credit . . . at such sale." [L-0000389; Security Agreement at § 7.01(b).]  The words "at such sale" at the end of the first sentence of section 7.01(b) refer back to the prior language of the sentence which "defines" "at such sale" as "at any public or private . . . sale in accordance with the UCC." Id. The Agreements do not refer to or state that the Collateral Agent has the ability to credit bid "at any sales of their collateral," as the Lenders baldly assert in their brief.

Both the Credit and Guaranty Agreement and the Security Agreement (the "Loan Documents") are by their terms governed by New York law.  New York law provides that

9

"[w]hen the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the document." ABS P'ship v. AirTran Airways, Inc., 1 A.D.3d 24, 29 (N.Y. App. Div. 2003) (citations omitted). Nowhere "within the four corners" of the Loan Documents do they provide Lenders or the Agent an opportunity to credit bid at a plan sale under the Bankruptcy Code. As a result, "the writing should be enforced according to its terms," Vermont Teddy Bear Co. v. 538 Madison Realty Co., 807 N.E.2d 876, 879 (N.Y. 2004), and no such right should now be created. Id.; accord W.W.W. Assoc. v. Giancontieri, 566 N.E.2d 639 (N.Y. 1990); Reiss v. Financial Performance Corp., 764 N.E.2d 958, 960 (N.Y. 2001). The clear terms of the Loan Documents do not provide either the Lenders or the Agent the contractual ability to credit bid at a sale of Debtors' assets under a Chapter 11 plan, and the settled rules of contract construction do not allow such a right to be inserted into those Loan Documents now.

Even if the Lenders' contracts were deemed to create a credit bid right, such a prepetition contractual right does not govern the requirements of a plan sale or trump the confirmation options granted in Section 1129.

**E.    The Debtors Need Not Prove Each Element of Plan Confirmation Now.**

The Committee's Brief seems to completely misapprehend the issue on appeal. The issue on appeal is whether the Debtors must provide the Lenders with a right to credit bid under Section 1129(b)(2)(A) as a matter of law in the context of a plan sale. The Debtors need not, at this point, demonstrate that they can meet every other requirement for confirmation. Notably, neither the Lenders (who claim the right to credit bid) nor the Bankruptcy Court adopts the Committee's view on this point. The Debtors acknowledge that, even if this Court agrees that the Lenders have no right to a credit bid, the Debtors still must establish all of the elements of

plan confirmation including that the Lenders will realize the indubitable equivalent of their claims.

###### F.    The Court Need Not Entertain Certain of the Lender and Committee Arguments that Exceed the Scope of the Issue on Appeal.

In the conference with the Court regarding the scheduling of this matter, the Court requested that the Debtors explain how the issue raised on appeal affects other aspects of the Debtors' Plan. See Oct. 15, 2009 Hrg. Tr. at 5:15-21.  Accordingly, the Debtors' Brief addressed this issue.

The Committee's Brief, as well as the Lenders' Brief to a lesser extent, venture far away from the legal issue that is the subject of the appeal or even the impact that this appeal will have on the plan process.[4]  Rather, as they did in the Court below, the Appellees seek to ascribe ill motives to the Debtors.  The motives of the Debtors, however, are not at issue in determining what the Bankruptcy Code does, and more importantly does not, require with respect to a credit bid.  Consistently, there was no "lengthy evidentiary hearing" as claimed by the Committee. [Committee Brief at 12.]  To the contrary, as noted by counsel for the Debtors, prior to the argument, the parties agreed that the credit bid issue was purely legal and, therefore, the Debtors would not present evidence:

> We have the very important issue of credit bidding, which we propose to address first.  **The parties have discussed that in terms of the presentation. I**

---

[4]    The views of the Committee are entitled to little weight.  The Committee consists of only three members, one of whom is not a creditor of the Debtors at all. The other two members are holders of the pre-petition subordinated notes, known as "mezzanine debt" or "mezz debt." Lead counsel for the Committee represented the pre-petition committee of mezz debt holders.  No member of the Committee is a regular trade creditor of the Debtors.

