IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE:                          :      CIVIL ACTION
PHILADELPHIA NEWSPAPERS, LLC    :      NO. 09-mc-178
                                :
                                :      BKY. NO. 09-11204


M E M O R A N D U M


EDUARDO C. ROBRENO, J.                        NOVEMBER 10, 2009


TABLE OF CONTENTS

I.    BACKGROUND...............................................3
      A.    Factual Background.................................3
      B.    Procedural History.................................9
II.   JURISDICTION............................................10
III.  STANDARD OF REVIEW.....................................15
IV.   DISCUSSION.............................................15
      A.    Applicable Law....................................16
            1.    The plain meaning rule......................16
            2.    Bankruptcy Code provisions relied upon
                  by the Appellees............................23
      B.    Opinion of the Bankruptcy Court...................31
      C.    Plain Meaning of Section 1129(b) Controls.........35
      D.    Objections of Appellees...........................40
            1.    Resort to section 1111(b) does not inform
                  the meaning of section 1129(b)(2)(A)........41
            2.    The canon of interpretation that a specific
                  provision should prevail over the general
                  provision is inapplicable...................43
            3.    The case law cited by the Bankruptcy Court
                  is unpersuasive.............................46
            4.    Resort to legislative history is
                  inappropriate and insufficient to contradict
                  the plain meaning of section 1129(b)........49
            5.    A finding as to whether the right to credit
                  bid is necessary under the circumstances of
                  the Debtors' Plan is appropriately addressed
                  at the confirmation stage...................55
V.    CONCLUSION.............................................57

This is an appeal from the order of the Bankruptcy Court denying approval of bid procedures for an auction of substantially all of the Debtors' assets.  The appeal presents two issues: (1) Whether the Bankruptcy Court erred in rejecting bid procedures which included a provision precluding the Debtors' secured lenders from submitting a credit bid at an auction sale contemplated by the Debtors' proposed plan of reorganization; and (2) Whether the Bankruptcy Court erred in rejecting bid procedures which contained a "break-up" fee and expense reimbursement fee to be provided to the stalking horse bidder. Due to the exigency in resolving the issue of the right of the secured lenders to credit bid in the Debtors' impending auction, the Court instructed the parties to brief only that issue for the present time, and the issue with respect to the "break-up" fee and expense reimbursement fee will be addressed subsequently.[1] As such, this Memorandum will address only the first issue of this appeal.

The Court holds that under the circumstances of this case, the Bankruptcy Court erred in rejecting the proposed bid procedures on the ground that the Debtors' secured lenders had a right to credit bid under 11 U.S.C. § 1129(b)(2)(A)(iii).  For the reasons that follow, the decision of the Bankruptcy Court

---

[1]    The Court shall issue a separate briefing schedule to address this issue.

will be reversed.

I.    BACKGROUND

      A.    Factual Background

      Philadelphia Newspapers, LLC and its related debtor-entities (the "Debtors") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") on February 22, 2009.[2]  The Debtors' cases are being jointly administered.  An Official Committee of Unsecured Creditors (the "Committee") was appointed on March 2, 2009.

      The Debtors own and operate numerous print and online publications in the Philadelphia region, including the Philadelphia Inquirer, the Philadelphia Daily News, and philly.com (collectively, the "Publications").  Prior to June 2006, the Publications were owned and operated by Knight-Ridder, Inc.  In June 2006, Knight-Ridder, Inc. was acquired by the McClatchy Company, which subsequently decided to divest itself of the Publications.  An investor group was formed, led by Brian P. Tierney ("Tierney"), for the purpose of acquiring the Publications from the McClatchy Company.  This investor group

---

      [2]    One of the Debtors herein, Philadelphia Media Holdings, LLC, did not file its petition for relief under the Bankruptcy Code until June 10, 2009.  Its Chapter 11 case, however, has been procedurally consolidated with the Debtors' other Chapter 11 cases.

formed Philadelphia Media Holdings, LLC ("PMH"),[3] which entered into an asset purchase agreement for the Publications and the related businesses for a sale price of $515 million.  Since this acquisition by PMH, Tierney has served as the Debtors' CEO and holder of 6.67% of the equity in the Debtors.

In order to finance the purchase of the Publications and the related businesses, PMH borrowed approximately $295 million from a group of lenders (the "Senior Lenders")[4] pursuant to a Credit and Guaranty Agreement dated as of June 29, 2006 (the "Senior Credit Agreement"), with appellees Citizens Bank of Pennsylvania acting as administrative and collateral agent.  The Senior Lenders contend that the Senior Credit Agreement provides a first priority lien and security interests in substantially all of the real and personal property of the Debtors.

In the months leading up to the bankruptcy filing, the Debtors engaged in extensive negotiations with the Senior Lenders for the purpose of effectuating a consensual out-of-court restructuring.  At a meeting held on November 17, 2008, to discuss restructuring alternatives, it was revealed that a representative of CIT Financial (one of the Senior Lenders) was

---

[3]    PMH is comprised of a diverse group of mainly Philadelphia-based investors.

[4]    Throughout this memorandum, the Court will use the term "Senior Lenders" and "Appellees", interchangeably, dependent upon the context.  The term "Appellees" should be construed to include the Committee as well.

4

recording the negotiations without obtaining the Debtors' prior consent, in an apparent violation of Pennsylvania law (the "Recording Incident").[5]  Tierney voiced his displeasure over the Recording Incident to the Senior Lenders, and the Debtors assert that they were subject to retaliatory conduct from the Senior Lenders as a result of Tierney's negative reaction to the Recording Incident.  The Debtors have obtained authority from the Bankruptcy Court to retain special counsel to advise them of their rights with respect to the Recording Incident, while the Committee has been empowered by the Bankruptcy Court to investigate the Recording Incident.  On August 28, 2009, following a mediation, all parties, including the Debtors, agreed to abstain from pursuing any review of the Recording Incident until January 2, 2010, in order to pursue the "big-picture" issues involved in the Debtors' cases.

As a result of the break-down in negotiations with the Senior Lenders, the Debtors were forced to file their respective bankruptcy petitions.  On August 20, 2009, the Debtors filed a Joint Chapter 11 Plan (the "Plan") and accompanying disclosure statement.  The Plan provides for a sale, by public auction (the "Auction"), of substantially all of the Debtors' assets, excluding certain real property that will be transferred directly

---

[5]     18 Pa. C.S.A. § 5703 (third degree felony for unauthorized recording); id. § 5725(a) (creating a civil cause of action for unauthorized recording).

to the Senior Lenders.  The sale resulting from the Auction is scheduled to close on the same date that the Plan becomes effective.  In conjunction with the Auction, the Debtors executed an Asset Purchase Agreement (the "Stalking Horse Agreement") with Philly Papers, LLC as the stalking horse and putative purchaser (the "Stalking Horse Bidder").  The Stalking Horse Bidder is comprised of several equity investors, including Carpenters Pension and Annuity Fund of Philadelphia and Vicinity, which owns an equity stake in PMH estimated to be approximately 30%.  Bruce Toll is the Chairman and another equity investor of the Stalking Horse Bidder, who until recently owned an approximately 20% equity stake in PMH.  Penn Matrix Investors, whose controlling partner is David Haas, is the third entity comprising the Stalking Horse Bidder and has never held an equity interest in PMH and does not have any prior affiliation with the Debtors.

The Plan contemplates that the Stalking Horse Bidder will pay a cash purchase price of $30 million, plus a combination of payment of certain expenses and assumption of liabilities that will yield gross proceeds to the Debtors' estates of approximately $41 million.  After payment of administrative and priority claims as well as outstanding debtor-in-possession financing facility advances, the Debtors anticipate a

distribution to the Senior Lenders of approximately $36 million.[6] The Debtors contend that the purchase price set by the Stalking Horse Agreement represents fair market value for the Debtors' assets.

The Plan further provides for the creation of a $750,000 liquidating trust[7] in favor of general unsecured trade creditors and a 3% distribution of equity interests in the Stalking Horse (or other successful bidder) to holders of unsecured prepetition claims other than general trade creditors.[8] A key component of the Plan is that the distribution provided for each class of creditors, other than the Senior Lenders, is not contingent on the outcome of the Auction and all proceeds of a cash overbid will flow directly to the Senior Lenders.  Thus, each dollar above the bid submitted by the Stalking Horse Bidder

---

[6]    The Stalking Horse Agreement does not include the sale of the Debtors' real property located at 400 North Broad Street, Philadelphia, Pennsylvania.  The Stalking Horse Agreement and Plan provide that this real property will be transferred directly to the Senior Lenders subject to a rent-free, short-term lease (limited to two years while operations are relocated) in favor of the Stalking Horse Bidder.  The Debtors assert that this real property is valued at approximately $30 million.

[7]    Subsequent to the filing of this appeal, the Debtors amended the Plan to provide that the amount of this liquidating trust could increase to approximately $1.2 million.  The exact amount of this liquidating trust, however, is not germane to this appeal.

[8]    The Plan contemplates that this 3% equity distribution will be allocated to general unsecured creditors only if the Senior Lenders agree to waive their rights under a subordination agreement with certain mezzanine debt holders of the Debtors.

resulting from the Auction will go directly toward satisfying the Senior Lenders' secured claim.

On August 28, 2009, the Debtors filed a motion with the Bankruptcy Court seeking authorization of certain bid procedures (the "Bid Procedures") to be employed in conjunction with the Stalking Horse Agreement and Auction. The key terms of the Bid Procedures for purposes of this appeal are that all bids submitted must be in cash and that the Senior Lenders are precluded from submitting a credit bid in connection with the Auction.[9] The exact provision of the Bid Procedures at issue states as follows:

> **Credit Bid**: The Plan sale is being conducted under sections 1123(a) and (b) and 1129 of the Bankruptcy Code, and not section 363 of the Bankruptcy Code. As such no holder of a lien on any assets of the Debtors shall be permitted to credit bid pursuant to section 363(k) of the Bankruptcy Code.