These unsecured, mezzanine notes are contractually subordinated to the Lenders' senior secured indebtedness. The subordination agreement that governs the mezz debt provides that any distribution to the mezz debt holders is automatically transferred to the Lenders until the Lenders' claims are paid in full. Accordingly, the mezz debt can get nothing from this bankruptcy case unless the Lenders choose to waive the provisions of the subordination agreement. The Committee acknowledges this fact. See Committee Brief at 13.  Therefore it is no surprise that the Committee supports the Lenders. Their support is borne of necessity, and for the benefit of only one type of unsecured creditor: the mezz debt.

**think we're all in agreement that that is essentially a legal argument -- is a legal argument.**

**We won't be making a record on it.** So I will argue that first. Once we've gotten through that, we have to deal with the issue of the breakup fee and expense reimbursement for the debtor's stalking horse bidder.

That will require a short amount of testimony. We have one witness. And our proposal is to proceed with that after we have -- after all the Court's questions on the credit bidding.

[P-379-80 (emphasis added).]

Although the Debtors believe these arguments should not even be considered by the Court in making a purely legal determination, they nonetheless summarize the major factual inaccuracies in these arguments below.

### 1.    The "Keep It Local" Campaign

There is no evidence in the Bankruptcy Court record, or before this Court, concerning the so-called "Keep It Local" campaign. Although the Creditors' Committee filed an "emergency" motion with respect to this campaign, it has been continually adjourned by agreement of the parties. Accordingly, there was neither a hearing on this motion nor any judicial determination concerning it, nor is any currently scheduled. The communications at issue appear in daily editions of *The Philadelphia Inquirer* and are plainly targeted to readers of that publication. Although the communications describe the benefits of local ownership of the Philadelphia institutions owned by the Debtors, nothing suggests that these views would be considered by or even known to out-of-town bidders. The Bankruptcy Court made no findings on this subject, nor could it since it was not at issue below. The "Keep It Local" campaign is not mentioned in the Bankruptcy Court opinion and it should not be considered by this Court in resolving the statutory question presented.

12

### 2.    Insider Status of Stalking Horse

The Lenders and the Committee constantly lampoon the Stalking Horse as an "insider" as if the Bankruptcy Code imparts some sort of evil status to insiders.  First, in a bankruptcy sale, an insider confers the same benefit on the process as any other stalking horse.  It establishes a floor on value.  The Eighth Circuit Court of Appeals has described the important role that a "stalking horse" can play in the auction process:

> In the bankruptcy context, a stalking horse bidder reaches an agreement with the debtor-in-possession [or trustee] to purchase assets prior to the court-supervised auction of those assets." M & M Holdings, LLC v. Unsecured Creditors Comm. (In re SpecialtyChem Prods. Corp.), 372 B.R. 434, 436 (E.D.Wis.2007). The parties anticipate that the "bid will be exposed to higher and better bids at auction." *Id.* The purpose of a stalking horse bid is merely to "set the floor" on the auction price. Bret Rappaport & Joni Green, Calvinball Cannot Be Played on this Court: The Sanctity of Auction Procedures in Bankruptcy, 11 J. Bankr.L. & Prac. 189, 194-95 (2002). **Stalking horse bids may generate interest in the assets and create a sense of confidence in the value of the assets among prospective buyers who might assume that a willing buyer has conducted due diligence.**

In re Reagan, 403 B.R. 614, 619 (8th Cir. BAP 2009) (emphasis added).  An insider stalking horse sends an even stronger message to the market:  if insiders of the debtor think that an asset is worth buying, then it really must be.  For decades, public securities analysts have attributed the same significance to corporate insiders buying a company's publicly traded stock.  Here, the message to the market is the same.  Two of the Debtors' old investors are contributing fresh cash in a very significant amount to acquire the operating assets of the Debtors.  Outsiders will regard that fact as a good sign and that the assets being sold are worth buying.