The Debtors contend that structuring the Auction without credit bidding will spur competitive bidding. The Debtors submit that they have engaged in extensive nationwide marketing to ensure that the results of the Auction generate the highest and best

---

[9] Credit bidding is a secured creditor's ability to "bid" the amount of its outstanding claim at a subsequent sale of the property. In other words, the secured creditor uses the amount of its claim as currency in an auction such that if the secured creditor is the winning bid no exchange of currency occurs and the amount of the bid is offset against the amount of the outstanding debt.

offer for the Debtors' assets.[10]

B.    Procedural History

On October 1, 2009, the Bankruptcy Court heard oral argument with respect to approval of the Bid Procedures.[11]  On October 8, 2009, the Bankruptcy Court issued an Opinion and Order denying the Bid Procedures due to the provision which prohibited the Senior Lenders from credit bidding at the Auction (the "October 8 Order").  The October 8 Order denied the Bid Procedures, but provided that the Bid Procedures could be resubmitted if altered in accordance with the October 8 Order, i.e., the prohibition on credit bidding was removed.  To that end, the Debtors submitted revised Bid Procedures which removed the credit bidding restriction, and the Bankruptcy Court approved the revised Bid Procedures on October 15, 2009.

---

[10]    The Debtors have employed a publicity campaign under the mantra to "Keep It Local" with respect to ownership of the Publications (the "Publicity Campaign").  The Debtors' stated goal of the Publicity Campaign is to promote the benefits of local ownership of the Publications.  The Committee has filed a motion with the Bankruptcy Court seeking an order directing the Debtors cease the Publicity Campaign on the grounds that it is intended to suppress competitive bidding by dissuading "out-of-town" bidders in order to skew the Auction in favor the Stalking Horse Bidder.  This motion is pending before the Bankruptcy Court.

[11]    Prior to deciding the motion to approve the Bid Procedures, the Bankruptcy Court permitted the parties to submit supplemental briefing on the Fifth Circuit's decision, In re Pacific Lumber Co., --- F.3d ---, 2009 WL 3082066 (5th Cir. Sept. 29, 2009), issued mere days before the oral argument, which addressed, at least tagentially, the issue of credit bidding in the context of plan confirmation.

Based upon the denial of the Bid Procedures by the October 8 Order, the Bankruptcy Court continued the respective deadlines for the Auction as follows: (1) Bid deadline: November 16, 2009; and (2) Auction date: November 18, 2009.

On October 13, 2009, the Debtors filed an emergency motion with this Court seeking an expedited appeal regarding the October 8 Order. On October 14, 2009, the Court granted the Debtors' motion for an expedited appeal, and a hearing was held on November 3, 2009. The issue is now ripe for adjudication.

II. JURISDICTION

The Committee raises the initial question as to whether the October 8 Order of the Bankruptcy Court is a final order that is appealable to this Court. This Court has jurisdiction to hear appeals "from final judgments, orders and decrees of the Bankruptcy Court," and, with leave granted by the Court, may hear appeals from interlocutory orders of the Bankruptcy Court. 28 U.S.C. §§ 158(a)(1), (a)(3). The October 8 Order stated that the motion for approval of the Bid Procedures was "denied as presented, but may be resubmitted if modified in accordance with the within Opinion." The Committee contends that the order entered by the Bankruptcy Court on October 15, which approved the Bid Procedures without the prohibition against credit bidding, needs to be considered as a companion order to the October 8

Order, thereby rendering the October 8 Order a non-final order.

At oral argument, the Committee conceded that it was not challenging the jurisdiction of the Court to hear the instant appeal.  Nonetheless, this Court has an independent duty to confirm that jurisdiction is vested with respect to this appeal before proceeding on the merits.

The Court has discretion to entertain an appeal of an interlocutory order from the bankruptcy court under 28 U.S.C. § 158(a)(3).  Rule 8003(c), which governs leave to appeal from the bankruptcy court, provides:

> (c) Appeal improperly taken regarded as a motion for leave to appeal
>
> If a required motion for leave to appeal is not filed, but a notice of appeal is timely filed, the district court or bankruptcy appellate panel may grant leave to appeal or direct that a motion for leave to appeal be filed. The district court or the bankruptcy appellate panel may also deny leave to appeal but in so doing shall consider the notice of appeal as a motion for leave to appeal. Unless an order directing that a motion for leave to appeal be filed provides otherwise, the motion shall be filed within 14 days of entry of the order.

Fed. R. Bankr. P. 8003(c).  Furthermore, the Advisory Committee Notes to Rule 8003(c) specifically provide that

> Subdivision (c) provides that **if a party mistakenly believes the order appealed from is final and files only a notice of appeal, the appeal is not automatically dismissed.** The district court or bankruptcy appellate panel has the options to direct that a motion be filed, to decide exclusively on the papers already filed to grant leave to appeal, or to deny leave to appeal.

Id., Advisory Committee Notes (emphasis added).  Thus, even where an appellant improperly appeals an interlocutory order, the Court retains discretion to grant leave to hear the appeal.  See, e.g., In re Tobacco Road Assocs., LP, Civ. No. 06-CV-2637, 2007 WL 966507, at *20 n.125 (E.D. Pa. Mar. 30, 2007 (Rufe, J.) (exercising discretion to hear appeal of an interlocutory order pursuant to Rule 8003(c)); O'Leary v. Maxum Marine (In re Orange Boat Sales), 239 B.R. 471, 474 (S.D.N.Y. 1999) (same).  The Committee explicitly conceded this point at oral argument.

No criteria are provided by section 158(a) or Rule 8003 for district courts to determine whether to exercise discretion in granting leave to appeal interlocutory bankruptcy orders.  In re Marvel Entm't Group, Inc., 209 B.R. 832, 837 (D. Del. 1997). Based upon the decision of the Third Circuit in Bertoli v. D'Avella (In re Bertoli), 812 F.2d 136, 139 (3d Cir. 1987), courts within this Circuit confronted with the decision whether to grant leave to allow an interlocutory appeal are informed by the criteria in 28 U.S.C. § 1292(b), which governs interlocutory appeals from the district courts to the courts of appeal.  See, e.g., Luke Oil Co. v. SemCrude, L.P. (In re SemCrude, L.P.), 407 B.R. 553, 556 (D. Del. 2009); Bowie Produce Co., Inc. v. Magic Am. Café, Inc. (In re Magic Rests., Inc.), 202 B.R. 24, 25 (D. Del. 1996) (noting that district courts apply section 1292(b) by analogy) (internal citations omitted).  In accordance with 28

U.S.C. § 1292(b), district courts will grant leave to file an interlocutory appeal when the order at issue: (1) involves a controlling question of law upon which there is (2) substantial grounds for difference of opinion as to its correctness, and (3) if appealed immediately, may materially advance the ultimate termination of the litigation.  In re Semcrude, 407 B.R. at 556-57 (citing Katz v. Carte Blanche Corp., 496 F.2d 747, 754 (3d Cir. 1974)).  These criteria do not serve to limit the Court's discretion to grant an interlocutory appeal pursuant to section 158(a)(3) or Rule 8003.  Id. at 557.  "Because an interlocutory appeal represents a deviation from the basic judicial policy of deferring review until the entry of a final judgement, the party seeking leave to appeal an interlocutory order must also demonstrate that exceptional circumstances exist."  Id. (citing In re Magic Rests., 202 B.R. at 26 (citations omitted)).

       Assuming arguendo that the October 8 Order is interlocutory, the Court concludes that it is proper to exercise its discretion to hear the appeal pursuant to 28 U.S.C. § 158(a)(3) and Rule 8003(c).  The criteria established by section 1292(b) are satisfied here since (1) the issue of whether the Bankruptcy Code provides the Senior Lenders the statutory right to credit bid is a controlling question of law; (2) substantial grounds for difference of opinion on this question of statutory interpretation exist; and (3) allowing an immediate appeal will

13

expedite a decision on confirmation of the Debtors' proposed
Plan, thereby facilitating the ultimate termination of these
bankruptcy proceedings.  Furthermore, exceptional circumstances
exist to justify immediate review of the October 8 Order due to
the urgency of resolving the credit bid issue in light of the
Auction scheduled for November 18, 2009.  Therefore, the Court
has determined it is appropriate to exercise its discretion and
hear the appeal pursuant to Rule 8003(c).[12]

---

[12]    It is not entirely clear that the October 8 Order
should be considered interlocutory based upon the posture of this
appeal.  The Third Circuit follows a relaxed rule of finality in
bankruptcy proceedings and adopted a "more pragmatic and less
technical" approach.  F/S Airlease II, Inc. v. Simon, 844 F.2d
99, 103 (3d Cir. 1988) (internal citation omitted).  This more
relaxed and pragmatic approach is grounded in the reality that
"bankruptcy cases frequently involve protracted proceedings with
many parties participating.  To avoid a waste of time and
resources that might result from reviewing discrete portions of
the action only after a plan of reorganization is approved,
courts have permitted appellate reviews of orders that in other
contexts might be considered interlocutory."  Id. at 104 (quoting
In re Amatex Corp., 755 F.2d 1034, 1039 (3d Cir. 1985)).  When
applying this relaxed approach to determine finality, the Third
Circuit has instructed that the following factors are to be given
weight: (1) the impact on the assets of the estate; (2) the
preclusive effect of a decision on the merits; (3) the need for
additional fact-finding on remand; and (4) whether the interests
of judicial economy will be furthered.  Commerce Bank v. Mountain
View Vill., Inc., 5 F.3d 34, 37 (3d Cir. 1993).