Second, to the extent this issue is relevant, the Court must look to the actual facts, not just to the label "insider."  The Stalking Horse has three investors.  David Haas is the largest investor with a $15,000,000 equity contribution to the Stalking Horse.  He is not an insider and has no prior affiliation with the Debtors or the old investors.  The Carpenters Pension and Annuity Fund of Philadelphia and Vicinity, which has committed $10,000,000 in new cash equity, is an

13

institution, not an individual. Although it is an insider of the Debtors by virtue of its percentage share of old equity (which is cancelled under the Debtors' proposed plan), it had no role in management of the Debtors other than an approval right over Mr. Tierney's compensation. Finally, Bruce Toll has also committed $10,000,000 of new cash equity. He had the honorary title of "chairman," but had no management authority other than the same compensation approval right. No one has (or would) suggest that the level of Mr. Tierney's compensation had anything to do with the financial circumstances of the Debtors, which are largely driven by a downturn in the advertising economy. None of the three Stalking Horse investors was ever an officer or director or otherwise in control of the Debtors.

The suggestion of the Bankruptcy Court, oft repeated by both Appellees, that the bid procedures were intended to perpetuate current ownership and management is clearly erroneous and unsupported by any record evidence. In fact the Debtors have over 20 equity owners, only two of whom are investors in the Stalking Horse. If the Stalking Horse bid prevails at the auction, there will be a substantial change in ownership of the Debtors' operating assets. The testimony at the October 1 hearing regarding the break-up fee and expense reimbursement issue also made clear that there is no agreement between the Stalking Horse and the current management team. The management team has done exactly the right thing in the context of a sale: it has remained unaffiliated with any bidder. While this management team may continue to operate the Debtors' assets after the sale and plan effective date for a time, there is no agreement, implied or otherwise, that requires or assures their continued role. See P484, 488, 498; Oct. 1, 2009 Hrg. Tr. at 109:12-16; 113:7-18; 123:16-23.

There is nothing about the credit bid issue, or the Debtors' proposal to conduct an auction sale without one, that in any way advantages the Stalking Horse. The Stalking Horse bid is an all

14

cash bid. Any other bidder coming to the auction will also bid with cash. Only the Lenders contend that they should be permitted to bid with something else: old debt. Treating the Lenders like all other bidders can hardly be said to advantage the Stalking Horse. It simply takes away the advantage that the Lenders want to have over all other bidders, including the Stalking Horse.

Putting the Lenders on a level playing field also does not put them at a disadvantage. The Plan Sale closes on the same date as the Plan becomes effective. That means that any cash paid by the Lenders immediately (that same day) is redistributed to them. As pointed out in the Debtors' opening Brief, the distribution of cash is easily managed under the Plan. Lenders who want to bid and want to be owners of the newspapers put up cash just like any other bidder. That cash is then distributed pro-rata to all of the Lenders, including those who choose not to bid. This process is objectively fair. The Bankruptcy Court erred in attributing ill motives to the Debtors for proposing an auction where all bidders are treated the same, particularly when there is no evidence of record of any such motives.

> **3.    The Debtors Have Not Waived Their Right to Pursue a Subordination Claim or Any Other Claim Arising Out of the Illegal Recording and Retaliatory Conduct.**

The Committee blatantly misrepresents to this Court that the Debtors have waived their right to pursue a subordination claim against certain of the Lenders arising out of the illegal recording of a confidential meeting and the retaliatory conduct. [Committee Brief at 15.][5]    The

---

[5] The Committee also misrepresents comments made by Judge Raslavich regarding the investigation. Even the shoddy investigation performed by the Committee revealed that Fred Hodara, counsel for the Steering Group of Pre-Petition Lenders, threatened counsel for the Company if it "tattled" on the CIT representative who illegally taped the meeting. Judge Raslavich noted the "schoolyard sandbox quality to this, when we talk about tattling to people. I don't know quite what to make of that." [P-97.]    Thus, this colloquy by Judge Raslavich was referring to the conduct of Mr. Hodara, not the illegal recording, when referring to the "schoolyard sandbox quality." It further indicates that Judge Raslavich has not prejudged the issue. Although the Committee claims that Judge Raslavich "reiterated his view that this taping incident was much ado about nothing," the Committee fails to provide any citation to where Judge Raslavich said that it "was much ado about nothing" or where he allegedly reiterated this view. To the contrary, Judge Raslavich declined to rule from the bench on this issue, instead taking it under advisement. [P-109.]