        Based upon these factors, it appears that the
substantial impact that the Bid Procedures will have on the
Auction, and the corresponding effect on the Plan, as well as the
interest of judicial economy, militate in favor of treating the
October 8 Order as final for purposes of this appeal.  See In re
Brown, 803 F.2d 120, 122 (3d Cir. 1986) ("Where the issue is
likely to affect the distribution of the debtor's assets, or the
relationship among the creditors, the most pragmatic response
will usually be to hear the appeal immediately.").  Since the

III. STANDARD OF REVIEW

Rule 8013 of the Federal Rules of Bankruptcy Procedure governs review of a bankruptcy court's order.  Findings of fact by the bankruptcy court are to be set aside on appeal only if clearly erroneous.  Fed. R. Bankr. P. 8013.  "A factual finding is clearly erroneous when 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'"  Schlumberger Resource Mgmt. Servs., Inc. v. CellNet Data Sys., Inc. (In re CellNet Data Sys., Inc.), 327 F.3d 242, 244 (3d Cir. 2003) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)).  Legal conclusions are reviewed under a de novo standard whereas mixed questions of law and fact are addressed with a mixed standard, in which the clearly erroneous standard applies to integral facts but plenary review is applied to the "interpretation and application of those facts to legal precepts."  Id. (internal citation omitted).


IV.  DISCUSSION

As an initial matter, it must be noted that no provision of the Bankruptcy Code directly addresses the standards for approval of bid procedures such as those proposed by the Debtors.  Since the Auction is to be implemented in conjunction

---

Court exercises its discretion to hear this appeal pursuant to
Rule 8003(c), it is unnecessary to make such a determination at
this juncture.

with the Debtors' Plan, section 1129(b), which provides the standards for confirmation of plan in which a secured creditor is subject to cramdown, provides a relevant analytical construct for this appeal.  The applicability of section 1129(b) in this case appears to be the only point in which all parties to this contentious appeal concur.

> A.    <u>Applicable Law</u>

> 1. The plain meaning rule.

It is often said that the polestar for interpreting a statute is to ascertain the intent of Congress.  <u>See</u> <u>White v. Lord Abbett & Co. LLC (In re Lord Abbett Mutual Funds Fee Litig.)</u>, 553 F.3d 248, 255 (3d Cir. 2009).  "The role of the courts in interpreting a statute is to give effect to Congress's intent."  <u>Alston v. Countrywide Fin. Corp.</u>, --- F.3d ---, 2009 WL 3448264, at *4 (3d Cir. Oct. 28, 2009) (quoting <u>United States v. Diallo</u>, 575 F.3d 252, 256 (3d Cir. 2009)).  In seeking to ascertain the intent of a statute, a court is bound to follow principles of statutory construction.  <u>See</u> <u>In re J.E. Brenneman Co., Inc.</u>, 277 F. Supp. 2d 518, 521 (E.D. Pa. 2003) (Yohn, J.) (recognizing that in interpreting the intent of Congress a district court follows established precepts of statutory interpretation).

"Because it is presumed that Congress expresses its intent through the ordinary meaning of its language, every

exercise of statutory interpretation begins with an examination of the plain language of the statute." <u>Alston</u>, --- F.3d ---, 2009 WL 3448264, at *4 (quoting <u>United States v. Diallo</u>, 575 F.3d 252, 256 (3d Cir. 2009) (internal quotation marks and citation omitted)); <u>see also</u> <u>Lamie v. United States Tr.</u>, 540 U.S. 526, 534 (2004) ("[W]hen the statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms."). Thus, the necessary starting point in any attempt to discern congressional intent is the language of the statute itself. <u>United States v. Abbott</u>, 574 F.3d 203, 206 (3d Cir. 2009) ("As in all cases of statutory interpretation, our inquiry begins with the language of the statute and focuses on Congress' intent.") (citing <u>United States v. Whited</u>, 311 F.3d 259, 263-64 (3d Cir. 2002)); <u>In re Armstrong World Indus., Inc.</u>, 432 F.3d 507, 512 (3d Cir. 2005) (citing <u>United States v. Ron Pair Enters., Inc.</u>, 489 U.S. 235, 241 (1989)); <u>Idahoan Fresh v. Advantage Produce, Inc.</u>, 157 F.3d 197, 202 (3d Cir. 1998).

This plain meaning rule dictates that where the meaning of the relevant statutory language is clear then no further inquiry is required. <u>In re Armstrong</u>, 432 F.3d at 512; <u>Abdul-Akbar v. McKelvie</u>, 239 F.3d 307, 313 (3d Cir. 2001) (en banc) (where the statutory language "admits of no more than one meaning the duty of interpretation does not arise and the rules which are to aid doubtful meanings need no discussion") (internal

quotation and citation omitted); <u>Lancashire Coal Co. v. Sec'y of
Labor, Mine Safety and Health Admin. (MSHA)</u>, 968 F.2d 388, 391
(3d Cir. 1992) ("[W]hen the statutory language is clear a court
need ordinarily look no further.").[13]

Adherence to the plain meaning rule is not simply a
matter of judicial craftsmanship.  Faithfulness to the words
Congress has used in enacting a statute promotes respect for
Congress as the principal source of positive law in a democratic
society.  See <u>Lamie</u>, 540 U.S. at 536 ("We should prefer the plain
meaning since that approach respects the words of Congress.");
<u>Pub. Citizen v. U.S. Dep't of Justice</u>, 491 U.S. 440, 470-71
(1989) (Kennedy, J., concurring) (recognizing that departure from
the plain meaning rule, except in limited circumstances where
completely necessary, would intrude upon the lawmaking powers of
Congress).  Furthermore, allegiance to the plain meaning rule
also disciplines courts to avoid making policy choices where the
intent of Congress is expressed in the language of the statute.
<u>Pub. Citizen</u>, 491 U.S. at 471 (Kennedy, J., concurring) (noting
that courts should act with self-discipline in refraining from
nonchalantly applying exceptions to the plain meaning rule);
<u>Lamie</u>, 540 U.S. at 538 (stating that the "unwillingness to soften

---

[13]    This was the approach endorsed by the Third Circuit in
its recent interpretation of section 1129, the same section (but
not the same subsection) which is before the Court in this case.
<u>See</u> <u>In re Armstrong World Indus., Inc.</u>, 432 F.3d 507, 512-13 (3d
Cir. 2005)

the import of Congress' chosen words . . . results from 'deference to the supremacy of the Legislature, as well as recognition that Congressmen typically vote on the language of a bill.'") (quoting <u>United States v. Locke</u>, 471 U.S. 84, 95 (1985) (internal citation omitted)).[14]

There is a hierarchal approach that courts must follow in construing a statute. First, the Court "determine[s] whether the language at issue has a plain and unambiguous meaning." <u>Dobrek v. Phelan</u>, 419 F.3d 259, 263 (3d Cir. 2005) (citing <u>Barnhart v. Sigmon Coal Co.</u>, 534 U.S. 438, 450 (2002)). In order to be ambiguous, the disputed language must be "reasonably susceptible of different interpretations." <u>Id.</u> at 264 (quoting <u>Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.</u>, 470 U.S. 451, 473 n.27 (1985)). The plain meaning approach requires a court to "read the statute in its ordinary and natural sense." <u>Harvard Secured Creditors Liquidation Trust, v. I.R.S. (In re Harvard Indus., Inc.)</u>, 568 F.3d 444, 451 (3d Cir. 2009)

---

[14]    The Third Circuit's decision in <u>Armstrong</u> supports the proposition that courts must refrain from indulging in competing policy interpretations when the statutory language is clear. <u>See In re Armstrong</u>, 432 F.3d at 512-13. <u>Armstrong</u> addressed the absolute priority rule under section 1129, and concluded that the statutory language clearly prohibited "gift plans" between senior and junior classes of creditors. <u>Id.</u> The Third Circuit turned aside arguments regarding the practical policy implications of such a reading of the statute and relied upon the inescapable conclusion that, regardless of practical arguments, the language of the statute meant what it said.

(internal quotation marks and citations omitted).  If the
language is clear, "'Congress says in a statute what it means and
means in a statute what it says there.'" Singer v. Franklin
Boxboard Co. (In re Am. Pad & Paper Co.), 478 F.3d 546, 554 (3d
Cir. 2007) (quoting Hartford Underwriters Ins. Co. v. Union
Planters Bank, N.A., 530 U.S. 1, 6 (2000) (internal quotation
marks and citation omitted)).  If no ambiguity exists, then the
plain meaning of the text is conclusive and the inquiry generally
comes to an end.  Lawrence v. City of Phila., Pa., 527 F.3d 299,
316-17 (3d Cir. 2008) ("The plain meaning of the text should be
conclusive, except in the rare instance when the court determines
that the plain meaning is ambiguous."); AT & T, Inc. v. F.C.C.,
582 F.3d 490, 498 (3d Cir. 2009)(finding that a determination
that the statutory language was unambiguous negates consideration
of arguments concerning statutory purpose, non-binding case law,
and legislative history).

        Second, if the statutory language appears to be
unambiguous, a court must look beyond that plain language where a
literal interpretation would lead to an absurd result, or would
otherwise produce a result "demonstrably at odds with the
intentions of the drafters." United States v. Ron Pair Enters.,
Inc., 489 U.S. 235, 242 (1989) (internal quotation marks
omitted); In re Kaiser Aluminum Corp., 456 F.3d 328, 330 (3d Cir.
2006) ("A basic principle of statutory construction is that we

should avoid a statutory interpretation that leads to absurd results.") (citing Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 575 (1982)); Mitchell v. Horn, 318 F.3d 523, 535 (3d Cir. 2003) ("We do not look past the plain meaning unless it produces a result demonstrably at odds with the intentions of its drafters . . . or an outcome so bizarre that Congress could not have intended it."). It is only in "rare cases" that a literal application will produce such results. See In re Mehta, 310 F.3d 308, 311 (3d Cir. 2002) (internal citation omitted); Abdul-Akbar, 239 F.3d at 313 (internal citation omitted).

Third, if application of the plain meaning approach dictates that the language is ambiguous or that application of the statute would lead to results demonstrably at odds with congressional intent, then the Court may employ other traditional tools of statutory interpretation.