Committee quotes at length from sub-paragraphs 5 and 6 of paragraph "F" of the Final DIP Financing Order but intentionally omits to tell this Court that paragraph "F" opens with the statement **"[s]ubject to Paragraph 34 below**, the Debtors acknowledge, admit and confirm the following as of the Petition Date." [C-0371 (emphasis added).] Paragraph 34 provides, in pertinent part:

> **Claims and Defenses shall not include any claims or causes of action relating to or arising out of the alleged taping of a meeting of the Debtors and certain Prepetition Lenders on November 17, 2008 (the "Taping Claims"). All such Taping Claims are expressly excluded from the releases provided herein.** Additionally, **nothing contained in this subparagraph shall affect** the rights of the Committee to undertake any action, on its own behalf, or on behalf of the Debtors' estates, with respect to any investigation or prosecution of, Claims and Defenses and an investigation or prosecution of the Taping Claims that is permitted in subparagraphs (b) and (c) of this Paragraph, nor **the Debtors' rights with respect to any investigation or prosecution of Taping Claims** pursuant to the Stipulation and Order entered by this Court on August 28, 2009 [Docket No. 1006].

[C-0403 (emphasis added).]   Nothing in the Final DIP Financing Order or any other document limits the Debtors to a claim for damages as opposed to a subordination claim. The Committee's misrepresentation of the Final DIP Financing Order once again demonstrates the Committee's lack of credibility.

16

For all of the foregoing reasons, and for the reasons set forth in the Debtors' opening Brief, this Court should reverse the October 8, 2009 Order of the Bankruptcy Court insofar as it requires the Debtors to allow the Lenders to credit bid at the Plan Sale, and remand the case to the Bankruptcy Court with instructions to approve the Debtors' proposed Bid Procedures requiring all bidders to bid cash.

Dated:  October 27, 2009
         Philadelphia, Pennsylvania

/s/ Lawrence G. McMichael
**DILWORTH PAXSON LLP**
Lawrence G. McMichael
Christie Callahan Comerford
Catherine G. Pappas
1500 Market St., Suite 3500E
Philadelphia, PA 19102
Telephone:  (215) 575-7000
Facsimile:  (215) 575-7200

-and-

PROSKAUER ROSE LLP
Mark K. Thomas
Paul V. Possinger
Peter J. Young
Three First National Plaza
70 West Madison, Suite 3800
Chicago, Illinois  60602-4342
Telephone:  (312) 962-3550
Facsimile:  (312) 962-3551
Co-Counsel for the Debtors

*Co-Counsel for the Debtors and Debtors in Possession*

830947_4

## CERTIFICATE OF SERVICE

I, Catherine G. Pappas, certify that on the 27th day of October, 2009, I caused a copy of

the foregoing Reply Brief to be served electronically via the CM/ECF System and/or First Class

Mail, Postage prepaid to the following parties:

DRINKER BIDDLE & REATH LLP
Andrew C. Kassner
Andrew J. Flame
David F. Abernethy
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103


AKIN GUMP STRAUSS HAUER & FELD LLP
Fred S. Hodara
Abid Qureshi
Alexis Freeman
One Bryant Park
New York, NY 10036


O'MELVENY & MYERS LLP
Ben Logan
400 South Hope Street
Los Angeles, CA 90071
and
Gerald Bender
Times Square Tower
7 Times Square
New York, NY 10036

ECKERT SEAMANS CHERIN
& MELLOTT, LLC
Gary Schildhorn
Brya Keilson
Two Liberty Place
50 South 16th Street, 22nd Floor
Philadelphia, PA 19102

831311_1

OFFICE OF THE UNITED STATES TRUSTEE
George M. Conway
833 Chestnut Street, Suite 500
Philadelphia, PA 19107


s/ Catherine G. Pappas___
CATHERINE G. PAPPAS


**THIS DOCUMENT HAS BEEN FILED ELECTRONICALLY AND IS AVAILABLE FOR VIEWING AND DOWNLOADING FROM THE CM/ECF SYSTEM.**