Where the plain meaning approach does not clearly define the disputed language, the Court should construe the relevant provision in the context of the statute as a whole. Kaufman v. Allstate N.J. Ins. Co., 561 F.3d 144, 156 (3d Cir. 2009) (citing Dolan v. U.S. Postal Serv., 546 U.S. 481, 486 (2006)). It is inappropriate, however, to reference other statutory provisions in order to create an ambiguity where none would otherwise exist. See Dir., Office of Workers' Comp. Programs v. Sun Ship, Inc., 150 F.3d 288, 292 (3d Cir. 1998)

(finding that related statutory sections could not be used to
create an ambiguity where the language was clear).

Further, courts may resort to canons of statutory
construction, such as <u>ejusdem generis</u>, when the plain meaning
approach does not yield a conclusive result.  <u>Baltimore County,</u>
<u>MD. v. Hechinger Liquidation Trust (In re Hechinger Inv. Co. of</u>
<u>Del., Inc.)</u>, 335 F.3d 243, 254 (3d Cir. 2003) (concluding that
even if section 1146 of the Bankruptcy Code was ambiguous, the
court's interpretation was supported by two canons of
construction); <u>Folger Adam Sec., Inc. v. DeMatteis/MacGregor JV</u>,
209 F.3d 252, 258 (3d Cir. 2000) (applying canons of construction
to ambiguous term "any interest" in section 363(f) of the
Bankruptcy Code).  These canons of construction only serve as
rules of thumb and "are often countered ... by some maxim
pointing in a different direction." <u>United States v. Cooper</u>, 396
F.3d 308, 313 (3d Cir. 2005)

One tool often used in parsing out ambiguity in the
language of the statute is legislative history.  It is recognized
that legislative history is a "useful and appropriate tool for
[an] inquiry into congressional intent" when the plain statutory
text is ambiguous.  <u>Francis v. Mineta</u>, 505 F.3d 266, 270-71 (3d
Cir. 2007); <u>In re Harvard Indus.</u>, 568 F.3d at 451. <u>Cf.</u> <u>Hay Group,</u>
<u>Inc. v. E.B.S. Acquisition Corp.</u>, 360 F.3d 404, 406 (3d Cir.
2004) ("The Supreme Court has repeatedly explained that recourse

to legislative history or underlying legislative intent is
unnecessary when a statute's text is clear and does not lead to
an absurd result.") (internal citation omitted).  Based upon the
inherent difficulty in distilling precise congressional intent
from the amorphous nature of legislative history, however, the
Third Circuit has instructed that "[f]or the vast majority of
ambiguous statutory provisions, then, relying on legislative
history to discern legislative intent should be done with
caution, if at all."  Morgan v. Gay, 466 F.3d 276, 278 (3d Cir.
2006).

> 2.  Bankruptcy Code provisions relied upon by the
>        Appellees.

All parties argue extensively over various provisions
of the Bankruptcy Code.  Although ultimately only one section,
1129(b), is relevant to the disposition of the issue before the
Court, an understanding of the provisions relied upon by the
Appellees and the Bankruptcy Court in its Opinion is helpful in
discerning the parties' arguments.

The starting point for analysis of the Bid Procedures
(in terms of the Auction and Plan) is section 1123(a)(5)(D) which
provides that a plan of reorganization may include a "sale of all
or any part of the property of the estate, either subject to or
free of any lien, or the distribution of all or any part of the
property of the estate among those having an interest in such
property of the estate."  11 U.S.C. § 1123(a)(5)(D).  This

permits a debtor to propose a "liquidating plan," a type of plan which is now popular in Chapter 11 cases.

Where, as here, a plan seeks to "cramdown"[15] a secured creditor, section 1129(b)(2)(A) is implicated because it restricts a debtor's ability to restructure secured obligations of a dissenting class of secured creditors.  The relevant text of section 1129(b) provides:

> (b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

---

[15] "Cramdown" is a term of art meaning that a secured claim is reduced to the present value of the collateral, thereby rendering the remaining claim unsecured and forcing the secured creditor to accept less than the full value of its secured claim. This concept of cramdown intersects with section 506(a) of the Bankruptcy Code, which provides for bifurcation of a secured claim into a secured portion and unsecured portion based upon the value of the collateral.  This provision reads in pertinent part:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim.

Id. § 506(a).  See generally Kenneth N. Klee, All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code, 53 Am. Bankr. L.J. 133 (1979).

(2) For the purpose of this subsection, the condition that a **plan be fair and equitable** with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides--

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

**(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or**

**(iii) for the realization by such holders of the indubitable equivalent of such claims.**

Id. § 1129(b) (emphasis added). This section requires that the plan proposed be "fair and equitable" to the secured creditor and specifies three alternative ways in which this "fair and equitable" standard may be satisfied. The two requirements which are pertinent to this appeal are: (1) subsection (b)(2)(A)(ii), which provides for the sale of the collateral free and clear of liens but subject to the right to credit bid (the "Sale Prong");

25

and (2) subsection (b)(2)(A)(iii), which provides for the
realization of the claim by some means which provides the secured
creditor with the indubitable equivalent of its claim (the
"Indubitable Equivalent Prong").

These three requirements are non-exhaustive in terms of
the fair and equitable standard, such that satisfying one of
these three alternatives does not _per se_ satisfy the fair and
equitable requirement.  See _In re Pacific Lumber Co._, --- F.3d
---, 2009 WL 3082066, at *9 (5th Cir. Sept. 29, 2009) ("Even a
plan compliant with these alternative minimum standards is not
necessarily fair and equitable."); _Sandy Ridge Dev. Corp. v. La.
Nat'l Bank (Matter of Sandy Ridge Dev. Corp.)_, 881 F.2d 1346,
1352 (5th Cir. 1989) (technical compliance with section
1129(b)(2) does not assure a finding that a proposed plan is fair
and equitable); _In re Pennave Props. Assocs._, 165 B.R. 793, 795
(E.D. Pa. 1994); _In re Century Glove, Inc._, 74 B.R. 958, 960
(Bankr. D. Del. 1987) (recognizing that a plan must "at a
minimum" satisfy one of these three requirements); _Sunflower
Racing, Inc. v. Mid-Continent Racing & Gaming Co. (In re
Sunflower Racing, Inc._, 226 B.R. 673, 687 (D. Kan. 1998)
("[S]ection 1129(b)(2) sets forth only minimum standards of what
is fair and equitable."); _see also_, 11 U.S.C. § 102(3)
(specifying that the term "includes" "is not limiting").

Courts have expressly recognized that the use of the

word "or" means that the three alternatives set forth under
section 1129(b)(2)(A) must be viewed in the disjunctive, such
that the plan must only satisfy the criteria of one of the three
alternatives.  See Wade v. Bradford, 39 F.3d 1126, 1130 (10th
Cir. 1994) (concluding that section 1129(a)(2)(B)'s "requirements
are written in the disjunctive, requiring [a debtor's] plan to
satisfy only one before it could be confirmed over creditor's
objection"); Heartland Fed. Sav. & Loan Assoc. v. Briscoe
Enters., Ltd. II (Matter of Briscoe Enters., Ltd., II), 994 F.2d
1160, 1168 (5th Cir. 1993) (holding that the "or" in section
1129(b)(2)(A) cannot be transformed into an "and" such that if a
plan satisfies the requirements of 1129(b)(2)(A)(i), a court need
not address 1129(b)(2)(A)(iii)); Corestates Bank, N.A. v. United
Chem. Techs., Inc., 202 B.R. 33, 50 (E.D. Pa. 1996) (Padova, J.)
(internal citations omitted) ("Courts consider Congresses' use of
the disjunctive "or" between subsections (i), (ii), and (iii)
indicative of Congressional intent that only one of the three
subsections need be satisfied in order to find a plan fair and
equitable.").

        Section 363(k) of the Bankruptcy Code codifies the
secured creditor's right to credit bid with respect to asset
sales conducted outside the ordinary course of business.  Section
363 deals with the sale of estate property outside the ordinary
course of business and subsection (k) specifically provides that

> "[a]t a sale under subsection (b) of this section
> of property that is subject to a lien that
> secures an allowed claim, unless the court for
> cause orders otherwise the holder of such claim
> may bid at such sale, and, if the holder of such
> claim purchases such property, such holder may
> offset such claim against the purchase price of
> such property."

11 U.S.C. § 363(k).  A secured creditor who is granted the right
to credit bid pursuant to section 363(k) is entitled to bid the
full face value of the claim, rather than being limited to the
economic value of the subject collateral.  Cohen v. KB Mezzanine
Fund II et al., (In re SubMicron Sys. Corp.), 432 F.3d 448, 459
(3d Cir. 2006).  Section 1129(b)(2)(A)(ii), unlike
1129(b)(2)(A)(iii), specifically imports this right to credit bid
under section 363(k) where a debtor attempts to sell property
free and clear of any liens in the context of a proposed plan.
11 U.S.C. § 1129(b)(2)(A)(ii).  Integrating "[t]his credit bid
provision 'gives the secured creditor protections against
attempts to sell the collateral too cheaply; if the secured party
thinks the collateral is worth more than the debtor is selling it
for, it may effectively bid its debt and take title to the
property.'"  Beal Bank, S.S.B. v. Waters Edge Ltd. P'ship, 248
B.R. 668, 679 (D. Mass. 2000) (quoting 7 Collier on Bankruptcy ¶
1129.05[2][b], at 1129-34 (15th ed. rev. 1998)).  The ability to
credit bid provides a weapon for a secured creditor who is
dissatisfied with a potential sales price to increase the bid to
what it deems to be fair market value, thereby protecting the

28

benefit of its bargain. See H & M Parmely Farms v. Farmers Home Admin., 127 B.R. 644, 648 (D.S.D. 1990) ("Thus, where a Chapter 11 plan contemplates liquidation of certain assets, the intent of § 363(k) is to notify the creditor of the upcoming sale of the secured property and allow it to reap the 'benefit of its bargain' by 'bidding in debt' to the full amount of its allowed claim and recovering the collateral.") (internal citations omitted).

The other Bankruptcy Code section relied upon by the Bankruptcy Court and Appellees is section 1111(b), which grants certain rights to holders of secured claims. In general, a secured claim is bifurcated under sections 506(a) and (d) into secured and unsecured portions. 11 U.S.C. § 506(a), (d). This reduces the secured claim to the amount equal to the value of the collateral, while allowing the secured creditor to vote these two claims separately and share in the distributions to the respective classes.

Section 1111(b) alters this lien-stripping effect of section 506 and provides certain protections to holders of secured claims. Specifically, section 1111(b)(2) offers an undersecured creditor the option of negating the effect of section 506 and electing to have its total claim treated as a secured claim under the plan of reorganization. The relevant text of section 1111(b) provides as follows:

29

(b)(1)(A) A claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse, unless--

       (i) the class of which such claim is a part elects, by at least two-thirds in amount and more than half in number of allowed claims of such class, application of paragraph (2) of this subsection; or

       (ii) such holder does not have such recourse and such property is sold under section 363 of this title or is to be sold under the plan.

(B) A class of claims may not elect application of paragraph (2) of this subsection if-

       (i) the interest on account of such claims of the holders of such claims in such property is of inconsequential value; or

       (ii) **the holder of a claim of such class has recourse against the debtor on account of such claim and such property is sold under section 363 of this title or is to be sold under the plan.**

(2) If such an election is made, then notwithstanding section 506(a) of this title, such claim is a secured claim to the extent that such claim is allowed.

11 U.S.C. § 1111(b) (emphasis added).  The exercise of this

1111(b)(2) election dictates that the undersecured creditor's

claim be treated as a single claim under a proposed plan which is

valued at the total amount of the outstanding claim, as opposed
merely to the value of the collateral.  By way of example, if an
undersecured creditor with a claim of $1 million secured by
collateral worth $500,000 makes the election under section
1111(b)(2), the creditor is entitled to a secured claim of $1
million and no unsecured deficiency claim.  In electing to have
its total claim be treated as fully secured, the creditor waives
its unsecured claim and forgoes any distribution and the right to
vote on account of the unsecured claim.  Section 1111(b)
expressly provides, however, that a secured creditor with
recourse is prohibited from making the 1111(b) election when the
subject collateral is "sold under the plan."  Id.

B.   Opinion of the Bankruptcy Court

The Bankruptcy Court resolved the competing statutory
interpretations proposed by the parties in favor of the Senior
Lenders, concluding that where a debtor proposes to sell an
undersecured creditor's collateral pursuant to a plan of
reorganization under section 1129, a secured creditor must be
afforded either the right to make an election under section
1111(b) or to credit bid the amount of its secured claim.  In re
Philadelphia Newspapers, LLC, Bankr No. 09-11204, 2009 WL
3242292, at *5 (Bankr. E.D. Pa. Oct. 8, 2009).

The Bankruptcy Court examined the structure of section
1129(b)(2)(A) and concluded that it would be "illogical" to

31

permit a debtor to "cash out" a secured creditor through a sale
under the Indubitable Equivalent Prong when the exact means
sought to be accomplished by such a sale are provided in the Sale
Prong. Id. The Bankruptcy Court found that such a reading was
"at odds" with the canon of statutory construction which prevents
the use of a general provision to achieve a result contemplated
by a more specific provision. Id. (internal citations omitted).
In spite of recognizing that section 1129(b)(2)(A) is phrased in
the disjunctive, the Bankruptcy Court reasoned that "to avail
onself of an 'alternative' to one section of a statute, one
cannot simply employ the provisions of that very section itself
and render it an 'alternative' merely by calling it such." Id.
The Bankruptcy Court determined that this strategy by the Debtors
constituted "a not so thinly veiled attempt to manipulate the
sale process in order to frustrate a credit bid which the Debtors
anticipate will exceed the bid of the Stalking Horse." Id.[16]

---

[16]    The Bankruptcy Court further rejected the Debtors'
contention that the right to credit bid contained in section
1129(b)(2)(A)(ii) is limited to sales conducted under section
363(b). Id. at *6. The Bankruptcy Court found that the explicit
reference in section 363(k) to a sale under section 363(b) is not
intended to restrict the right to credit bid to section 363
sales. Id. The Bankruptcy Court reasoned that an equally
plausible interpretation is that section 1129(b)(2)(A)(ii)
directly imports the right to credit bid codified in section
363(k) to sales conducted under the Sale Prong. Id. The
Bankruptcy Court relied upon the language "subject to 363(k) of
this title" as creating ambiguity in the statute and serving as
an additional ground to look beyond the plain meaning of section
1129(b)(2)(A). Id.

Based upon this reading of the statute, the Bankruptcy Court found that section 1129 contained a latent ambiguity, and therefore it was appropriate to resort to extrinsic evidence. Id. at *6.[17]  The Bankruptcy Court then resorted to legislative history in order to support its interpretation of section 1129(b)(2)(A).  In support of this reading of the statute, the Bankruptcy Court cited to the legislative history of section 1111(b), more specifically the Bankruptcy Court quoted the following remark by Representative Edwards:

> Sale of property under section 363 or under a plan is excluded from treatment under section 1111(b) because of the secured party's right to credit bid in the full amount of its allowed claim at any sale of collateral under section 363(k) of the House Amendment.

Id. at *7 (citing 124 Cong. Rec. 31795, 32407 (remarks of Rep. Edwards); 124 Cong. Rec. 33130, 34007 (remarks of Sen. DeConcini)).[18]  Beyond this legislative history, the Bankruptcy Court relied on a leading bankruptcy treatise's explication of section 1111(b), which provides in relevant part:

---

[17]    The Bankruptcy Court further found that examination of the available extrinsic evidence dictates that "even if one were to accept Debtors' arguments, in this instance the alleged 'plain meaning' of the statute should not be conclusive, as the literal application of the language in question would produce a result demonstrably at odds with the intention of the drafters."  Id. (citing Ron Pair Enters., 489 U.S. at 242).

[18]    The legislative statement cited by the Bankruptcy Court was read into the record by both Representative Edwards and Senator DeConcini.

> As previously noted in connection with section
> 1111(b)(1)(A)(i), the reason for the inclusion
> of the exception contained in section
> 1111(b)(1)(B)(ii) is that a secured creditor has
> the opportunity to protect its position. It may
> bid its debt at the sale of the collateral and
> recover the collateral. This ability gives it
> the benefit of its bargain and requires no
> special protection.

Id. (quoting 7 Collier on Bankruptcy, ¶ 1111.03[3][b]).  Informed

by this extrinsic evidence, the Bankruptcy Court concluded that

Congress intended that an undersecured creditor maintain the

ability to protect its rights in its collateral, either by making

an election under section 1111(b) or by credit bidding its debt.

Therefore, the Bankruptcy Court held that because the Senior

Lenders were ineligible to make a section 1111(b) election, the

Debtors were precluded from denying the Senior Lenders "a credit

bid as a matter of right under the relevant provisions of the

Bankruptcy Code."  Id. at *9.[19]

---

[19]     The Bankruptcy Court also found that even if the
Bankruptcy Code itself did not mandate that credit bidding be
permitted, it would be inappropriate to defer to the Debtors'
business judgment to prohibit credit bidding in this case.  Id.
at *10.  The Bankruptcy Court concluded that due to the make-up
of the equity holders of the Stalking Horse Bidder, the proposed
sale constitutes an insider transaction subject to close
scrutiny.  Id.  In light of these facts, the Bankruptcy Court
concluded that the Debtors' attempt to preclude any credit
bidding is not to spur competitive bidding at the Auction, but
rather to encourage the success of the Stalking Horse Bidder and
entrench current ownership and management in the continuation of
the Debtors' businesses.  Id.  Furthermore, the Bankruptcy Court
noted that preventing the Senior Lenders from credit bidding will
not adversely impact other creditor constituencies since the Plan
fixes the relevant distributions to these creditor classes and
any cash overbids will inure to the benefit of the Senior

C.    The Plain Meaning of Section 1129(b)(2)(A) Controls

At the outset it is necessary to detail exactly what issues are involved in this appeal, or more appropriately which issues are not encompassed by this appeal. The crux of the appeal involves the approval of pre-confirmation bid procedures for an auction that is be conducted as part of a larger plan of reorganization.[20] This appeal does not address whether the Debtors' Plan as proposed actually satisfies the requirements of confirmation under section 1129(b)(2)(A). The hurdles which the Debtors must clear at the confirmation stage are not before the Court and cannot be adjudicated at this juncture.

---

Lenders. Id. Based upon the circumstances, the Bankruptcy Court concluded that no justification existed to support the exercise of the Debtors' business judgment to preclude the Senior Lenders' ability to credit bid. Id.

_____    The Bankruptcy Court's determination as to whether the Debtors have satisfied the business judgment standard would normally be afforded considerable deference as a mixed question of fact. Here, however, because a factual record was not developed before the Bankruptcy Court and the facts are in dispute, any findings on appeal are not entitled to deference. Thus, the "holding" of the Bankruptcy Court on this issue constitutes mere dicta which need not be addressed on this appeal.

[20]    As referenced above, no section of the Bankruptcy Code addresses the rights of a debtor or a secured creditor with respect to bid procedures implemented in connection with an auction of the debtor's assets. The only section of the Bankruptcy Code which informs the Court's inquiry relates to plan confirmation, and therefore provides only limited guidance on this issue.

In this vein, the issue of whether the Debtors' proposed sale to the Stalking Horse Bidder constitutes an "insider" transaction, and what effect, if any, this would have on the confirmability of the Plan is not to be considered here. Likewise, any alleged unscrupulous conduct engaged in the by the respective parties, or their counsel, in creating such a highly acrimonious situation, as it appears to exist among the parties, is irrelevant to the Court's analysis.  Rather, the discrete issue addressed in this appeal is the correctness of the Bankruptcy Court's holding that the Bankruptcy Code does not allow the Debtors' to deny the Senior Lenders the right to credit bid under the text of the relevant statutory provisions.

Turning to the language of section 1129(b)(2)(A), the statutory provision which controls, the Court has no difficulty in concluding that it provides three distinct alternative arrangements for satisfaction of plan confirmation in the context of cramdown of a dissenting class of secured creditors and that the Debtors may select any of these to proceed to confirmation. The Bankruptcy Court itself recognized "that the alternatives available under § 1129(b)(2)(A) are framed in the disjunctive by virtue of the use of the word 'or.'"  In re Philadelphia Newspapers, 2009 WL 3242292, at *5.  The use of the connector "or" in section 1129(b)(2)(A) supports the conclusion that the three alternatives are to be applied in the disjunctive. See

<u>Wade</u>, 39 F.3d at 1130 (finding that section 1129(a)(2)(B)'s requirements are written in the disjunctive); <u>Briscoe Enters., Ltd., II</u>, 994 F.2d at 1168 (holding that the "or" in section 1129(b)(2)(A) cannot be transformed into an "and"); <u>Corestates Bank, N.A.</u>, 202 B.R. at 50 (recognizing that the use of the term "or" indicates that section 1129(b)(2)(A) should be read in the disjunctive).

The plain language of section 1129(b)(2)(A)(ii) provides that where the sale of collateral is proposed under a plan pursuant to the Sale Prong, the secured creditor expressly retains the right to credit bid as codified in section 363(k). If a debtor proposes to sell a secured creditor's collateral under this Sale Prong, the creditor undoubtedly retains the right to credit bid at such an auction.

In contrast, section 1129(b)(2)(A)(iii) provides only that the secured creditor receive the indubitable equivalent of its claim and provides absolutely no reference to the right to credit bid created by section 363(k). Given the contrasting language, it appears that Congress intended to provide three alternative paths to confirmation, one of which (subsection 1129(b)(2)(A)(iii)), does not entitle a secured creditor the right to credit bid at a public auction. Therefore, it was error for the Bankruptcy Court to conclude that the Senior Lenders had a statutory right to credit bid when a plan of reorganization

pursued under the Indubitable Equivalent Prong does not guarantee that the Senior Lenders be afforded such a right.

This interpretation of section 1129(b)(2)(A) would not produce a result that is "demonstrably at odds with the intentions of its drafters" or absurd, such that no exception to the plain meaning rule is warranted.  Ron Pair Enters., Inc., 489 U.S. at 242-43 (internal quotation marks omitted); Mitchell, 318 F.3d at 535 ("We do not look past the plain meaning unless it produces a result demonstrably at odds with the intentions of its drafters . . . or an outcome so bizarre that Congress could not have intended it.") (internal quotation marks and citations omitted).  The search is not for the optimal or most desirable policy outcome, rather the inquiry boils down to whether it is plausible that Congress sought to provide for a particular outcome.

The indubitable equivalent concept contained in section 1129(b)(2)(A)(iii) was crafted and coined by Judge Learned Hand in In re Murel Holding Corp., 75 F.2d 941 (2d Cir. 1935).  Judge Hand explained:

> "a creditor who fears the safety of his principal will scarcely be content with ... [interest payments alone]; he wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that ... unless by a substitute of the most indubitable equivalence."

Murel, 75 F.2d at 942.  The key word in this analysis is

"substitute," meaning that regardless of the form proposed, the treatment must provide substituted value to the secured creditor such that it receives the benefit of its bargain.  See In re Sandy Ridge Dev. Corp., 881 F.2d at 1350.  The very vagueness of the term "indubitable equivalent" is an invitation to debtors to craft an appropriate treatment of a secured creditor's claim, separate and apart from the provisions of subsection (ii).

The fact that the Indubitable Equivalent Prong provides a flexible standard indicates that Congress could well have intended to provide a debtor with latitude in proposing a sale under this approach which precluded the right to credit bid but still generated the indubitable equivalent of the secured creditor's claim.  See Pacific Lumber, 2009 WL 3082066, at *9 ("What measures constitute the indubitable equivalent of the value of . . . collateral are rarely explained in case law . . . ."); Aetna Realty Investors, Inc. v. Monarch Beach Venture, Ltd. (In re Monarch Beach Venture, Ltd.), 166 B.R. 428, 433 (C.D. Cal. 1993) (recognizing that the Indubitable Equivalent Prong is the "most vague and potentially far-reaching" of the alternatives provided under section 1129(b)(2)(A)) (internal citation omitted)).  Standard means for providing the indubitable equivalent to a secured creditor include surrendering the collateral or substituting different collateral, however, a plan sale is potentially another means to satisfy this indubitable

39

equivalent standard.  See Pacific Lumber, 2009 WL 3082066, at *10 ("Whatever uncertainties exist about indubitable equivalent, paying off secured creditors in cash can hardly be improper if the plan accurately reflected the value of the collateral."). In other words, it is entirely plausible that Congress envisioned a scenario in which a debtor could conduct a collateral sale and assure that a secured creditor would receive the benefit of its bargain without requiring that such a plan always provide the right to credit bid.

There is yet an additional consideration which supports the view that the plain meaning rule in this case does not lead to an absurd result.  Under the Indubitable Equivalent Prong, a secured creditor who is not entitled to credit bid or make an election under section 1111(b) still possesses a deficiency claim that is entitled to vote in both the secured and unsecured classes.  See 11 U.S.C. § 506(a).  In other words, Congress did not leave a secured creditor without protection.  Therefore, because the outcomes obtained by application of section 1129(b)(2)(A)(iii) are entirely plausible, a literal application of the plain meaning of section 1129(b)(2)(A) does not produce a result that is either absurd or demonstrably at odds with the intent of Congress.

D.    Objections of Appellees

As the Court has concluded that the plain meaning of

40

section 1129(b)(2)(A) is unambiguous on its face and that a
literal application does not lead to a result that is
demonstrably at odds with congressional intent, then resort to
other Bankruptcy Code sections, canons of statutory
interpretation, non-binding case law and legislative history are
unwarranted.  See AT & T, 582 F.3d at 498 (finding that a
determination that the statutory language was unambiguous negates
consideration of arguments concerning statutory purpose, non-
binding case law, and legislative history).  The Court, however,
will address the arguments advanced by the Appellees and adopted
by the Bankruptcy Court for purposes of completeness.

> 1.   Resort to section 1111(b) does not inform the
>      meaning of section 1129(b)(2)(A).

The Appellees argue, and the Bankruptcy Court agreed,
that section 1129(b)(2)(A) must be read in conjunction with
section 1111(b), which provides certain protections to holders of
secured claims.  Appellees claim that sections 1129(b) and
1111(b) read together reveal that Congress intended not to
deprive a secured creditor of the protections afforded by these
two sections of the Code.  The connection between sections
1129(b) and 1111(b) is at best attenuated.  In fact, nothing
contained in section 1129(b)(2)(A) references section 1111(b), or
vice versa, to indicate that these sections were intended to be
read in pari materia.  While the Bankruptcy Court could well be
correct that as a matter of policy, it may be desirable to afford

a secured creditor either the right to credit bid or an election
under 1111(b), "a court's policy preferences cannot override the
clear meaning of a statute's text." <u>Hay Group,</u> 360 F.3d at 406
(citing <u>Eaves v. County of Cape May</u>, 239 F.3d 527, 531-32 (3d
Cir. 2000)("We do not find the reasoning of the courts adopting
the 'majority view' persuasive, because they ignore a textual
analysis of § 1961(a) and, instead, base their result on policies
they find to underlie post-judgment interest and attorney's fee
awards.")).

Next, Appellees cite to language in the Supreme Court's
decision in <u>Robinson v. Shell Oil Company</u>, 519 U.S. 337, 341
(1997), for the proposition that ambiguity is determined by
reference not just to the language itself, but the specific
context in which that language is used, and the broader context
of the statute as a whole.  Pointing to this language, Appellees
contend that reference to section 1111(b) is appropriate in order
to inform the language of section 1129(b)(2)(A).

<u>Robinson</u> is not on point.  In <u>Robinson</u>, the Supreme
Court addressed the interplay between the various statutory
sections of Title VII while searching for the meaning of the term
"employees" after concluding that the term itself was ambiguous.
<u>Id.</u>  Similarly, the Third Circuit cited <u>Robinson</u> in <u>Price v. Del.</u>
<u>State Police Fed. Credit Union, U.S.,</u> 370 F.3d 362, 369 (3d Cir.
2004), in explaining that "[s]tatutory context can suggest the

42

natural reading of a provision that <u>in isolation</u> might yield
contestable interpretations." (emphasis added).  Thus, under
<u>Robinson</u>, courts look to other statutory sections in order to
resolve conflicting interpretations of a provision that is
ambiguous standing alone.  <u>See, e.g.</u>, <u>id.</u>; <u>Dobrek</u>, 419 F.3d 264
(noting that in the event that the statutory term is ambiguous
"we look next at the surrounding words and provisions and also to
the words in context") (internal citation omitted).[21]  Given that
the language of section 1129(b)(2)(A) standing alone is not
ambiguous, resort to section 1111(b) is not warranted.

> 2.    The canon of interpretation that a specific
>       provision should prevail over the general
>       provision is inapplicable.

The Bankruptcy Court relied upon the canon of statutory
construction that "a generic provision of a statute should not be
used to achieve a result not contemplated by a more specific
provision." <u>In re Philadelphia Newspapers</u>, 2009 WL 3242292, at
*5.  The Bankruptcy Court reasoned that if the generic
Indubitable Equivalent Prong were used to conduct a plan sale,

---

[21]    Furthermore, both of the cases cited in <u>Robinson</u> to
support this proposition analyzed the context of the surrounding
statute in light of an ambiguity in the disputed language itself.
<u>McCarthy v. Bronson</u>, 500 U.S. 136, 139 (1991) (resorting to the
context of the statute after concluding that the term
"challenging conditions of confinement," when viewed in isolation
was ambiguous); <u>Estate of Cowart v. Nicklos Drilling Co.</u>, 505
U.S. 469, 477 (1992) ("If the language of § 33(g)(1), in
isolation, left any doubt, the structure of the statute would
remove all ambiguity.").

which is specifically provided for under the Sale Prong, this
would serve to allow the Indubitable Equivalent Prong to subsume
the Sale Prong, thereby rendering the Sale Prong superfluous.
Id.

     Canons of statutory interpretation are used to discern
Congressional intent only if the statutory language at issue is
unclear.  Cooper, 396 F.3d at 310; see Lane v. Pena, 518 U.S.
187, 211 (1996) ("We appropriately rely on canons of construction
as tie breakers to help us discern Congress' intent when its
message is not entirely clear.").  "[C]anons of construction are
no more than rules of thumb that help courts determine the
meaning of legislation, and in interpreting a statute a court
should always turn first to one, cardinal canon before all others
. . . courts must presume that a legislature says in a statute
what it means and means in a statute what it says there."
Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992)
(internal citations omitted).  As explained above, where the
statutory language is clear, as is the case here, resort to any
canons of interpretation is inappropriate.

     Even assuming this canon of interpretation is
applicable, it is not apposite to the facts of this case.
Appellees and the Bankruptcy Court cite to In re Combustion
Engineering, Inc., 391 F.3d 190, 235 (3d Cir. 2004), to support
the conclusion that the general Indubitable Equivalent Prong

44

cannot be employed to render the more specific Sale Prong
irrelevant.  In Combustion Engineering, the Third Circuit
addressed the conflict between section 105(a) of the Bankruptcy
Code[22], which confers a bankruptcy court with broad equitable
powers, and section 524(g) of the Bankruptcy Code, which provides
a specific type of channeling injunction to enjoin actions
against non-debtors.  Id. at 235-37.  The Third Circuit cited to
the maxim that specific statutory provisions prevail over more
general provisions in holding that the bankruptcy court erred in
relying upon the equitable powers provided by section 105(a)
instead of recognizing the limitations imposed by section 524(g).
Id. at 236-37.  The court reasoned that "[t]he general grant of
equitable power contained in § 105(a) cannot trump specific
provisions of the Bankruptcy Code, and must be exercised within
the parameters of the Code itself."  Id. at 236 (internal
citations omitted).  Combustion Engineering held that the broad
catch-all provision of section 105 could not be used to sidestep
the specific requirements provided by section 524(g).  Id. at
236-37.

Unlike Combustion Engineering, the present issue does
not involve the use of a generalized catch-all provision in order

---

[22]    Section 105(a) of the Bankruptcy Code expressly
provides bankruptcy courts the equitable power to "issue any
order, process, or judgment that is necessary or appropriate to
carry out the provisions of this title."  11 U.S.C. § 105(a).

to subsume the specific requirements contained in a separate
subsection.  As explained above, the Sale Prong and Indubitable
Equivalent Prong are separate and independent options under
section 1129(b)(2)(A).  Under section 1129(b)(2)(A), only one of
these alternative options needs to be satisfied.  See Pacific
Lumber, 2009 WL 3082066, at *10 ("Indubitable equivalent is
therefore no less demanding a standard than its companions.").
Therefore, this is not a case where a general provision serves to
negate the more specific.  Rather these options are separate and
independent and the fact that some overlap exists does not
militate in favor of reading a right to credit bid into the
Indubitable Equivalent Prong where such a right is not provided
by the statute.

    3. The case law cited by the Bankruptcy Court is
      unpersuasive.

   The non-binding case law relied upon by the Appellees
and the Bankruptcy Court is distinguishable.  Importantly, none
of the cases cited hold that a right to credit bid exists
pursuant to section 1129(b)(2)(A)(iii).  See In re 222 Liberty
Assocs., 108 B.R. 971, 978-80 (Bankr. E.D. Pa. 1990) (refusing to
confirm a reorganization plan that denied a non-recourse creditor
the right to be treated as a recourse creditor under section
1111(b) and the right to credit bid at the plan sale); In re Orfa
Corp., Nos. 90-11253, 90-11254, 90-11255, 1991 WL 225985, *6
(Bankr. E.D. Pa. Oct. 31, 1991); In re River Vill., 181 B.R. 795,

805 (E.D. Pa. 1995) (upholding confirmation of plan that permitted a secured creditor to credit bid and noting that "Congress did not intend to deprive creditors of the right to bid their full claim under a reorganization plan," without addressing whether such the right to credit bid was guaranteed under section 1129(b)(2)(A)(iii)); In re Realty Invs., Ltd. V, 72 B.R. 143, 146 (Bankr. C.D. Cal. 1987) (refusing to confirm a plan under section 1129(b)(2)(A)(ii)); In re Kent Terminal Corp., 166 B.R. 55, 566-67 (Bankr. S.D.N.Y. 1994) (finding that a non-recourse creditor was entitled to credit bid pursuant to plan sale proposed under section 1129(b)(2)(A)(ii)); In re SunCruz Casinos, LLC, 298 B.R. 833, 839 (Bankr. S.D. Fla. 2003) (refusing to confirm a plan that restricted a creditor's ability to credit bid the entire amount of the allowed claim without addressing the statutory right to credit bid under section 1129); H & M Parmely Farms v. Farmers Home Admin., 127 B.R. 644, 648 (D.S.D. 1990) (addressing the right of a secured creditor to have its lien attach to the proceeds of a sale conducted pursuant to section 1129(b)(2)(A)(ii) and subject to section 363(k)).

In contrast, two cases cited to by the Debtors are on point in addressing the statutory right to credit bid under section 1129. The Bankruptcy court in In re Criimi Mae, Inc., 251 B.R. 796, 807-08 (D. Md. 2000), held that confirmation of a reorganization plan was not precluded due to the fact that the

debtors proposed a sale without affording a creditor the opportunity to credit bid where the plan otherwise provided the creditor with the indubitable equivalent of its claim. The Bankruptcy Court noted that both subsections (ii) and (iii) were applicable to the proposed plan sale. Id. at 807. The Bankruptcy Court applied the plain meaning of the statute and reiterated that section 1129(b)(2)(A) is to be given a disjunctive construction. Id. The Bankruptcy Court then reasoned that since subsections (ii) and (iii) can be satisfied in the alternative and only subsection (ii) contained an explicit reference to credit-bidding under section 363(k), if the debtors were able to satisfy the indubitable equivalent prong, then the debtors were not required to provide the right to credit bid as required by subsection (ii). Id. at 807-08.

The most recent decision on the operation of credit bidding under section 1129(b)(2)(A) is the Fifth Circuit's decision in Pacific Lumber Co., --- F.3d ---, 2009 WL 3082066 (5th Cir. Sept. 29, 2009). The Fifth Circuit held that a plan could be confirmed as fair and equitable, even where it denied a group of secured noteholders the right to credit bid at a private judicial sale. The Fifth Circuit relied upon the disjunctive nature of the statute in concluding that although subsection (ii) could theoretically apply to the proposed sale, subsection (iii) provided a distinct and independent basis upon which the plan

48

could be confirmed.  _Id._ at *9-10.  The court specifically
rejected the contention that permitting confirmation of the plan
sale would violate the canons of statutory construction that (1)
the generic provision of subsection (iii) should not be used to
achieve a result contemplated by the more specific provision of
subsection (ii), and (2) allowing such sales under subsection
(iii) would render subsection (ii) superfluous.  _Id._  The Fifth
Circuit did recognize that under certain circumstances the right
to credit bid could be "imperative."  _Id._ at *10.  The court
held, however, that a plan which proposed to satisfy the secured
creditor in cash would be proper so long as the plan accurately
reflected the value of the collateral.  _Id._[23]

        Both _Criimi Mae_ and _Pacific Lumber_ support the Court's
conclusion that no statutory right to credit bid exists for a
secured creditor whenever the debtor chooses to sell its
collateral under the Indubitable Equivalent Prong.

                    4.    Resort to legislative history is
                          inappropriate and insufficient to contradict
                          the plain meaning of section 1129(b).

        The legislative history relied upon by the Bankruptcy

_____

        [23]    The Bankruptcy Court attempted to distinguish the
_Pacific Lumber_ decision on the following grounds: (1) a private
sale was involved in _Pacific Lumber_ rather than an auction; (2)
the Bankruptcy Judge in _Pacific Lumber_ held a hearing to set the
relevant asset values; and (3) the noteholders in that case had
failed to raise the objection in a timely fashion, present an
alternative plan, or make a section 1111(b) election.  As these
distinguishing facts do not address the interpretation of the
statute, the Court finds such distinctions unpersuasive.

Court is unavailing.  It bears repeating that legislative history
alone is insufficient to contradict the plain reading of the
statute.  <u>See</u> <u>United States v. Gonzales</u>, 520 U.S. 1, 6 (1997)
(reciting the oft-repeated admonishment that when the language of
the statute is plain, legislative history is irrelevant).

        Even if appropriate, the Third Circuit has cautioned
against using legislative history for ascertaining congressional
intent.  <u>See</u> <u>Bruesewitz v. Wyeth, Inc.</u>, 561 F.3d 233, 244 (3d
Cir. 2009) ("We have recognized that legislative history is not
without its shortcomings as a tool of interpretation. 'As a point
of fact, there can be multiple legislative intents because
hundreds of men and women must vote in favor of a bill in order
for it to become a law.'") (quoting <u>Morgan</u>, 466 F.3d at 278);
<u>Lawrence</u>, 527 F.3d at 316-17 (noting that courts which consider
legislative history due to statutory ambiguity should do so "with
caution"); <u>Szehinskyj v. Atty. Gen. of U.S.</u>, 432 F.3d 253, 256
(3d Cir. 2005) (recognizing the "well-known admonition that what
individual legislators say a statute will do, and what the
language of the statute provides, may be far apart indeed.  The
law is what Congress enacts, not what its members say on the
floor.").  Thus, while legislative history can be helpful under
certain circumstances, it should be used with caution.  <u>See</u> <u>Exxon</u>
<u>Mobil Corp. v. Allapattah Servs., Inc.</u>, 545 U.S. 546, 568 (2005)
(noting that "legislative history is itself often murky,

ambiguous, and contradictory," and that it "may give
unrepresentative committee members-or, worse yet, unelected
staffers and lobbyists-both the power and the incentive to . . .
secure results they were unable to achieve through the statutory
text"); Lamie, 540 U.S. 526, 536 (2004) (noting that courts
should be mindful of "the pitfalls that plague too quick a turn
to the more controversial realm of legislative history").

This caveat is particularly appropriate when searching
through the legislative history of the Bankruptcy Code.  The
Bankruptcy Code enacted in 1978 was the result of years of study
by Congress.  It sought to bring bankruptcy law up to the
realities of modern commercial law.  The Bankruptcy Code emerged
from Congress as a comprehensive legislative enactment, spanning
across multiple subjects, touching upon the interests of numerous
stakeholders and setting public policy in a number of areas.  See
Ron Pair Enters., 489 U.S. at 240-41 (internal citations omitted)
("Initially, it is worth recalling that Congress worked on the
formulation of the Code for nearly a decade. It was intended to
modernize the bankruptcy laws, and as a result made significant
changes in both the substantive and procedural laws of bankruptcy
. . . .  In such a substantial overhaul of the system, it is not
appropriate or realistic to expect Congress to have explained
with particularity each step it took."); In re Armstrong World
Indus., Inc., 320 B.R. 523, 532 (D. Del. 2005) ("The

congressional calculus embodied in the Bankruptcy Code for confirmation of a Chapter 11 reorganization plan is the product of long experience with reorganization legislation and hard-fought battles over policy judgments.").

The Bankruptcy Code, however, is not an ALI restatement of the law of bankruptcy or a model code, resulting from serene reflection and academic dialogue. Rather the Code is the child of the "give and take" of the political process, perhaps not entirely pretty in its making. See generally In re Top Grade Sausage, Inc., 227 F.3d 123, 130 n.5 (3d Cir. 2000), abrogated on other grounds by, Lamie v. United States Tr., 540 U.S. 526 (2004) (citing to the phrase widely attributed to Otto Van Bismarck that "[n]o man should see how laws or sausages are made"). What may appear to be latent ambiguity, when removed in time and viewed from afar, is likely the result of legislative judgments intended to compromise competing interests or appease particular constituencies. These political judgments should not be disturbed lightly.

The Bankruptcy Court cited to a single statement of legislative history of section 1111(b) in order to support its interpretation of section 1129(b)(2)(A).[24] The Court disagrees

---

[24] Although the referenced statement was read into the record by both Representative Edwards and Senator DeConcini, the statement was identical in the remarks submitted by both Congressman.

that, under the circumstances of this case, reliance on that
statement tips the scale in favor of the Appellees.    First,
neither the text nor the legislative history of section
1129(b)(2)(A) suggests that this section is to be informed by the
provisions of section 1111(b).[25]    See SUPERVALU, Inc. v. Board of
Trs. of Southwestern Pa. and W. Md., 500 F.3d 334, 343-44 (3d
Cir. 2007) (refusing to "allow an examination of the legislative
history to create an ambiguity where none exists in the statute")
(citing Exxon Mobil Corp., 545 U.S. at 567-68).    Even assuming
that the legislative history of section 1111(b) possesses some
probative value to the instant inquiry, these selected statements
cannot contradict the plain language of the statute. See Hay
Group, 360 F.3d at 406 n.2 ("Even the most ardent academic
defenders of the use of legislative history in statutory
interpretation are quick to disavow cherry-picking from floor
speeches.") (citing Lawrence M. Solan, Private Language, Public
Laws: The Central Role of Legislative Intent in Statutory
Interpretation, 93 Geo. L.J. 427, 447-48 (2005) ("[S]tray remarks

---

[25]    The relevant legislative history includes the following
statement, which was not cited by the Appellees or the Bankruptcy
Court, which indicates a connection between sections 1129(b) and
1111(b), "[b]efore discussing section 1129(b) an understanding of
section 1111(b) is necessary."  124 Cong. Rec. 31795, 32406
(remarks of Rep. Edwards); 124 Cong. Rec. 33130, 34006 (remarks
of Sen. DeConcini)).  While this statement indicates that an
understanding of section 1111(b) is helpful to understanding the
workings of section 1129(b), it does not suggest that section
1129(b) is to be interpreted in light of section 1111(b).

from individual legislators . . . are most often not probative of much of anything.")).

Second, it is true that the remarks relied upon by the Appellees and the Bankruptcy Court are from Representative Edwards and Senator DeConcini, which have been recognized as "persuasive evidence of congressional intent" due to the absence of a conference being conducted during the enactment of the Bankruptcy Code. See Begier v. I.R.S., 496 U.S. 53, 64 n.5 (1990) ("Because of the absence of a conference and the key roles played by Representative Edwards and his counterpart floor manager Senator DeConcini, we have treated their floor statements on the Bankruptcy Reform Act of 1978 as persuasive evidence of congressional intent.") (internal citations omitted). Yet, while these statements are to be afforded due weight, in the final analysis they represent the views of one congressman and cannot be taken as to collective view of Congress. See Conroy v. Aniskoff, 507 U.S. 511, 519 (1993) (Scalia, J., concurring) (describing "the use of legislative history as the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends.").[26]

---

[26]    The Appellees point out that in Armstrong, both the district court and the Third Circuit cited to the statements of Representative Edwards and Senator DeConcini as probative of congressional intent. See In re Armstrong, 432 F.3d at 513-14 (analyzing the legislative history of section 1129 and finding that it supported, rather than contradicted, a plain meaning interpretation of the statute). It must be noted that in

54

5.   A finding as to whether the right to credit bid is necessary under the circumstances of the Debtors' Plan is appropriately addressed at the confirmation stage.

As a final point, it is worth reiterating what this Opinion does not cover.  Specifically, the Opinion does not address whether denying the right to credit bid under the circumstances satisfies the fair and equitable or indubitable equivalent standards under section 1129.  Nor does it preclude a debtor from providing for credit bidding under certain circumstances.  In other words, the Court's decision is limited to the application of the unadorned statutory language of section 1129(b), which standing alone does not provide a right to credit bid.  The decision of the Court is limited in time to a point prior to confirmation, and limited in effect to a pre-confirmation auction.  Therefore, the scope of the Court's decision addresses only a narrow window in the pre-confirmation process.  The Senior Lenders retain the right to argue at confirmation, if appropriate, that the restriction on credit bidding failed to generate fair market value at the Auction, thereby preventing them from receiving the indubitable equivalent of their claim.[27]

---

Armstrong, legislative history was relied upon by the courts not in derogation of, but to validate the plain meaning analysis.

[27]   The Debtors also argue that the Senior Lenders should not be permitted the right to credit bid because the Debtors may seek to equitably subordinate a portion of the Senior Lenders'

The Court is cognizant that addressing this issue after
the Auction is completed could serve to inject additional issues
into the confirmation calculus.  It is equally true, however,
that postponing the determination of whether the Auction, and
corresponding Plan, satisfy the "fair and equitable" requirement
will facilitate the confirmation process by removing the aspect
of conjecture.  Upon completion of the Auction, all parties,
along with the Bankruptcy Court, will be apprised of whether any
independent third-party bids exist along with the amount of such
bids.  Full disclosure of this information will remove all
speculation as to the impact of credit bidding on the results of
the Auction and allow the Bankruptcy Court to make an informed
decision on confirmation now armed with all available economic

---

claim based upon the Recording Incident and its subsequent effect
on the pre-bankruptcy negotiations between the parties.  This
argument need not be addressed by the Court at this point in time
for several reasons.  First, since the Debtors failed to raise
this particular argument before the Bankruptcy Court, it will not
be considered here.  See Med. Protective Co. v. Watkins, 198 F.3d
100, 105 n.3 (3d Cir. 1999); In re Weinberg, 337 B.R. 65, 70
(E.D. Pa. 1995) (Davis, J.) (refusing to hear equitable exception
argument that was not raised before the bankruptcy court based on
waiver).  Second, the Bankruptcy Court's final order approving
debtor-in-possession financing clearly states that the Debtors
agreed not to seek to subordinate any portion of the Senior
Lenders' liens in return for accepting the debtor-in-possession
financing.  Third, due to the August 28, 2009 stipulation in
which the parties agreed to refrain from pursuing any claims
arising from the Recording Incident until January 2010, the
factual record before the Court as to whether any likelihood of
success exists with respect to the Debtors' potential equitable
subordination claim prevents the Court from considering this
issue for purposes of this appeal.

information concerning the Auction.

Regardless of whether revisiting the credit bidding issue will potentially complicate or facilitate confirmation, it alone cannot justify reading a right into the statute that is not provided by the plain statutory language.  Since the Court is constrained by the language that Congress has provided, the right to credit bid by the Senior Lenders cannot be found to exist at this juncture.[28]

V.    CONCLUSION

For these reasons, the decision of the October 8 Order of the Bankruptcy Court shall be reversed.  An appropriate order will issue.

---

[28]    The Senior Lenders make an alternative argument that the right to credit bid is granted by the Senior Credit Agreement with the Debtors.  Section 9.09(b) of the Senior Credit Agreement grants the Senior Lenders the ability to credit bid "in the event of a foreclosure by Collateral Agent on any of the Collateral pursuant to public or private sale."  The Senior Lenders contend that this is a contractual right that exists separate and apart from its rights under the Bankruptcy Code and should be respected.  Here, it appears that the plain language of the Senior Credit Agreement does not authorize the Senior Lenders to credit bid in this circumstance because this is a Chapter 11 sale rather than a sale resulting from a foreclosure instituted by the Senior Lenders.